**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION PLAN, Individually and on Behalf of Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SKECHERS U.S.A., INC., ROBERT GREENBERG and DAVID WEINBERG<br><br>Defendants. | Case No. 17-cv-08107 (AT) (SN)<br><br><u>CLASS ACTION</u><br><br>AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Jury Trial Demanded |

# TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 7

A. Lead Plaintiff .......... 7

B. Defendants .......... 7

IV. CONTROL PERSON ALLEGATIONS .......... 8

V. SUBSTANTIVE ALLEGATIONS .......... 11

A. Skechers' Business Overview .......... 11

B. The Company Worked Closely with its Domestic Wholesale Accounts through a Meticulous Planning Process, Which Gave Skechers Visibility Into Future Revenues and Growth .......... 12

1. Skechers' Domestic Wholesale Timeline Gave Defendants Clear Visibility Six Months Out .......... 12

2. Skechers' Wholesale Delivery Timeline and Strong Client Relationships Provided Advance Notice of Sales and Revenue .......... 15

C. Skechers' Domestic Wholesale Division Was a Key Driver of Skechers' Massive Growth .......... 17

D. Highly Anticipated Dockworker Strike Caused Headwinds for Skechers Leading Up to the 2015 Back-to-School Season .......... 18

E. By the Start of the Class Period, and Continuing Throughout, Skechers Faced Significant Revenue Vulnerability in its Domestic Wholesale Segment .......... 20

F. Despite Knowledge of a Significant Revenue Deficit and Massive Deceleration in Domestic Wholesale Growth, Defendants Continued to Trumpet the Company's Growth, Allowing Greenberg to Cash Out .......... 23

1. Defendants' Statements and Actions During 2Q15 .......... 24

2. Defendants' Statements and Actions During 3Q15 .......... 26

3. Defendants' August 21, 2015 Press Release and Greenberg's Final Class Period Sales ........ 28

4. Defendants Began to Disclose the Problems Regarding Domestic Wholesale's Decelerating Growth and Increasing Inventory ........ 29

5. The Market Was Shocked by Skechers' Disclosures ........ 30

VI. DEFENDANTS' VIOLATED ITEM 303 BY FAILING TO DISCLOSE KNOWN TRENDS AND UNCERTAINTIES, AND THE POTENTIAL THREAT THEREFROM, IN BOTH THE 1Q15 AND 2Q15 FORM-10-Q ........ 32

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO ........ 33

A. 1Q15 Earnings Announcements ........ 33

1. April 22, 2015 Press Release ........ 33

2. April 22, 2015 – Earnings Call ........ 34

3. The Market Reacted Favorably to Defendants' Statements on April 22, 2015 ........ 39

4. April 23, 2015 – CNBC's Mad Money With Jim Cramer ........ 40

5. Greenberg Cashes Out On the Inflated Stock Price ........ 41

B. May 8, 2015 – Defendants' Form 10-Q for the Quarter Ended March 31, 2015 ........ 42

C. May 28, 2015 – Citi Global Consumer Conference ........ 43

D. 2Q 2015 Earnings Announcements ........ 46

1. July 29, 2015 Press Release ........ 46

2. July 29, 2015 – 2Q 2015 Earnings Call ........ 47

3. The Market Reacted Favorably to Defendants' July 29, 2015 Statements ........ 58

4. July 30, 2015 – Mad Money With Jim Cramer ........ 59

5. Greenberg Profited Again From the Inflated Stock Price ........ 61

E. August 10, 2015 – Defendants' Form 10-Q for the Quarter Ended June 30, 2015 ........ 61

F. August 21, 2015 Press Release ..... 63

1. Defendants Issued a Press Release Announcing a Stock Split ..... 63

2. Greenberg Cashed Out One Last Time ..... 64

VIII. DEFENDANTS BEGAN TO REVEAL THE TRUTH ABOUT THE PROBLEMS WITH THE DOMESTIC WHOLESALE SEGMENT ON OCTOBER 22, 2015 ..... 64

A. October 22, 2015 Corrective Disclosures ..... 64

B. Belying Weinberg's Purported Surprise Over the Company's Problems in 3Q15, Domestic Wholesale Continued to Perform Poorly After the Class Period ..... 68

IX. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER ..... 69

A. Domestic Wholesale Was the Company's Largest and Most Important Division ..... 70

B. Defendants Tracked Key Metrics Informing Them of the Performance, Prospects, and Problems in Domestic Wholesale ..... 72

C. Defendants Worked Closely With Domestic Wholesale Customers, Informing the Individual Defendants of the Performance, Prospects, and Problems With Their Domestic Wholesale Clients ..... 76

D. Defendant Greenberg Engaged in Massive, Suspiciously-Timed Sales of Skechers Stock During the Class Period ..... 77

1. The Timing of Greenberg's Sales Was Suspicious ..... 79

2. The Amount of Greenberg's Class Period Sales Was Suspicious ..... 80

X. CLASS ACTION ALLEGATIONS ..... 83

XI. LOSS CAUSATION ..... 86

XII. APPLICABILITY OF PRESUMPTIONS OF RELIANCE ..... 88

XIII. NO SAFE HARBOR ..... 90

A. Defendants' False and Misleading Statements and Omissions Were Not Forward-Looking ..... 90

B. The False and Misleading Statements Were Not Properly Identified as "Forward-Looking" ..... 91

C. Any Forward-Looking Statements Were Not Accompanied by Meaningful Cautionary Language ........ 92

D. Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made ........ 92

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ........ 92

COUNT II Violation of § 20(a) of the Exchange Act Against Defendants Greenberg and Weinberg ........ 94

COUNT III Violation of § 20A of the Exchange Act (Against Defendant Greenberg) ........ 96

XIV. PRAYER FOR RELIEF ........ 97

XV. JURY DEMAND ........ 98

By and through its undersigned counsel, Lead Plaintiff Cavalier Fundamental Growth Fund ("Cavalier" or "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, alleges the following against Defendants Skechers U.S.A., Inc. ("Skechers" or the "Company"), and Robert Greenberg and David Weinberg (collectively, the "Individual Defendants" and together with Skechers, the "Defendants"), upon personal knowledge as to those allegations concerning Lead Plaintiff and, to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Skechers and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Skechers, the Individual Defendants, and related non-parties; (e) research reports issued by financial analysts; and (f) consultation with a retail industry expert on retail-footwear industry norms and practice.

Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This case concerns a massive "pump and dump" scheme perpetrated by Defendants. Specifically, Defendants fraudulently "pumped" the price of Skechers stock by concealing decelerating growth and a significant revenue vulnerability in the Company's largest business segment – Domestic Wholesale. Once the price of the Company's stock was sufficiently inflated, the Company's CEO, Defendant Greenberg, "dumped" 800,000 of his beneficially owned shares (approximately 16% of his beneficial holdings) on the unsuspecting

public. Then, less than one month after Defendant Greenberg completed his massive selling spree, Defendants began to reveal deteriorating conditions in the Domestic Wholesale segment, which caused the price of Skechers stock to plummet by more than 30%. However, by that time, Defendant Greenberg had already pocketed **more than $101 million** in illicit proceeds at the expense of investors. To recover the damages that Defendants inflicted on investors, Lead Plaintiff brings this federal securities class action under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), on behalf of itself, and all persons and entities, who purchased or acquired the publicly traded common stock of Skechers during the period from April 23, 2015 through October 22, 2015, inclusive ("Class Period"), and were damaged thereby ("Class").

2. Skechers designs, develops, and markets footwear for men, women, and children. Beginning in 2012, the Company experienced rapid growth and increased profitability. Skechers became a Wall Street darling because of its seemingly unconstrained growth story. Key to this growth was the performance of its Domestic Wholesale business – the Company's most profitable and reliable business segment – which in the quarters leading up to the Class Period boasted robust sales growth.

3. The consistent and reliable growth of the Company's Domestic Wholesale segment was in part driven by the Company's close relationships with its customers and the Company's meticulous planning process, which began six months prior to customers receiving the Company's products each retail season. This provided Defendants with tremendous visibility into the Company's revenue stream.

4. The Company began planning for its 2015 retail seasons in 2014. At this time, the Company and its Domestic Wholesale customers accelerated the order and delivery planning

process by two months, holding "buy" meetings for the overlapping 2015 Fall and Back-to-School ("BTS") seasons – Skechers' most critical retail seasons – in October and November of 2014. Defendants assured the market that they had clear visibility into future orders, a strong backlog, and that continued revenue growth was ahead.

5. As a result of the Company's strict Domestic Wholesale Timeline, by approximately mid-April, Defendants would have known that Skechers' Domestic Wholesale customers intended to pull orders for the third quarter of 2015 ("3Q15") into the second quarter of 2015 ("2Q15"). While this would enable Defendants to maintain the appearance of significant, continued growth in the Domestic Wholesale segment for 2Q15, it also created significant revenue exposure of approximately $20 million that the Company would need to make up in 3Q15. As Defendants knew, based on historical practice, seasonal demand, and visibility into their customers' upcoming needs, the Company was unlikely to overcome such a huge deficit.

6. Accordingly, at the start of the Class Period on April 23, 2015, Defendants knew or should have known they had a significant revenue vulnerability for 3Q15 that would profoundly impact the Company's ability to achieve expected sales and its seemingly perpetual growth trajectory in Domestic Wholesale. Yet, Defendants not only concealed this information from the market, they also misrepresented the Company's growth prospects. When they reported earnings results for the first quarter of 2015 ("1Q15") on April 22, 2015 (after the market's close), Defendants heralded the Company's record revenues, strong backlog, and accelerated growth trend, and assured the market that this momentum – and particularly the momentum in the Domestic Wholesale division - would continue into the third quarter and the back half of 2015. Based on these misrepresentations and omissions, analysts increased their stock price

targets and Skechers' stock price soared. On April 29 and 30, 2015, Defendant Greenberg took advantage of the Company's artificially high stock price, selling 300,000 of his Skechers shares for $27 million in proceeds.

7. In the months that followed, the Company's problems didn't abate. After the Company stuffed its Domestic Wholesale channel in 2Q15 with inventory that was originally scheduled to be sold in 3Q15, Defendants knew that 3Q15 sales and Domestic Wholesale growth would suffer. Indeed, Skechers' Domestic Wholesale customers experienced an inventory overhang, which they needed to clear before they could order any additional product. However, based on Defendants' stringent Domestic Wholesale Timeline, feedback from customers, and continuous analysis of key metrics such as backlog (orders placed but not shipped) and sell-through (percentage of shipped products sold by wholesale customers), Defendants knew or should have known that they would not be able to make up that revenue and that Domestic Wholesale sales and revenues would decelerate in 3Q15. This impending slowdown was compounded by the fact that retailers expected a diminished selling opportunity for Labor Day, which was typically the peak of BTS selling, because it fell later than usual on the calendar. A late Labor Day meant there would be fewer BTS "backfill" (replenishment) orders from Domestic Wholesale customers because orders placed at or around Labor Day would be shipped too close to the end of the third quarter (*i.e.*, September).

8. By late July, not only would Skechers be unable to pull through sufficient 4Q15 sales forward into 3Q15 to make up for the $20 million revenue gap, but also that the BTS "backfill" orders the Company desperately needed were threatened and the revenue deficit was growing. Despite this, when Defendants held their 2Q15 earnings call on July 29, 2015, they again reported record results (driven in part by the pull forward of 3Q15 sales to 2Q15) and

highlighted their Domestic Wholesale backlog and sell-throughs. Defendants also affirmed consensus estimates and expressed confidence that Domestic Wholesale revenue would shift from 4Q15 to 3Q15 to compensate for the revenue vulnerability created by the shift from 3Q15 to 2Q15. They also continued to highlight the Domestic Wholesale growth trajectory. Analysts continued to offer high praise of the Company. As Morgan Stanley stated the next day, "SKX is one of Retail's best growth stocks and guidance suggests no slowdown is near." A Sterne Agee analyst also affirmed its understanding that 4Q15 revenue would be pulled in to 3Q15.

9. Inflated by Defendants' assurances of continued growth for 3Q15 and beyond, Skechers' stock price reached its Class Period high closing price of $160.29 on August 5, 2015. At this point, Defendants knew (but concealed from investors) that Domestic Wholesale growth had slowed dramatically and backfill orders, were unlikely to bridge the massive revenue deficit. On August 18-19, 2015, approximately one week after the Company issued 2Q15 financial results, Defendant Greenberg capitalized on this undisclosed information, liquidating another 300,000 shares of his Skechers stock, this time earning $46 million in proceeds.

10. On September 23-25, 2015, just five days before 3Q15 ended, and with knowledge that the Company would be forced to report a massive slowdown in Domestic Wholesale growth in less than one month's time, Defendant Greenberg sold an additional 200,000 shares for proceeds of $28 million. While Defendant Greenberg was able to profit by exploiting the artificial inflation in the Company's stock price before the market began to learn of the problems affecting the performance of Domestic Wholesale, shareholders were left poised for a fall.

11. On October 22, 2015, Defendants finally revealed the slowdown in Domestic Wholesale growth – an anemic 11.8% compared to the 30% that Defendants had guided the

market to believe they would achieve. They also revealed that inventory growth (37.8%) had surpassed sales growth. The market was stunned by these disclosures, which stood in stark contrast to Defendants' Class Period statements.

12. As a result, the Company's stock price collapsed 31.5%, from a close of $138.57 per share (split-adjusted)[1] on October 22, 2015 to a close of $94.92 per share (split-adjusted) on October 23, 2015, on highly unusual trading volume of 36.8 million (845% higher than the average trading volume for the five prior trading days). This massive decline, which represented the most significant single day drop in the Company's stock price in 13 years, caused investors to lose millions.

13. Defendant Greenberg, in contrast, reaped over $100 million in artificially inflated proceeds just before Defendants' story fell apart and the stock price collapsed.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); Section 20A of the Exchange Act, 15 U.S.C. § 78t–1.

15. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

---

[1] Skechers announced a three-for-one split on August 21, 2015 which took effect on October 16, 2015. (*i.e.*, each shareholder effectively exchanged one share for three shares). Wall Street divides the pre-split price by three to adjust for the additional shares or "float" in the market. Unless otherwise stated, the prices listed in the Complaint are the actual price of the stock on the defined date. In this instance, the prices in ¶ 12 adjust to the pre-split price on October 22-23, 2015.

16. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this district. Skechers also has operations in this district and division, including the listing of the Company's stock on an exchange located in this District, the New York Stock Exchange ("NYSE").

17. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of NYSE, the world's largest stock exchange by market capitalization.

## III. PARTIES

### A. Lead Plaintiff

18. On January 19, 2018, this Court appointed Cavalier to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 33).

19. Cavalier is a mutual fund with more than $83 million of assets under management. As set forth in its PSLRA certification (*see* ECF No. 18-1), Cavalier purchased common stock of Skechers during the Class Period and suffered damages as a result of the securities law violations alleged herein.

### B. Defendants

20. Defendant Skechers is a Delaware corporation with principal executive offices at 228 Manhattan Beach Boulevard, Manhattan Beach, California 90266. Skechers was founded in 1992, and became a publicly-traded company and Securities Exchange Commission ("SEC") registrant through an Initial Public Offering in 1999. Throughout the Class Period, Skechers

common stock was traded actively on the NYSE under the ticker symbol "SKX." During the Class Period, Skechers had approximately 42 million shares (126 million post-stock split[2]) of common stock outstanding on the NYSE.

21. Robert Greenberg served as Skechers' Chief Executive Officer ("CEO") and Chairman of the Board ("Chairman") throughout the Class Period. Greenberg has served as Chairman and CEO of Skechers since founding the Company in 1992. Greenberg was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in Skechers' press releases and SEC filings.

22. David Weinberg served as Skechers' Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), Executive Vice President ("EVP"), and Board Director at all times throughout the Class Period. Weinberg joined Skechers as CFO in 1993. He was named EVP and Board Director in 1998, and COO in 2006. Weinberg was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in Skechers' SEC filings, quarterly conference calls, industry events, and events for analysts, investors, and the media.

## IV. CONTROL PERSON ALLEGATIONS

23. The Individual Defendants, by virtue of their high-level positions at Skechers, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements,

---

[2] *See*, n.1, *supra* (explaining the stock split).

and financial condition, as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of their collective actions.

24. Defendants Greenberg and Weinberg were closely involved in all aspects of the Company's operations. *See* Section IX, *infra* (Additional Allegations Supporting the Individual Defendants' Scienter).

25. Defendant Greenberg issued public statements on behalf of Skechers in Company press releases and SEC filings during the Class Period.

26. Defendant Greenberg also possessed an exorbitant level of control over Skechers through the voting power of the Class A and Class B common shares that he owned and/or effectively controlled directly and through a family trust. During the Class Period, Skechers had a dual share class structure comprising Class A and Class B common shares. Owners of the Class A shares publicly traded on the NYSE were entitled to one vote per share. Class B shares held super-voting rights of 10 votes per share, were directly convertible to an equal number of Class A shares, and otherwise provided identical rights as Class A shares. According to Skechers' February 27, 2015 Form 10-K, as of December 31, 2014 Greenberg beneficially owned approximately 28% of all votes eligible to be cast by all Skechers' shareholders, or 4.8 million shares.

27. Defendant Weinberg is listed in Skechers' annual risk disclosures as one-of-three "key personnel" whose continued employment was deemed necessary for the Company to be successful going forward. Weinberg also spoke to the public on behalf of Skechers, including reporting its financial performance in SEC filings, earnings calls, and during investor presentations, as well as on television.

28. The Individual Defendants, as senior executive officers and directors of Skechers, a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by the federal securities laws, each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, so that the market prices of Skechers' publicly-traded common stock would be based on accurate information. Greenberg and Weinberg violated these requirements and obligations during the Class Period.

29. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of Skechers, were able to, and did, control the content of the SEC filings, press releases, and other public statements issued by Skechers during the Class Period. Both were provided with copies of the statements at issue in this action before they were made available to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants Greenberg and Weinberg are responsible for the accuracy of the public statements detailed herein.

30. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of Skechers, also had access to the adverse undisclosed information about Skechers' business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Skechers materially false and misleading.

31. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Skechers common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme and course of conduct: (i) deceived the investing public about the growth prospects of Skechers, including the Company's ability to continue to grow the Domestic Wholesale division at the same rate as it had been growing in the quarters leading up to 3Q15; (ii) deceived the investing public regarding Skechers' products, business, operations, and management, and the intrinsic value of Skechers' common stock; and (iii) caused Lead Plaintiff and members of the Class to purchase Skechers common stock at artificially inflated prices.

## V. SUBSTANTIVE ALLEGATIONS

### A. Skechers' Business Overview

32. Skechers was founded in 1992 by Defendant Greenberg. The Company designs, develops, markets, and distributes footwear to customers in more than 160 countries. Skechers does not own or operate any manufacturing facilities, but rather produces its products through independent contract manufacturers located primarily in China and Vietnam.

33. During the Class Period, Skechers offered more than 3,000 footwear styles across 19 product lines, including: (i) Skechers USA – adult footwear, ranging from sandals to casual athletic shoes to boots; (ii) Skechers Sport – adult footwear designed in performance and athletic-inspired styles to provide the appearance of a technical performance shoe; (iii) BOBS – ultralight slip-on shoes, primarily marketed to young women; and (iv) Skechers Kids – comprised primarily of shoes that are originally designed for adults, but in a "takedown" style formulated to appeal to children.

34. Skechers sells its products through four business segments: Domestic Wholesale, International Wholesale, Retail, and E-Commerce. Of these segments, Domestic Wholesale was

the largest and most important division (approximately 40% of revenue), followed by International Wholesale (approximately 32%), Retail (approximately 26%), and E-Commerce (approximately 1%). The Company's Domestic Wholesale accounts, which are its core business, include a large number of department and specialty stores, including: Zappos, Famous Footwear, Sears, Kohl's, DSW, Shoe Carnival, and Macy's.

### B. The Company Worked Closely with its Domestic Wholesale Accounts through a Meticulous Planning Process, Which Gave Skechers Visibility Into Future Revenues and Growth

35. Domestic Wholesale was the core of the Company, so Skechers worked hand-in-hand with its Domestic Wholesale customers. Specifically, the Company's executives, merchandise and marketing personnel worked in a close partnership with Domestic Wholesale accounts to ensure that appropriate styles were purchased and correct inventory levels were carried at each wholesaler's store, and that merchandise and marketing materials were properly presented at their customers' stores. Through these partnerships, Skechers gleaned critical data needed to determine the product needs of each wholesale customer, and also obtained the information needed to manage the Company's inventory, analyze historical and current sales trends, forecast demand and product quantity, and to develop financial projections. This provided Skechers visibility into future results across all of its key metrics.

#### 1. Skechers' Domestic Wholesale Timeline Gave Defendants Clear Visibility Six Months Out

36. Retail is a long-lead business. Skechers, like most major retail companies, engaged in a meticulous planning process which ensured visibility into current and future sales. Indeed, Skechers closely budgeted and planned for four major selling seasons – spring, summer, fall/back-to-school ("BTS"), and winter/holiday. The Company's strongest sales generally occurred in its second and third quarters, which encompass the BTS selling season. Historically,

the Company's fourth quarter was a seasonally low quarter for sales - with October sales typically being the lightest.

37. Key to the Company's planning process was the maintenance of its order-to-delivery timeline (the "Domestic Wholesale Timeline"), which included the order, production, shipping and processing of footwear products for delivery to Domestic Wholesale customers across the United States. The Company's standard Domestic Wholesale Timeline was six months, which provided Skechers with good visibility into upcoming sales six months in advance.

38. Typically, the six-month process began after an initial product line review with wholesale customers, quickly followed by order placement. Skechers' management held "buy" meetings with its key Domestic Wholesale accounts at its corporate offices located in Manhattan Beach, California, at which its Domestic Wholesale customers placed orders for future selling seasons, and Skechers obtained important feedback about demand from such customers.

39. After meeting with Domestic Wholesale customers and planning for the BTS season, Skechers would then place orders with contract manufacturers in China and Vietnam, who typically required three to four months to produce the footwear after orders were placed. Following production, it takes approximately four to six more weeks for the footwear products to travel via cargo ship from Asia to West Coast U.S. ports in Los Angeles and Long Beach, California. Once deliveries are received in these ports, product could be shipped to Skechers' distribution center in Rancho Belago, California (or another central warehouse) for processing and shipment to Domestic Wholesale customers. The process of taking receipt of product into Skechers' distribution center, followed by shipment and receipt to retailer warehouses and ultimately to stores, could take six weeks.

40. When demand was high, Domestic Wholesale customers had two options for obtaining additional merchandise from Skechers. One option was to "pull in" or "pull forward" orders from one quarter to an earlier quarter, allowing the customer to receive merchandise the quarter before it had originally planned. Typically, it takes a lot of planning, coordination, and logistics to be able to pull in orders from one quarter to another. A vendor like Skechers would need to receive notice of such a "pull in" or "pull forward" from a customer weeks in advance in order to fulfill and ship the order in time. For example, industry norm dictates that approximately mid-April 2015 is the time by when a Domestic Wholesale customer would need to notify a vendor like Skechers that the customer wanted to pull in sales from 3Q15 to 2Q15, and similarly, industry norm dictates that approximately mid-July 2015 represents the time by when a Domestic Wholesale customer would need to notify a vendor like Skechers about a pull in of sales from 4Q15 to 3Q15.

41. Domestic Wholesale customers also had the opportunity to place "backfill orders" within a given quarter or a selling season. Backfill orders are replenishment orders for products with high sell-through rates. Backfill orders ensure continued sales momentum of popular sizes, colors, and styles, maintaining full-price selling and optimizing higher margins. Backfill orders are typically only placed when a customer has had strong sell-through of current seasonal merchandise and needs additional quantities before the end of the current quarter or selling season. Retailers, such as the Company's Domestic Wholesale customers, will neither want nor request backfill orders when they have too much inventory – because there is no shelf space for the merchandise and they have no Open-to-Buy ("OTB")[3] dollars to make the purchases.

---

[3] Retailers, like the Company's Domestic Wholesale accounts, typically use OTB, a sales and inventory optimization tool, to plan. This sales management tool consists of monthly sales projections and planned inventory levels, and is detailed down to specific vendor, category, style,

*(continued)*

Backfill orders are beneficial to a vendor such as Skechers in that it facilitates the movement of inventory already in its warehouse, while making additional sales. At the same time, a Domestic Wholesale customer also benefits in that it allows the customer to capitalize on the sales momentum of popular products, styles, and colors.

42. Domestic Wholesale customers would need to formally notify a vendor like Skechers of a backfill order early in a selling season in order for the customer to be able to receive, restock, and sell the product before that season ended. Although backfill orders were fulfilled with inventory that a retailer had on hand at its distribution center or other warehouse, the orders typically take approximately three weeks to pick, pack, and ship.

### 2. Skechers' Wholesale Delivery Timeline and Strong Client Relationships Provided Advance Notice of Sales and Revenue

43. As is standard industry practice, during its six-month Wholesale Delivery period, Skechers, through communication and collaboration with its Domestic Wholesale customers, garnered greater visibility into its sales projections, inventory requirements, and product shipping windows – including whether it could achieve a certain level of sales in a particular selling period. *See* Scienter Section IX.B-C. Since this process involved long lead times, including the time required to manufacture and ship products to the customer, Domestic Wholesale customers had to provide Skechers with **advance notice** of any product needs, including any changes to

---

*(continued)*
and even by store location in some cases. If sales exceed projections and inventories fall below planned levels, retailers have more "open to buy dollars" to order (or reorder) more merchandise from vendors. In turn retailers can then sell more of the product that consumers are demanding at full price and greater margins. For retailers, available OTB dollars are a reward for robust sales and well-controlled inventory levels, and an opportunity to maintain retail selling momentum. The OTB tool is closely watched, frequently updated, and often shared with key vendor partners, like Skechers, who claim to have a very close working relationship with their Domestic Wholesale customers.

order delivery dates, or backfill orders of products with strong sell-through. This information was typically conveyed via direct communication with the customer or through electronic purchase orders. Skechers also utilized an electronic data interchange system ("EDI") to which some of its larger Domestic Wholesale customers were linked. The EDI system allowed those customers to automatically place orders with Skechers and included direct billing and shipping information.

44. Skechers' meticulous planning process coupled with its close relationships and constant communication with Domestic Wholesale partners, also enabled the Company to carefully track important retail metrics including sell-through[4] and backlog[5]. *See also* Section IX.B. Backlog and sell-through were two key metrics used to assess the Company's inventory levels, which were carefully monitored (both in its distribution center and while goods were in-transit). Like any vendor, Skechers' control over inventory was vital. As Defendant Weinberg explained in October 2014, the earlier that orders come in (creating backlog), "[i]t makes us more efficient with inventory and production."

45. Through analysis of these metrics, close communications with Domestic Wholesale customers, and the Company's Domestic Wholesale Timeline, Defendants had clear visibility into the Company's Domestic Wholesale sales into October 2015 by the start of the Class Period - April 23, 2015.

---

[4] Sell-through is a ratio used to show how much product a Domestic Wholesale customer has sold versus what they received from Skechers (sales vs. inventory).

[5] Backlog refers to sales that have been booked, but not yet shipped. Skechers' standard policy is not to book revenue until a product has been shipped.

### C. Skechers' Domestic Wholesale Division Was a Key Driver of Skechers' Massive Growth

46. Beginning in 2012, Skechers' growth was on an upward trajectory. The Company was well on its way to becoming one of the top two footwear companies in the world – second only to Nike. The global athletic apparel market was also surging. Benefitting from this wave and the Company's aggressive marketing campaigns and strategic infrastructure investments, Skechers' sales began to rise precipitously. Between 2012 and 2014, sales grew by 52% and the Company's net income improved by an industry leading ***1,350%***. This astounding growth was in large part driven by Domestic Wholesale, the Company's largest, most profitable, and most reliable operating segment. In its 2014 Form 10-K, Skechers described the "core Skechers business" as its Domestic Wholesale accounts.

47. Indeed, from 2012 to 2014, Skechers' Domestic Wholesale revenue increased 53% from $653 million to $998 million, representing 42%-43% of total Company revenue. From 2012 to 2014, this segment experienced a year-over-year growth rate of approximately 23%. Domestic Wholesale profitability was also on the rise during this period, with gross profits swelling from $243 million to $368 million, an increase of 51%.

| Quarter | Revenue | YoY Increase |
|---|---|---|
| 3Q14 | $268.4 | 18% |
| 4Q14 | $240.4 | 24% |
| 1Q15 | $321.3 | 38% |

48. In the several quarters leading up to the Class Period, and during the Class Period, the Company boasted impressive year over year growth in Domestic Wholesale:

49. Skechers' public statements in the quarters leading up to the Class Period unequivocally signaled to investors that the Company was on the path to continued and

sustainable growth. Skechers consistently flagged backlog and sell-through rates during this period while heralding the Company's seemingly boundless growth. Analysts closely followed the Company's meteoric rise and understood the importance of Domestic Wholesale to the stability and growth of Skechers.

50. While Skechers did not always provide its own detailed quarterly or annual guidance to the market, Defendants routinely affirmed and adopted Wall Street's revenue guidance or "consensus" estimates of revenue.[6] Indeed, for the 12 quarter period from 1Q12 to 1Q15, Skechers affirmed consensus estimates and met or exceeded such estimates in each instance. In such a way, the market came to trust the Company's guidance and expect the Company to deliver on the phenomenal growth that it promised – both Company-wide and at the Domestic Wholesale level.

### D. Highly Anticipated Dockworker Strike Caused Headwinds for Skechers Leading Up to the 2015 Back-to-School Season

51. Due to its long-lead order-to-delivery cycle, the Company began planning for the 2015 seasons in 2014.

52. In 2014, a labor dispute arose between the dockworkers at West Coast seaports and a maritime association representing their employers. The parties' labor agreement expired on June 30, 2014 and negotiations for a new labor agreement were at an impasse throughout the remainder of 2014, which slowed West Coast cargo shipments and strongly signaled an impending strike. This labor dispute impacted 29 West Coast ports, including those in Los

---

[6] For example, during Skechers' 1Q14 earnings call, Weinberg said: "[W]e remain comfortable with the current consensus estimates for earnings in the second quarter, while there may be some upside in the revenue forecast." Similarly, during Skechers' 3Q14 earnings call, Weinberg stated: "[W]e remain comfortable with the analysts' current consensus for both revenue and earnings for [4Q14]."

Angeles and Long Beach, California. This critically impacted the Company's business because Skechers received substantially all of its footwear by cargo ship from Asia at the ports in Los Angeles and Long Beach.[7]

53. In late 2014, the Company adjusted its timeline for 2015 BTS Domestic Wholesale "buy meetings" and orders. While product review and order placement for BTS usually began around December of the year prior, Skechers shifted its BTS buy meetings with key domestic accounts to October and November 2014 (two months earlier than usual) to ensure product deliveries in time for BTS - late June or early July 2015.

54. By adjusting the meetings, Skechers gained invaluable insight into Domestic Wholesale demand for 2015 BTS prior to the end of 2014, triggering Skechers to finalize production orders with their third party contract manufacturers in Asia earlier than usual to ensure BTS products arrived at U.S. ports by late June 2015. *See* Section IX.C. Indeed, as Defendant Weinberg stated in February 2015, based on Skechers' backlog at December 31, 2014 and incoming order rate in January, Skechers had "good visibility into June [2015]."

55. Based on Skechers six month time frame, industry practice, and early buy meetings, the Wholesale Delivery Timeline for 2015 BTS would have been as follows:

---

[7] A tentative labor agreement resolving the dispute was not reached until February 20, 2015.




**E. By the Start of the Class Period, and Continuing Throughout, Skechers Faced Significant Revenue Vulnerability in its Domestic Wholesale Segment**

56. As detailed above, BTS is Skechers' strongest selling season. High demand for BTS sometimes required Skechers to pull forward orders that had already been booked for the third quarter into the second quarter to meet this demand. While this practice would bolster the second quarter revenue, it could also have a detrimental effect on the next quarter if the Company was unable to make up for the shifted third quarter sales. Defendants acknowledged this potential problem prior to the Class Period. As Defendant Weinberg stated in July 2014, "[i]f people move [orders] up from July . . . to June [3Q into 2Q] there is usually not enough booked for October to move into September [4Q into 3Q] to make up the difference wholly."

57. This problem occurred with respect to 2015 BTS. As Defendants would later admit, (¶¶[ 129, 137, 139, 164-70), many of the Company's Domestic Wholesale accounts pulled forward approximately $20 million of 3Q15 orders into 2Q15, creating a revenue deficit and vulnerability for Skechers in 3Q15. Defendants would have been keenly aware of this revenue vulnerability by the start of the Class Period (April 23, 2015) because as per industry norms their customers would have informed them by approximately mid-April that they required a pull in of additional merchandise from 3Q15 to 2Q15 – creating the revenue hole for 3Q15 (ultimately $20 million).

58. On July 29, 2015, Skechers admitted to pulling in merchandise from 3Q15 to 2Q15, but simultaneously reassured the market that to make up for the revenue gap in 3Q15, Skechers would look to pull 4Q15 orders into 3Q15. By this point in time, however, Defendants would have known that the Company would not be pulling sufficient revenue forward from 4Q15 to 3Q15 to make up for this gap because, per industry norm, Domestic Wholesale customers would have needed to notify Skechers about a pull in approximately by approximately mid-July in order to receive the order by September. The pull in didn't sufficiently materialize.

59. To make matters worse, Skechers Domestic Wholesale customers experienced an inventory overhang caused in part by the earlier port disruption, reducing the demand for BTS "backfill" orders from Domestic Wholesale customers. When the port disruption occurred late in 2014 and early in 2015, Domestic Wholesale customers over-ordered merchandise to hedge against the impending port strike. In other words, in order to have enough inventory on hand, Domestic Wholesale customers ordered more than they ordinarily would have. Similar to Skechers, the vast majority of Skechers' Domestic Wholesale footwear competitors (*e.g.*, Nike), had their products manufactured in Asia, and shipped to the U.S. through West Coast ports. Also

similar to Skechers, such competitors knew of and prepared for the looming strike by ordering large quantities of BTS merchandise for early delivery. So when the strike was called off in February 2015, a massive influx of footwear inventory poured into the United States, resulting in an inventory "overhang." This inventory overhang was problematic for BTS 2015 because Skechers and its customers were plagued with more product than they could sell. Thus, with greater store inventories and a shorter backfill period in 3Q15 due to Labor Day falling later than usual on the calendar, Skechers' customers were unwilling to place additional BTS backfill orders.[8]

60. Defendants knew or would have known about this inventory overhang because they tracked the sell-through of Skechers' products by their Domestic Wholesale customers, as well as the sales of competing products by such customers. *See* ¶ 192. Indeed, as Defendants admitted on the Company's July 29, 2015 conference call, they were tracking sell-throughs and already had "early feedback on [their] fall products." Defendants also would have seen that their competition was having trouble selling goods, due to the inventory overhang, because Defendants admittedly monitored their competition. *See* Section IX.B.

61. For the 2015 BTS selling season, Domestic Wholesale customers would have needed to place backfill orders with Skechers by late July/early August in order to receive the products by late August – in time for critical Labor Day sales. This is because, per industry norm, backfill orders take upwards of three weeks to fulfill and receive in store. Placing BTS backfill orders too close to the end of the third quarter would diminish the customers' ability to

[8] In 2015, Labor Day fell later than usual (six days later than in 2014). This was important because the week before Labor Day weekend is marked by promotional activity as retailers attempt to secure strong sales, reduce inventories, and clean out end-of-season styles. Because Labor Day fell late in 2015, there was a further diminished opportunity to capitalize on demand.

sell those products in the third quarter, both because of timing and demand. Industry-best practice is to have any remaining backfill orders for the BTS selling season on the floor ***at least*** one week before Labor Day, and depending on when Labor Day falls, that is no later than the back half of August. Therefore, and because backfill orders take upwards of three weeks to fulfill and receive in store, most BTS 2015 backfill orders by the Company's Domestic Wholesale customers would have been submitted in late July, with the remainder ordered no later than early August 2015.

62. Therefore, by late July 2015, Defendants would have known that there would be, at a minimum, a $20 million deficit in 3Q15 due to the lack of pull in from 4Q15 to 3Q15. By late July (when backfill orders were lacking), Defendants would also have seen a material weakness in the amount of backfill orders coming due to the inventory overhang - further reducing 3Q15 growth. By early August, and due to the shipping schedules associated with backfill, Defendants would have known that these backfill orders would not be coming in, and that the Company's growth had decelerated and would not be in the range of 1Q15 (38%) or 2Q15 (32%).

### F. Despite Knowledge of a Significant Revenue Deficit and Massive Deceleration in Domestic Wholesale Growth, Defendants Continued to Trumpet the Company's Growth, Allowing Greenberg to Cash Out

63. As detailed above, by the start of the Class Period, Defendants would have known of the Company's significant revenue vulnerability for 3Q15 that was unlikely to be resolved by pulling through future orders, and that the Company's growth trajectory was compromised. The situation grew worse during the Class Period as the inventory overhang further diminished Skechers' ability to make new 3Q15 sales to Domestic Wholesale customers.

64. Yet, Defendants concealed these problems from investors when they announced results for the first and second quarters of 2015. Instead, Defendants assured the market that

there was an "upside opportunity" in the third quarter and the Company's growth trajectory would continue along the same path.

65. Defendants' maintenance of this fiction artificially inflated the Company's stock price and enabled Defendant Greenberg to sell more than 16% of his beneficially owned shares at inflated prices for more than $101 million in proceeds before Defendants revealed the Company's problems and Skechers' stock experienced its largest single day percentage decline in 13 years.

**1. Defendants' Statements and Actions During 2Q15**

66. Despite knowing that 3Q15 orders were being pulled through to 2Q15, leaving a significant revenue vulnerability that was unlikely to be resolved by pulling 4Q15 orders into 3Q15, Weinberg stated the following on the Company's 1Q15 earnings call on April 22, 2015 and during an appearance on Jim Cramer's "Mad Money" television show the following day:

(a) "With significantly increased worldwide bookings, our year-over-year worldwide backlogs are up mid double digits at March 31, 2015, ***which we believe is a clear indicator that our momentum will continue throughout the year***."

(b) "Based on our Domestic Wholesale backlog . . . and spring sell-throughs, we believe ***we will continue to achieve strong gains in 2015***."

(c) "Our record 2015 first quarter and a strong start to April in terms of revenues and backlogs, including double-digit domestic and international retail comps, leads us to believe that our ***accelerated growth trend will continue through the second quarter and into the back half of 2015***."

(d) "Given the key performance indicators, we are comfortable with the second quarter analyst estimates and ***believe there is upside opportunity in the third quarter***."

(e) "*[W]e're very strong into the back half of this year and things are still looking pretty good*."

(f) With regard to 3Q15: "***We still see significant growth and significant demand***."

(g) In response to an analyst question about Domestic Wholesale growth, Weinberg stated that he "***would be surprised***" if the growth rate dipped significantly under 38% and that Skechers was not anticipating a slowdown in growth in the third quarter.

67. Numerous analysts praised the Company's results, parroting the growth story that Skechers touted. For example, Sterne Agee increased their price target that same day in a report titled "**A 40.5% revenue increase & backlog increase of ~50% = momentum and strength**." Sterne Agee also noted that "Domestic growth continues: We are forecasting domestic wholesale to grow 27.5% in 2015." Susquehanna published a report on April 23, 2015 with the heading: "**Strong backlog and continued share gains should lead to upside opportunity throughout FY15**." Mad Money host Jim Cramer noted that **Skechers' stock "just keeps roaring because the company continues to post phenomenal results**." On the same day, Buckingham Research issued a report discussing the 38% 1Q15 revenue growth in Domestic Wholesale, upgrading the stock to buy, and raising the price target based on "double digit growth in 2H with all of its top 10 customers," noting that "our 27% domestic wholesale estimate should prove conservative."

68. The market's interpretation of these misstatements and omissions, among others, artificially inflated Skechers' stock price. Less than a week later, and with knowledge of a revenue vulnerability that would impact Skechers' growth trajectory through 3Q15, Defendant

Greenberg liquidated a combined 300,000 shares of his Skechers stock on April 29 and 30, 2015 reaping total proceeds of over $27 million.

### 2. Defendants' Statements and Actions During 3Q15

69. As detailed above, by late July, Defendants would have known that compromised Domestic 3Q15 Domestic Wholesale growth was unavoidable, due to (1) pulled through 3Q15 orders, (2) the inability to pull through sufficient 4Q15 sales into 3Q15 to make up for the gap, and (3) the lack of sufficient backfill orders due to the inventory overhang. Although Defendants knew the Company's growth would not reach the levels they had been touting, they again concealed this from investors during their second quarter 2015 earnings announcement on July 29, 2015. On the July 29, 2015 call, after posting a 32% year over year increase in Domestic Wholesale, Weinberg stated that the he did not "anticipate any significant change" in the domestic business and that it "still had room to grow." Weinberg acknowledged that part of the record revenue in 2Q15 came from 3Q15 sales that were shifted to 2Q15 to meet "pent-up demand," they also misleadingly stated that such sales momentum would continue throughout the year:

(a) "Our year-over-year worldwide backlogs are up mid double digits at June 30, 2015, ***which we believe is a clear indicator that our momentum will continue throughout the year.***"

(b) "***Based on our Domestic Wholesale backlog . . . strong sell-throughs for spring and early feedback on our fall products, we believe we will continue our sales momentum through the back half of 2015***."

70. Although he acknowledged the shifted revenues, Weinberg did not caution the market about its deteriorating 3Q15, and instead reassured investors that they would make up for the revenue pulled from 3Q15 into 2Q15 with revenue pulled from 4Q15 into 3Q15: "I haven't

heard of any slowdowns. So certainly, if we continue at this pace, ***we would anticipate [revenue] movement up from Q4 into Q3***..."

71. During the July 29, 2015 earnings call, Weinberg also **affirmed** consensus guidance for 3Q15 of $874 million Company-wide, stating that they: "remain comfortable with the analysts' current consensus estimates for the back half of 2015."

72. Defendants repeatedly stated throughout the Class Period that Domestic Wholesale would continue on its growth trajectory - which to that point had been in the 30% range. Thirty percent growth in 3Q15 would have meant approximately $350 million in Domestic Wholesale revenues for 3Q15. Analysts also expected the growth for 3Q15 to be in this range. For example, on July 29, 2015 after the earnings call, Sterne Agee issued an analyst report projecting Domestic Wholesale revenues for 3Q15 at $349 million. On July 30, 2015, Buckingham Research issued a report raising their price target by nearly 36% due in large part to "Domestic wholesale sales increase[ing] 31.9%."

73. So, despite the shift in sales from 3Q15 to 2Q15, and with knowledge that a 4Q15 shift would not save the day, Defendants continued to mislead the market that the Domestic Wholesale business would continue to grow, with Weinberg stating: "[a]nd moving to forecast for Q3 . . . we're comfortable with the growth as it – which is still pretty good for Q3 as far as volume."

74. Furthermore, Defendants failed to give any indication whatsoever that an inventory overhang was negatively impacting its Domestic Wholesale customers, with Weinberg instead stating: "***we're off to a great start in July***," and "***we hear we're performing well for Back-to-School***."

75. Analysts were again duped by Defendants' statements, expressing confidence in Skechers' growth trajectory. Sterne Agee stated that they were not concerned over the 3Q15 – 2Q15 shift because they understood, based on Weinberg's statements during the earnings call: "orders for the rest of 2H15 are shifting: October to September [4Q15 to 3Q15], November to October, December to November." In raving about the "Blow out 2Q," another analyst said "we expect the momentum [to] continue" due to continued Domestic Wholesale sales growth in the back half of the year. Mad Money host Jim Cramer said on July 30, 2015: "Skechers did it again . . . . Quarter after quarter these guys just keep managing to trounce Wall Street's expectations." The reactions of these highly-trained analysts who closely follow the Company and industry exemplify the extent to which Defendants' continued boasts misled investors, in turn keeping the stock price inflated.

### 3. Defendants' August 21, 2015 Press Release and Greenberg's Final Class Period Sales

76. Approximately three weeks after the Company released its 2Q15 financial results, (which Defendant Greenberg certified, on August 18-19, 2015), Skechers' stock was trading near its all-time high – and Greenberg cashed in again. On those two days, Greenberg sold 300,000 shares at prices of $153.73 and $152.86, approximately 19% higher than the closing price of Skechers' stock before the July 29, 2015 earnings call ($128.44). Thus, Defendant Greenberg reaped **approximately $46 million** in proceeds while he was knowingly in possession of material, adverse, and non-public information concerning the Company.

77. Two days later, on August 21, 2015, the Company issued a press release announcing a 3-for-1 stock split. Despite being more than halfway through 3Q15, and with knowledge that Domestic Wholesale revenue growth would come in well below the 30% growth

range that Defendants had led the market to believe and the market expected, Greenberg used the press release to continue to tout Skechers' growth trajectory.

78. Then, **just five days prior to the end of 3Q15**, between September 23-25, 2015, with the Domestic Wholesale division's growth rate woefully below the 30% range of quarters past and below what the Company had led the market to expect, Greenberg cashed out one last time – selling an additional 200,000 shares for net proceeds of **more than $28 million**. At this time, Defendants knew that in a few weeks they would need to announce (i) a Company-wide revenue miss; (ii) a significant slowdown in Domestic Wholesale revenue growth; and (iii) that inventory had outpaced sales for the first time in years. While investors were in the dark over the six month Class Period, Greenberg profited handsomely.

#### 4. Defendants Began to Disclose the Problems Regarding Domestic Wholesale's Decelerating Growth and Increasing Inventory

79. Just weeks later, on October 22, 2015, the Company disclosed unexpectedly poor financial results for 3Q15, which the Company directly attributed to weakness in the Domestic Wholesale division. Specifically, Greenberg announced an anemic 11.8% Domestic Wholesale revenue growth rate, or $31.7 million, as compared to the prior year period.

80. This reflected a dramatic decrease in the growth targets that Skechers had guided to, and was expected to achieve based on what Defendants had led the market to believe (11.8% versus an average of nearly 30% over the prior four quarters).[9]

81. Defendants provided two rationales for the Company's miss. First, they explained that approximately $20 million of the Domestic Wholesale weakness was due to the shift of sales from 3Q15 to 2Q15. However, this excuse was a pretext because, just one quarter

[9] The four quarter trailing average was 28.2%.

earlier, Defendants reassured the market that their 3Q15 guidance already factored in the $20 million shift in sales and they expected a shift from 4Q15 to 3Q15 to replace those sales. Second, Defendants blamed weak BTS sales and an industrywide inventory overhang experienced by their Domestic Wholesale clients during the quarter.

82. While Defendants made it seem to the market that they were caught by surprise by the slowdown in Domestic Wholesale sales growth, as detailed above, they were fully apprised of these issues from the beginning of the Class Period. Their strict planning process and delivery timeline, ongoing sell-through conversations with customers and monitoring of customer inventory levels, as well as their tracking of competition would have provided this knowledge. A 3Q15 revenue deficit and deceleration in growth was foreseeable when Defendants announced earnings for 1Q15 on the eve of the Class Period (April 23, 2015). Defendants' visibility into their declining growth trajectory became clearer by the day, and was known when Skechers again touted growth on July 29, 2015.

83. In addition to the shockingly low growth rate for Domestic Wholesale, Weinberg described the excess inventory problem during the October 22, 2015 call: "**Total inventory**, including merchandise in transit, at September 30, 2015, was $500.2 million, **representing an increase of $137.2 million or 37.8% from the prior year period and an increase of $46.4 million from December 31, 2014**." Weinberg explained that Skechers' inventory had grown faster than sales, and that its inventory would continue to grow for the remainder of 2015. As explained below, inventory outpacing sales was an important sign of decelerating growth to investors. *See* ¶¶ 85, 172.

### 5. The Market Was Shocked by Skechers' Disclosures

84. The October 22, 2015 disclosures sharply contrasted with Defendants' positive statements throughout the Class Period, which had artificially and materially inflated the

Company's stock price. As a result, Skechers' stock price plummeted 31.5% in a single trading day, from a close of $46.19 per share on October 22, 2015 to a close of $31.64 per share on October 23, 2015.[10] This massive decline represented the largest single day decrease Skechers had experienced in nearly 13 years - and the second largest drop since its IPO in 1999. In just one day, more than $2 billion in market capitalization[11]was extinguished, and investors suffered million in losses - as the artificial inflation was removed from the stock price.

85. Analysts who followed Skechers explained the market's surprise over Skechers' October 22, 2015 announcements. For example, Buckingham Research issued a report on October 23, 2015 downgrading their rating on Skechers from "Buy" to "Neutral" and lowering their price target 45% to $30.00 from $55.00. In that report, Buckingham explained that, while the Company missed both sales and earnings in 3Q15, the sales miss was more troubling to the market because "**investors typically trade SKX, first, on sales momentum and a distant second, on EPS**." Buckingham further reported the Company's year-over-year backlog growth had dropped from 40% in 2Q15 to 28% in 3Q15, and the Company's year-over-year inventory had grown 37.8% in 3Q15. Buckingham noted that such inventory growth outpaced sales growth (27%) in 3Q15, which was important because historically, "faster inventory growth than sales presaged a deterioration in both fundamentals and stock price." *See also* ¶ 172 (additional analyst commentary on the October 22, 2015 disclosures and resulting stock price decline).

---

[10] *See* n.1, *supra* (Explaining the 3-for-1 stock split on October 16, 2015). The prices in ¶ 84 reflect the actual price at the time. Although the percentage price change is the same, but for the stock split on October 16, each share would have fallen $43.65, from $138.57 on October 22 to $94.92 on October 23, 2015.

[11] Market capitalization is merely the market price multiplied by the number of shares outstanding.

## VI. DEFENDANTS' VIOLATED ITEM 303 BY FAILING TO DISCLOSE KNOWN TRENDS AND UNCERTAINTIES, AND THE POTENTIAL THREAT THEREFROM, IN BOTH THE 1Q15 AND 2Q15 FORM-10-Q

86. Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii) & (b).

87. The SEC has explained, "[o]ne of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties." SEC Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), Securities Act Release No. 8350, 68 Fed. Reg. 75,056, 75,061 (Dec. 29, 2003) ("2003 SEC Release").

88. Thus, SEC guidance requires management to make two assessments where a trend or uncertainty is known:

> (a) Is the known trend . . . or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, then no disclosure is required.
>
> (b) If management cannot make that determination, it must evaluate objectively the consequences of the known trend . . . or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur. See Certain Investment Company Disclosures, Securities Act Release No. 6835, 54 Fed. Reg. 22,427-01, 22,430 (May 24, 1989) ("1989 SEC Release").

89. Further, the SEC has made clear for decades that, in addition to the identification of such "known trends or uncertainties," Item 303 specifically requires disclosure of the expected impact that any such trends or uncertainties are expected to have on a company's prospective financial performance. Moreover, the SEC has stated that "Item 303 require[s] disclosure of forward-looking information," including, at a minimum, disclosure of the "reasonably likely material effects on operating results." 1989 SEC Release at 22,428-29.

90. As described in Section VII. below, Defendants violated Item 303 by failing to describe known trends and uncertainties that impacted Domestic Wholesale growth.

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO

91. During the Class Period, Defendants made the following materially false and misleading statements and omissions.[12]

### A. 1Q15 Earnings Announcements

#### 1. April 22, 2015 Press Release

92. Skechers issued a press release on April 22, 2015 announcing the Company's 1Q15 results for the period ended March 31, 2015. In the press release, Defendant Greenberg made a number of statements touting the Company's strong performance as a key indicator of continued sales growth in 2015. Specifically, Greenberg said:

> "Having just achieved a new annual sales record of $2.4 billion in 2014, ***we expected [sic] the momentum to continue into 2015***. We attribute this success to our constant development of fresh and innovative products … **the continued marketing support we provide for every key product category** … and, finally, **our tremendous logistical support and inventory management**."

[12] The statements that are ***bolded and italicized*** are statements alleged to be false and misleading. Additional statements are **bolded** (and not italicized) for emphasis only, and are not alleged to be false and misleading.

> ….
>
> "***With the demand for our key product initiatives in the United States***, Asia, Europe, the Middle East and South America remaining very high, ***we believe the growth that we experienced in the first quarter will continue in 2015***."

93. Greenberg's statements that "we expected [sic] the momentum to continue into 2015" and "we believe the growth that we experienced in the first quarter will continue in 2015" were materially false and misleading when made because based on industry norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior year, Defendant Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders from 4Q. Thus, Greenberg's statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues. Greenberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

**2. April 22, 2015 – Earnings Call**

94. After the market closed on April 22, 2015, Skechers also held an earnings call to announce the Company's 1Q15 results for the period ended March 31, 2015. During the call, Weinberg made a number of statements touting increased backlog and sell-throughs as key indicators of continued sales growth.

95. As part of his prepared remarks during the call, Weinberg stated:

> "***With significantly increased worldwide bookings, our year-over-year worldwide backlogs are up mid double digits at March 31, 2015, which we believe is a clear indicator that our momentum will continue throughout the year***."

….

"***Based on our Domestic Wholesale backlog***, our continued focus on delivering innovative product and relevant marketing and spring sell-throughs, ***we believe we will continue to achieve strong gains in 2015***."

….

"***Our record 2015 first quarter and a strong start to April in terms of revenues and backlogs, including double-digit domestic*** and international retail comps, ***leads us to believe that our accelerated growth trend will continue through the second quarter and into the back half of 2015***."

….

"***Given the key performance indicators, we are comfortable with the second quarter analyst estimates and believe there is upside opportunity in the third quarter***."

96. Weinberg's statements concerning "strong gains in 2015," and the "accelerated growth trend [that] will continue through the second quarter and into the back half of 2015," and "upside opportunity in the third quarter" were materially false and misleading when made because based on industry norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior year, Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders from 4Q. Thus, Weinberg's statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues. Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

97. During the earnings call, Weinberg made additional statements about Skechers' growth and guidance for the overlapping 2015 Fall and BTS seasons based on meetings and feedback received from customers.

> "***Based on the reaction by key accounts during our interim meetings this month in our corporate offices, we believe the strength of our brand and product has not slowed***."
>
> ....
>
> "***We believe we are well positioned to maintain this growth***, with $396.7 million in cash and in line inventory levels. We are looking forward to what we believe will be a record for second quarter, delivering our Back-to-School product and new annual sales record."

98. Weinberg's statements concerning "the strength of our brand," that "product had not slowed," and that Skechers was "well positioned to maintain" their current level of growth, were materially false and misleading when made because based on industry norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior year, Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders from 4Q. Thus, Weinberg's statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues. Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

99. During the Q&A portion of the earnings call, an analyst asked about guidance and growth from 2Q15 going into 3Q15 for Domestic Wholesale:

**Samuel Marc Poser, Sterne Agee & Leach**

"And then when we think about the U.S., the Domestic Wholesale business, the same kind of the thinking there? I mean, how are we thinking about that?"

**David Weinberg, Skechers CFO, COO, and Director**

"Yes, ***there were tougher comparisons, but they'll stay pretty lofty. I don't know if they stay quite at 38%, but I'd be surprised if they dipped significantly***. We're at the early stages now. ***And we've looked very well for the initial stages of Back-To-School and borrowing [sic] any significant downturn, which we haven't of any yet***. We actually -- we started to sell very well going through Easter is my understanding. Even at the retail level, ***I really wouldn't anticipate any significant slowdown in the growth at domestic as we get into third quarter***."

100. Weinberg's statements concerning Domestic Wholesale sales not "dipp[ing] significantly" below 38% or experiencing "any significant slowdown" in 3Q15, and BTS sales looking "very well" were materially false and misleading when made because based on industry norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior year, Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders from 4Q. Thus, Weinberg's statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues. Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

101. Another analyst inquired about the backlog levels in 2Q15 as compared to 3Q15:

**Jeffrey Wallin Van Sinderen, B. Riley & Co.**

"I'm just trying to understand the difference in how much the backlog is up for Q2 compared to Q3. Maybe you can also just touch on the break out for domestic backlog a little more versus international backlog again."

**David Weinberg, Skechers CFO, COO, and Director**

> "***[W]hy we have confidence that Q3 can be significantly to the upside***. It's not -- Q2 will grow, but just given the comparison, it can't grow at a 40% level because it was just up too high last year. ***So I don't think anything has really slowed down or changed. It's just the comparisons have changed. We still see significant growth and significant demand***. As far as where the backlog is, obviously, the closer we're booked in, the higher we are full. We are pretty much booked up for second quarter. ***But you understand, in our analysis also, is we try to keep a very even keel on that June, July differential we have for shipping, where a lot of July can move to June if there's big demand for Back-To-School and vice versa. So that still is out there and could change our outlook for Q2 and Q3. But right now, given uneven distribution and that significant move, we think we'll have significant growth in Q2***. ***Although, certainly not the 40%, but the upside in Q3 because that's where demand around the world will converge*** into the larger shipments."

102. Weinberg's statements that "Q3 can be significantly to the upside" and "[w]e still see significant growth and significant demand," were materially false and misleading when made because based on industry norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior year, Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders from 4Q. Thus, Weinberg's statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues. Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

### 3. The Market Reacted Favorably to Defendants' Statements on April 22, 2015

103. The market was visibly enthralled by Skechers' 1Q15 earnings announcement and bullish guidance for the next two quarters. To wit, Skechers' stock price increased approximately $11 per share, or 15%, on April 23, 2015 – the day following the earnings call.[13]

104. Analysts also reacted positively to Defendants' statements. For example, on April 22, 2015, Sterne Agee published a report titled "**A 40.5% revenue increase & backlog increase of ~50% = momentum and strength**." In the report, Sterne Agee said that their valuation "is appropriate in our view, **given the increased visibility SKX has into sales and EPS growth this year**…." Further parroting Defendants' comments, Sterne Agee provided the following rationale for their investment opinion: (i) "**Given the magnitude of the upside revisions the last two quarters**, we are more comfortable with SKX's potential to earn almost $6 in EPS **paving the way for investors to value SKX more like a growth stock**"; and (ii) "Fundamentals are strengthening as SKX's constant currency wholesale backlog accelerated this quarter to 60%+ … **and inventory growth remains meaningfully below the rate of sales growth**."

105. Susquehanna Financial published a similarly favorable report on April 23, 2015, with the heading: "**Strong backlog and continued share gains should lead to upside opportunity throughout FY15**." In addition, Susquehanna wrote: "As we look ahead, **the combination of strong backlog … and improved efficiencies in the back half gives us better visibility for upside, particularly in 3Q**." The analyst also noted that, although inventory was up 26% year over year, the level remained favorable because it was "outpaced by sales growth."

[13] Skechers announced earnings after the markets closed on April 22, 2015. Thus, the market could not react to the news until the following day.

106. Skechers also received favorable press following its April 22, 2015 announcements. For example, NASDAQ published an encouraging article on April 23, 2015, writing: "With increased focus on the new line of products, cost containment, inventory management, a global distribution platform and sturdy backlogs, **the company remains confident of sustaining the growth momentum in 2015**." The industry publication Footwear News said Skechers' "stock hit at an all-time high Thursday following a Q1 performance that far surpassed Wall Street's estimates despite currency headwinds, unseasonably cold weather and the West Coast ports slowdown."

**4. April 23, 2015 – CNBC's Mad Money With Jim Cramer**

107. On April 23, 2015, one day after announcing 1Q 2015 results, Defendant Weinberg appeared as a guest on CNBC's Mad Money With Jim Cramer.

108. Before Weinberg was announced, Cramer provided the following 1Q15 highlights based on Skechers' announcement the previous day:

> "Up $11.00, nearly 15% in one session."
>
> "Even though the stock had nearly doubled over the past 12 months, as of yesterday's close, it just keeps roaring because the company continues to post phenomenal results."
>
> "When Skechers reported last night after the close - the company delivered a blow away quarter beating Wall Street's expectations on virtually every metric. 9 cent earnings beat; substantially higher than expected revenues, up 40.5% YoY; not to mention strong guidance; and management predicts more accelerated growth through the rest of 2015."

109. After the introduction, Cramer and Weinberg engaged in the following Q&A:

> **Jim Cramer, Host of Mad Money:**
>
> "What kind of numbers could you have put up had you not had any friction…?"
>
> **David Weinberg, Skechers CFO, COO, and Director:**

> "We could have been significantly higher just from the currency. And obviously if the port had been more efficient for us we could have had an extra turn. ***So it seems we're very strong going into the back half of this year and things are still looking pretty good***."

110. Weinberg's statements concerning the strength of the back half of the year were materially false and misleading when made because based on industry norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior year, Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders from 4Q. Thus, Weinberg's statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues. Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

**5. Greenberg Cashes Out On the Inflated Stock Price**

111. One week after Skechers announced 1Q15 earnings and Defendants appeared on Mad Money, between April 29 – 30, 2015, Greenberg sold 300,000 of his Class A common shares at an average price of $90.53 - for net proceeds of $27 million. Prior to the 1Q15 announcements, Skechers stock closed on April 22, 2015 at $75.84, or 19% lower than the average price at which Greenberg sold over this two-day period. Moreover, Greenberg made these sales while in possession of material, adverse, non-public information as described above and in *See* Section IX.D..

### B. May 8, 2015 – Defendants' Form 10-Q for the Quarter Ended March 31, 2015

112. Defendants filed their 1Q15 Form 10-Q with the SEC on May 8, 2015. Both Individual Defendants Greenberg and Weinberg signed the 1Q15 Form 10-Q and certified the Form 10-Q's contents pursuant to Sarbanes Oxley. The Form 10-Q violated Item 303 in that it failed to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.". 17 C.F.R. §229.303(a)(3)(ii) & (b).

113. In their 1Q15 Form 10-Q, Defendants listed the following relevant risk factors:[14] (1) "our ability to sustain, manage and forecast our costs and proper inventory levels"; (2) "decreased demand by industry retailers"; (3) "our ability to predict our revenues, which have varied significantly in the past and can be expected to fluctuate in the future due to a number of reasons, many of which are beyond our control"; and (4) "sales levels during the spring, back-to-school and holiday selling seasons."

114. Defendants' risk disclosures were insufficient and violated Item 303 because they failed to disclose known trends and uncertainties. Based on industry norms, when Skechers issued the 1Q15 10-Q on May 8, 2015, Skechers would already have been informed by its Domestic Wholesale customers would have already needed to inform Skechers of their intent to shift sales from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior year, Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders in from 4Q. *See* Scienter Section. Thus, although Defendants specifically listed "our ability to

[14] The "Risk Factors" contained in Skechers' Form 10-K for fiscal year ended December 31, 2014 (the "2014 10-K") were incorporated by reference into the 1Q15 10-Q.

predict our revenues" and "sales levels during the spring [and BTS] … selling seasons" as **potential** risks, they already knew but failed to disclose that there was a serious vulnerability in 3Q15, that Domestic Wholesale growth was trending downward for 3Q15, and that the Company was unlikely to get a pull in from 4Q15 to 3Q15 to make up for the difference.

### C. May 28, 2015 – Citi Global Consumer Conference

115. On May 28, 2015, Citigroup held an investor conference Q&A with Weinberg attending on behalf of Skechers.

116. First, the host and moderator Corinna Van der Ghinst asked Weinberg about Skechers' growth prospects:

> **Corinna Gayle Van der Ghinst, Citigroup Analyst**
>
> "How do you see the long-term growth trajectory of the SKECHERS business? And what are the key drivers that will help sustain this growth over the next several years?"
>
> **David Weinberg, Skechers CFO, COO, and Director**
>
> "***I think it's just more of the same***. We continue to grow international, which is significantly underpenetrated. It will continue to grow. ***We continue to grow in the U.S. by category expansion, shelf expansion, price point expansion. So I don't think anything changes significantly other than we continue to grow at a significant pace***. I think first quarter, even with all its headwind, showed a very positive result. ***I don't know that things are changing as we go to the back half. We continue to grow and we continue to, I don't know, I'm sure we continue to grow our market cap. We'll see what happens when we're here this time next year. Maybe $10 billion***."

117. Weinberg's statements concerning Skechers' continued growth at a "significant pace" were materially false and misleading when made because based on industry norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior

year, Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders from 4Q. Thus, Weinberg's statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues. Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

118. The same analyst then asked about Skechers' inventory planning. Weinberg replied:

> "***When you grow at the pace we were growing and the demand keeps growing, you don't really have inventory issues***. The challenge would be to continue to have -- increase your production capacity to keep up. So that's a high-class problem to have. Our thought process to inventory is always to make whatever we can to match demand as it exist going to into the season. And so far, we've been able to keep up with that. ***The good news is we're growing at a faster pace than even our consumers around the world anticipate order for. I don't think it's changed very much***."

119. Weinberg's statements concerning Skechers' unchanged growth and lack of any inventory issues were materially false and misleading when made because based on industry norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior year, Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders from 4Q. Thus, Weinberg's statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues. Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

120. Next, Weinberg was asked about the strength of Skechers' customers, and how the Company's perspective on demand shaped its view of the back half of 2015:

> "But I think currently, from what we see this year-to-date, we have no issues with the strength of our consumer. Particularly, ***we continue to be at the top end of where we think we should be. And sell-throughs continue and acceptance continues***, ***and we haven't seen any slowdown***."

121. Weinberg's statements concerning the lack of a slowdown were materially false and misleading when made because based on industry norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior year, Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders from 4Q. Thus, Weinberg's statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues. Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

122. Finally, an anonymous participant asked Weinberg about Skechers' performance with Domestic Wholesale customers: "Can you talk about the brand's performance at DSW, Shoe Carnival, kind of some of your wholesale partners?"

> "***I think it's fair to say that those names you mentioned, like DSW and Shoe Carnival, our business grows, and if it wasn't growing there, it'll be very difficult for us to maintain the growth we've shown domestically***."

123. Weinberg's statements concerning the unchanged growth of Skechers' Domestic Wholesale business were materially false and misleading when made because based on industry

norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15. Following a similar shift in revenue from 3Q to 2Q the prior year, Weinberg admitted that this kind of a shift this time of year creates a revenue deficit in 3Q that is unlikely to be filled by pulling in orders from 4Q. Thus, Weinberg's statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues. Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

### D. 2Q 2015 Earnings Announcements

#### 1. July 29, 2015 Press Release

124. Skechers issued a press release on July 29, 2015 announcing the Company's 2Q15 results for the period ended June 30, 2015. In the press release, Defendant Greenberg made a number of statements touting the Company's strong performance as a key indicator of continued sales growth into the third quarter. Specifically, Greenberg said:

> "**Skechers is clearly in the midst of the most exciting time in the Company's 23- year history**. ***The present has never looked as*** colorful, comfortable and ***successful thanks to our product and marketing, and resulting record sales, shipments and earnings***."
>
> ….
>
> "***The demand for Skechers footwear in markets worldwide continues***, and we are excited for several new product introductions coming later this year-including Star Wars® from Skechers shoes for boys and men, along with some developments in our Skechers Performance and athletic lifestyle divisions. ***We believe that our accelerated growth trend will remain through 2015 and into 2016***."

125. Greenberg's statements that "[t]he present has never looked as … successful thanks to our … record sales, shipments and earnings," and "[w]e believe that our accelerated

growth trend will remain through 2015 and into 2016" were materially false and misleading when made because at this time (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Greenberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Greenberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

**2. July 29, 2015 – 2Q 2015 Earnings Call**

126. On July 29, 2015, Skechers also held an earnings call to announce the Company's 2Q15 results for the period ended June 30, 2015.

127. Weinberg opened the call by disclosing for the first time that Skechers had shifted sales from 3Q15 to 2Q15:

> "The second quarter benefitted from both pent-up demand, resulting from U.S. port issues in the first quarter as well ***as a shift in back-to-school shipments due to increased demand in both domestic and international markets.*** This continued strong demand for our product worldwide also led to record net sales, earnings from operations, net earnings and earnings per share in the second quarter."

128. Weinberg's statements concerning the shift were materially false and misleading when made because at this time (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Weinberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C..

129. Later during the earnings call, Weinberg made additional statements about Skechers' growth and guidance for the remainder of 2015, which included the overlapping Fall 2015 and BTS seasons:

> "Our balance sheet at June 30, 2015, remained strong . . . . ***This, along with double-digit backlogs, strong July incoming order rates and spring 2016 buy meetings with our key accounts in our corporate offices this month gives us confidence that the strength and demand for our brand will continue throughout the year and into 2016. We will remain comfortable with the analysts' current consensus estimates for the back half of 2015***."

130. Weinberg's statements concerning the "strong July incoming order rates" and "confidence that the strength and demand for our brand will continue throughout the year" were materially false and misleading when made because at this time (1) the shift in Domestic

Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Weinberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

131. During the call, Weinberg also made a number of statements touting Domestic Wholesale backlog levels, and strong sell-through and order rates as key indicia of continued sales growth. As part of his prepared remarks during the call, Weinberg stated:

> "***Our year-over-year worldwide backlogs are up mid double digits at June 30, 2015, which we believe is a clear indicator that our momentum will continue throughout the year***."
>
> ….
>
> "***Based on our Domestic Wholesale backlog***, our continued focus on delivering innovative product and relevant marketing, including our increased team of SKECHERS brand ambassadors, ***strong sell-throughs for spring and early feedback on our fall products, we believe we will continue our sales momentum through the back half of 2015***."
>
> ….

> "***This, along with double-digit backlogs, strong July incoming order rates and spring 2016 buy meetings with our key accounts in our corporate offices this month gives us confidence that the strength and demand for our brand will continue throughout the year and into 2016***."

132. Weinberg's statements concerning "sales momentum" and growth throughout 2015 were materially false and misleading when made because at this time (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Weinberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

133. As part of his prepared remarks during the call, Weinberg also stated: "We believe the increased inventory when compared to the prior-year period is appropriate based on our strong backlog and our forecasted revenues for the second half of 2015."

134. This statement regarding increased inventory being appropriate based on strong backlog and forecasted revenues was materially false and misleading when made because at this time (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue

deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Weinberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

135. During the Q&A portion of the earnings call, an analyst asked about backlog, and how backlog and the overall business were impacted by the shift from 3Q15 to 2Q15.

> **Jeffrey Wallin Van Sinderen, B. Riley & Co.**
>
> "David, maybe you can just give us a little more color on what the backlog mostly consists of? Is there -- are there any notable changes in concentration? And then maybe you could also just go through how much of the business you think was pulled forward into Q2 due to the high demand that you talked about? And based on that, I guess, how should we think about Q3 in terms of the year-over-year increase in revenues?
>
> **David Weinberg, Skechers CFO, COO, and Director**
>
> "It's very difficult to put a number on what was moved forward and not. If I had to guess, I would assume it was somewhere in the $15 million, $20 million range that normally would have gone into Q3. We had some increased demand in April as well, simply because of the port strike and because of the weather issues that we thought we wouldn't make up. We made up in April because the brand was doing so well around the United States. ***As far as the backlog is concerned, it's obviously down a little bit from second quarter, and that's because we moved some shipments***

> ***in from third to second quarter, so we obviously had a backlog and into the shipments. Customers haven't had a chance to replace them all at the back end of the cycle for September, October*. *We anticipate that's coming. . . .***

136. Weinberg's statements that Skechers "anticipated" a pull through was coming to replace the shipments pulled in from 3Q15 to 2Q15 were materially false and misleading when made because at this time (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Weinberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

137. In response to the same analyst query, Weinberg went on to state:

> ***And moving to forecast for Q3, we think because of this movement into Q2, we're comfortable with the growth as it -- which is still pretty good for Q3 as far as volume*.** And we left the operating or the earnings per share number the same because we do anticipate a slight decrease in the gross margin, ***so slightly higher volume getting to slightly higher EPS. But we do know that there is room to the upside. And given such a big shift to June, we'd have to see some increased demand for Back-to-School to get the increases on the back half. It's usually acquired at that time. So we're still in the process of that*. *I think while our stores continue to comp at double digit through July, there is a case to be***

> ***made that Back-to-School is moved to further out since Labor Day is so late, but we're off to a great start in July. So we think a lot of good possibilities out there, but we are still comfortable with the growth shown, which will make for a very good 3 quarters for us."***

138. Weinberg's statements that Skechers was "comfortable with the growth . . . which is still pretty good for Q3 as far as volume" and having "room to the upside" in light of the revenue already shifted from 3Q15 to 2Q15 were materially false and misleading when made because at this time (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Weinberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

139. In response to a follow-up question from the same analyst Weinberg stated:

> **Jeffrey Wallin Van Sinderen, B. Riley & Co.**
>
> Okay, and then **what are you hearing for early Back-to-School from some of your wholesale accounts**? It sounds like your retail stores continued to be really strong, but **just wondering if there's any feedback from them so far in early Back-to-School business**.
>
> **David Weinberg, Skechers CFO, COO, and Director**

> Well, Kids continues to grow. We saw it very close to double digits in the second quarter, and it's up double digits for the first 6 months. We're all very excited about Star Wars . . . and the footwear got a good reception when we were expanding and we anticipate as we go -- get closer. We do have some orders already -- a significant amount of orders already booked for fourth quarter, to start along with the running of the commercial. . . . We wish we had it worldwide, but we really have it, and the United States is the biggest market and then some selected markets in South America and very few in Southeast Asia. So the biggest piece will be in the United States. So it doesn't move the needle worldwide. And we continue-- ***I forgot the beginning part of the question, but it all continues to come down the road. We think it's all positive going into third quarter. And what I heard -- we hear from – we hear we're performing well for Back-to-School. Most people do think it's starting slower because of the late Labor Day. And but we still continue to perform very positive and get great feedback from our customers. I don't really have a lot of input on how other than us, things are faring away from us in the marketplace for Back-to-School so far.***

140. Weinberg's statements concerning the Company's BTS performance thus far in 3Q15 were materially false and misleading when made because at this time (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Weinberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline,

conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

141. During the call, another analyst asked Weinberg about the shift from 3Q15 to 2Q15, and whether the Company was expecting to make up for that with a subsequent shift from 4Q15 to 3Q15.

> **Samuel Marc Poser, Sterne Agee**
>
> And then just lastly, on the shifting of the orders from Q3 into Q2, you would also guess, I assume, given the run rate that -- and where you are that you said some of the orders for October and others haven't been written. But likely, you would expect, given the rate that there may be shifts from November into October -- or October into September, excuse me.
>
> **David Weinberg, Skechers CFO, COO, and Director**
>
> I believe there's certainly a possibility of that as Back-to-School picks up. I mean, we have to see how back-to-school continues. I mean, they took it in early. I haven't heard of any slowdown, so certainly, if we continue with this pace, we would anticipate some movement up from Q4 into Q3, but it's too early to say anything about the order of magnitude. And remember, you missed -- the order of magnitude potential in Q3 to Q2 is certainly significantly larger than Q4 to Q3 because October is a small month, and September is the smallest month of the third quarter. It's already past Back-to-School. So the opportunity is not quite as large as it is right this minute.

142. Weinberg's statements concerning growth and their anticipated movement in sales from 4Q15 to 3Q15 were materially false and misleading when made because at this time (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make

up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Weinberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

143. In a direct follow-up question, the same analyst asked whether Skechers was including that potential shift from 4Q15 to 3Q15 in its earnings guidance.

> **Samuel Marc Poser, Sterne Agee**
>
> But you're not including any of that in the guidance that you're -- in your [indiscernible] the numbers that are on The Street. That is -- none of that is within that -- if it happens, that's over and above where people are right now, if I'm...
>
> **David Weinberg, Skechers CFO, COO, and Director**
>
> Well, there always has to be some of that in our guidance because as we move -- I mean, nothing is strictly as it sits today because we're such a dynamic company. It changes from day to day. So we're always taking running rates in what we see around the world and trying to get the best middle road. And some will go over on and some will be under on. Nothing comes to the penny as it stands. So we do have, in those numbers, some shift back because we can't move that much out and

> expect it to still continue with such a big plus for the prior year. There was only so much book for it, but it certainly is possible. Some of it is in our guidance, certainly not all that's possible is in our guidance.

144. Weinberg's statements concerning growth and that 3Q15 guidance included a shift in Domestic Wholesale sales from 4Q15 to 3Q15 were materially false and misleading when made because at this time (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Weinberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

### 3. The Market Reacted Favorably to Defendants' July 29, 2015 Statements

145. The market was blown away by Skechers' earnings announcement and its "bullish" guidance for 3Q15 and the "back half" of 2015. The very next day on July 30, 2015,[15] Skechers' stock price exploded from $128.43 to $148.98 per share – an increase of $20.55 or 16%.

146. Analysts also reacted favorably to Defendants' statements on July 29, 2015. In a report issued the same day, Sterne Agee reiterated its BUY rating on Skechers because "**SKX beat the quarter handily, with a total revenue increase of 36%,** and a 129% increase in EPS." Sterne Agee also said that "[b]acklog remains robust," and, echoing Weinberg's comments wrote: "backlog would have been higher had not $15M-$20M of orders, due to strong demand, been pulled forward from 3Q to 2Q." In further support of its recommendation, Sterne Agee cited sales growth outpacing inventories by nearly 6% and "**the Company provided guidance by blessing consensus 2H15 estimates, which currently stand at revenue growth of 26%.**"

147. A number of other analysts issued positive reports on Skechers on July 30, 2015. For example, Buckingham Research reiterated its BUY rating, noting "**we expect the momentum will continue with comps [quarter to date up double digits]** and backlog +40%," and "[v]isibility into at least mid-teens domestic growth in FY16." Susquehanna Financial cited "[s]olid 2Q results," "[b]etter inventory turns," and guidance for the second half that is in line with consensus estimates, as reasons for its positive outlook on Skechers. Echoing what Weinberg said during the call, Morgan Stanley issued a laudatory report on July 30, writing: "SKX **is one of Retail's best growth stocks and guidance suggests no slowdown is near**."

[15] Skechers announced earnings after the markets closed on July 29, 2015. Thus, the market could not react to the news until the following day, July 30, 2015.

Morgan Stanley also noted that it had increased its "**3Q15 sales and gross margin forecast [] slightly due to strong July MTD trends**."

148. Skechers also received favorable press following its July 29-30, 2015 announcements. For example, Reuters published an article that day noting that Skechers' stock was up 14.5% in after-hours trading, "adding nearly $1 billion to the company's market value," after trouncing consensus estimates. The next day, Zacks.com praised the Company for its "robust results" in 2Q15, and noted the following about its growth prospects: "With increased focus on the new line of products, cost containment, inventory management, a global distribution platform and sturdy backlogs, **the company remains confident of sustaining the growth momentum in 2015 and 2016**."

### 4. July 30, 2015 – Mad Money With Jim Cramer

149. One day after announcing 2Q15 results, Weinberg was a guest on CNBC's Mad Money.

150. Before Weinberg was announced, Jim Cramer provided the following 2Q15 highlights based on Skechers' announcement the previous day:

> "Skechers did it again. Skechers has been on an epic multiyear run."
>
> "Skechers is a juggernaut. It's given us a magnificent nearly 72% gain since we last spoke to the CFO."
>
> "Quarter after quarter these guys keep managing to trounce Wall Street's expectations, sending the stock still higher. Last night they delivered one more time. Skechers reported: a monster earnings beat; printed a buck 55 per share; massively higher than expected revenues that increased by 36.4% YoY; double digit increases in all three of their main business channels."
>
> "Management was very bullish in the commentary."

151. After the introduction, Cramer and Weinberg engaged in the following Q&A:

> **Jim Cramer, Host of Mad Money:**

> "It's all about the base this time?"
>
> **David Weinberg, Skechers CFO, COO, and Director**
>
> **"**It's all about everything all the time. It's about everything we do, all the categories, the geography…. ***It all works and it's all starting to work even better now.*"**
>
> **Jim Cramer, Host of Mad Money:**
>
> "You're the number one walking brand in the U.S. But I think the most amazing one that a lot of people still don't realize – you're the number two athletic footwear brand in this country. That happened in just the last year."
>
> **David Weinberg, Skechers CFO, COO, and Director**
>
> "***That's right. And we continue to grow.*** And we want to take that everyplace in the world."

152. Weinberg's statements regarding continued growth were materially false and misleading when made because at this time (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to pull in orders from 4Q15 to 3Q15 to sufficiently make up for this deficit; and (2) there was a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment. Thus, Weinberg's statements omitted both that (1) by approximately mid-July (which per industry norm was the time by when Domestic Wholesale customers needed to inform Skechers they wanted to pull in orders from 4Q15 to 3Q15) Skechers did not have sufficient pull in orders to make up for the $20 million revenue gap caused by the 3Q15 to 2Q15 pull in; and (2) by late July, an inventory overhang threatened backfill orders - which signaled a material weakness for the entire backfill order period (comprised of late July/early August). Weinberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Domestic Wholesale Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

### 5. Greenberg Profited Again From the Inflated Stock Price

153. Shortly after Skechers announced 2Q15 earnings and Defendants appeared on Mad Money, between August 18-19, 2015, Greenberg sold 300,000 more of his Class A common shares at an average price of $153.30 - for net proceeds of nearly $46 million. Prior to the 2Q15 announcements, Skechers stock closed on July 29, 2015 at $128.43, or 19% lower than the average price at which Greenberg sold over this two day period. Moreover, Greenberg made these sales while in possession of material, non-public, and adverse information as described above and in Section IX.D.

## E. August 10, 2015 – Defendants' Form 10-Q for the Quarter Ended June 30, 2015

154. Defendants filed their 2Q15 Form 10-Q with the SEC on August 10, 2015. Both Individual Defendants Greenberg and Weinberg signed the 2Q15 Form 10-Q and certified the Form 10-Q's contents pursuant to Sarbanes Oxley. The Form 10-Q failed to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in violation of Item 303. 17 C.F.R. §229.303(a)(3)(ii) & (b).

155. In their 2Q15 Form 10-Q, Defendants listed the following relevant risk factors: [16] (1) "our ability to sustain, manage and forecast our costs and proper inventory levels"; (2) "decreased demand by industry retailers"; (3) "our ability to predict our revenues, which have varied significantly in the past and can be expected to fluctuate in the future due to a number of reasons, many of which are beyond our control"; and (4) "sales levels during the spring, back-to-school and holiday selling seasons."

[16] The "Risk Factors" contained in Skechers' Form 10-K for fiscal year ended December 31, 2014 (the "2014 10-K") were incorporated by reference into the 2Q15 10-Q.

156. Defendants' risk disclosures in were insufficient and violated Item 303 because they failed to disclose known trends and uncertainties. Based on industry norms, when Skechers issued the 2Q15 Form 10-Q on August 10, 2015, Defendants already knew based on the Domestic Wholesale Timeline and shipping norms that there would not be a shift in revenues from 4Q15 to 3Q15 to make up for the revenue deficit in 3Q15 caused by the earlier shift in revenues. Thus, although Defendants specifically listed "our ability to predict revenues" and "sales levels during the spring [and BTS] … selling seasons" as **potential** risks, they **already** knew that 3Q15 revenues and sales levels had been materially, negatively, and irreversibly impacted by the shift. Defendants also knew but failed to disclose that by this time there would be a material weakness in backfill orders seriously impacting growth in the Domestic Wholesale division for 3Q15.

157. Additionally, Defendants' risk disclosures were insufficient and violated Item 303 because, when the 2Q15 10-Q was issued on August 10, 2015, Defendants already knew that their Domestic Wholesale customers were in the throes of a massive inventory overhang caused by increased orders to hedge against an anticipated dockworker strike and the related influx of footwear from Asia (both from Skechers and its competitors) when the strike was averted. Thus, although Defendants specifically listed "decreased demand" and "inventory levels" as **potential** risks, as of August 10, 2015 they **already** knew of the inventory overhang, including how this would impact their ability to make backfill sales in 3Q15 and how it would impact Skechers' inventory at the end of 3Q15. Defendants knew this for multiple reasons, including their monitoring of Domestic Wholesale customer inventory, and ongoing conversations with such customers about demand, sell-through, and backfill (*see* Section Scienter and Planning Process), and because Skechers admittedly monitored its competition (which would have informed

Skechers that, at Weinberg admitted after the Class Period, the inventory overhang was "fairly across the board" and "pretty widespread."). *Id*.

### F. August 21, 2015 Press Release

#### 1. Defendants Issued a Press Release Announcing a Stock Split

158. On August 21, 2015, nearly seven weeks into 3Q15, Skechers issued and filed a press release with the SEC on Form 8-K announcing the proposal of a three-for-one stock split which would impact and require a shareholder vote by owners of Skechers' Class A and Class B common stock.

159. In the press release, Greenberg once again reaffirmed Skechers' continued growth prospects, stating:

> "***Our decision to adopt this stock split is another indication of our confidence in our business model worldwide, which we believe will continue to generate profitable growth and strong cash flows***."
>
> ….
>
> "***Personally, I have never been more confident and excited about the future of Skechers***."

160. Greenberg's statements regarding continued growth were materially false and misleading when made because, because at this time he omitted (1) the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to sufficiently pull in orders from 4Q15 to 3Q15 to make up for this deficit; (2) by this time Defendants would have known of a material weakness in backfill orders that further contributed to the Domestic Wholesale revenue deficit and declining growth in that segment; and (3) growth in the Domestic Wholesale division had decelerated and in 3Q15 would not come in at the 30% growth range that Defendants had led the market to believe. Greenberg already knew (but omitted) these material facts based upon the visibility provided by Skechers' Wholesale

Delivery Timeline, conversations with Domestic Wholesale customers, and a regular review of sales metrics. *See* Section V.B; IX.B-C.

#### 2. Greenberg Cashed Out One Last Time

161. A few weeks after the August 21, 2015 press release, and just days before the end of 3Q15, Greenberg sold an additional 200,000 Class A common shares between September 23 – 25, 2015 at an average price of $141.69 - for net proceeds of approximately $28 million. Skechers stock closed on July 29, 2015 at $128.43, or 10% lower than the average price at which Greenberg sold at over this three day period. Moreover, Greenberg made these sales while in possession of material, non-public, and adverse information as described above and in Section IX.D.

## VIII. DEFENDANTS BEGAN TO REVEAL THE TRUTH ABOUT THE PROBLEMS WITH THE DOMESTIC WHOLESALE SEGMENT ON OCTOBER 22, 2015

### A. October 22, 2015 Corrective Disclosures

162. On October 22, 2015, when Defendants announced the Company's 3Q15 financial results, they finally began to reveal adverse information concerning the performance of the Company's Domestic Wholesale segment, which was previously concealed from investors. In a press release issued after the market's close, Defendants disclosed that, despite earlier assurances that Domestic Wholesale growth would continue in the 30% range as it had in previous quarters, this business segment only achieved a net sales increase of 11.8%. This significant deceleration in the Company's core business segment caused a drag on the Company's top line revenue and caused it to miss consensus estimates for 3Q15 by over $20 million (which had been adopted by the Company).[17]

[17] The Company also reported diluted earnings per share of $0.43 compared to its 3Q consensus estimate of $0.55.

163. On the same day, after the market's close, Defendant Weinberg hosted a call with analysts on behalf of Skechers, in which he reiterated the Company's financial results, including the Company's sluggish 11.8% growth rate in Domestic Wholesale. Defendant Weinberg further revealed that the Company had experienced an inventory increase of "$137.2 million or **37.8% from the prior year period** and an increase of $46.4 million from December 31, 2014." This significant inventory growth of nearly 38% ***far exceeded*** the Company's overall sales growth of 27%, signaling that the Company's inventory was growing faster than sales.

164. During that call, when a Citigroup analyst pressed Defendant Weinberg about this growth rate, Weinberg revealed that it was driven by two things: (1) the loss of $20 million in revenue that was pulled through from July (3Q15) to June (2Q15) and the inability to replicate those sales in September; and (2) Company's failure to get fill-in business (backfill). Defendant Weinberg stated in pertinent part:

> **Corinna Gayle Van Der Ghinst - Citigroup – Analyst:**
>
> "So US wholesale was up 12% this quarter with more than half of that coming from pricing gains. It looks pretty different from the industry data out there. Can you help us understand maybe what channels did better or worse? And was there anything in particular that surprised versus your plan for the quarter?"
>
> **David Weinberg** - *Skechers USA, Inc. - COO and CFO*
>
> Yes, I think it's a number of things. I think part of it was obviously, the $20 million that moved from July to June. And we weren't anticipating an extra turn in September. For whatever reason, although we were selling very well, I think most of the channels of distributions that were big and had a not-so-good end of September **and because we don't necessarily participate in a lot of the close-outs, there were no fill-in business and stuff to come.**
>
> From our meetings, it doesn't seem to have a significant amount to do with the way we're selling or the perception of our brand or what's moving through. **It's just that we lost that big piece in July to June, and it didn't get replicated in September because there was a lot of promotional activity and there was no need to bring in a lot of new full-price inventory at that time for a lot of the people. . . .**

165. Later in the call, Defendant Weinberg explained how the inventory overhang, which he knew about in July, hurt demand and prevented a revenue shift from 4Q15 to 3Q15 - which in turn contributed to the Company's poor Domestic Wholesale results:

> **Samuel Mark Poser, Sterne Agee & Leach Analyst:**
>
> "I just want to clarify something. So basically, large -- some large retailers in the U.S., because they had goods of yours or from other brands to clear in September, did not step up on the fill-in orders in the manner you would have expected based on the selling that you were seeing. Am I thinking about that right?"
>
> **David Weinberg, Skechers' CFO, COO, and VP:**
>
> "**Yes**. I mean, it's anecdotal at this point. But yes, my understanding is that there was no issues with our sell-throughs or on margins from all the reports I've seen and people I've spoken to. **September wasn't a great month. There was no step-up as we've seen in the last 2 or 3 quarters to that extent, certainly not anything to the extent that moved from July to June…."**

166. Moreover, Defendant Weinberg also confirmed that the market should expect inventory levels to continue to rise for the remainder of 2015:

> **Corinna Gayle Van der Ghinst, Citigroup Analyst:**
>
> "Should we be expecting that inventory number to increase from here into the end of the fourth quarter when you report Q4?"
>
> **Weinberg:**
>
> "**I would anticipate that it will increase** because first quarter is very seasonal both here and in Europe. We like to ship at the early end. And remember, even those things that are in transit count. **So … we'll be building for through the end of the year**. So as we have in times past, we **anticipate we will go into the end of the year with higher inventories**, of course, unless there's a significant shift as things get better through holiday and we start picking up some shipments at the end of December and get the extra turn that way. And that's way too early to determine right now."

167. While Defendant Weinberg feigned surprise at the Company's inability to make up the revenue deficit that was pulled from July to June and the slowdown in Domestic Wholesale, Defendants were well aware of these issues through their Domestic Wholesale

Timeline, close relationships with the Company's Domestic Wholesale accounts, and regular analysis of key metrics. Indeed, as discussed above (¶¶ 6, 43, 45, 94-102), the 3Q15 revenue deficit was foreseeable as of the first day of the Class Period (April 23, 2015), and the fact that Domestic Wholesale growth would come in way below the 30% growth that the Company had led the market to believe it would achieve - was known as of the day 3Q15 guidance was issued (July 29, 2015).

168. Defendants' disclosures, which stood in stark contrast to their earlier Class Period assurances of continued growth, stunned the market, causing the Company's stock price to collapse 31.5%, from a close of $138.57 per share (split-adjusted) on October 22, 2015 to a close of $94.92 per share (split-adjusted) on October 23, 2015, on highly unusual trading volume of 36.8 million (845% higher than the average trading volume for the five prior trading days). [18]

169. Following these disclosures, the Company's unexpectedly poor 3Q15 financial results and resulting stock price decline were covered in detail by securities analysts who followed the Company. For example, Sterne Agee issued a report on October 22, 2015 lowering its price target for Skechers stock to $54 from $62. The report stated that the Company's "[3Q15] miss was due to disappointing 12% growth in the domestic wholesale business," in contrast to that segment's previous quarters, in which it grew by 20%-30% and pulled forward orders to support demand. Sterne Agee also observed that "SKX inventory increased 37.8% because October orders did not shift to September."

170. The following day, on October 23, 2015, Buckingham Research issued a report downgrading its rating on Skechers' stock from "Buy" to "Neutral" and lowering its price target

[18] *See* n.1, *supra* (Explaining the 3-for-1 stock split on October 16, 2015). The prices here reflect the pre-split value of each share.

to $30 from $55, a 45% drop. In that report, Buckingham explained that Skechers' backlog had decelerated "from +40% at the end of 2Q to +28% at the end of 3Q," which was expected to cause a "major multiple contraction" in the Company's price-to-earnings ratio. Buckingham further noted that inventory was growing faster than sales: "At the end of 3Q15, SKX's inventory grew 37% YoY (versus a 27% [Company-wide] sales increase) and management indicated that it would grow further by year-end."

171. On the same day, October 23, 2015, Jim Cramer noted the market's surprise over Skechers' results, stating:

> What the heck just happened with the stock of Skechers? SKX. The footwear company that has been among the hottest of the hot. Stock had been up 150% for the year going into yesterday's close. **Wall Street had gotten used to Skechers knocking it out of the park every single time. So when Skechers reported after the close yesterday and the numbers were viewed as disappointing, the stock got beheaded**. Down 31% - $14.

172. Also on October 23, 2015, Susquehanna Financial Group issued a report lowering its price target to $45 from $55, with a downside risk of $32. The report stated that the "key drag" on the Company's 3Q15 financial results was a deceleration in Domestic Wholesale growth, impacted by the approximate $20 million in orders pulled forward from 3Q15 to 2Q15 and the Company's inability to make up for the lost sales.

### B. Belying Weinberg's Purported Surprise Over the Company's Problems in 3Q15, Domestic Wholesale Continued to Perform Poorly After the Class Period

173. In the quarters after the 3Q15 miss, the Domestic Wholesale division continued to suffer and decelerate because of ongoing weakness in the domestic retail environment and an ongoing inventory overhang.

174. For example, Skechers announced 4Q15 and fiscal 2015 earnings for the periods ended December 31, 2015 on February 10, 2016. During the earnings call, Skechers announced

that while it met overall consensus guidance, Domestic Wholesale continued to decelerate on a quarter-over-quarter basis from 32% in 2Q15 to 12% in 3Q15, and now to 8% in 4Q15.

175. Morgan Stanley noted this downtrend in their report the following day, blaming "cautious department store behavior," because the "US retail environment is weak and retailers are over-inventoried." Morgan Stanley also noted that, while Domestic Wholesale backlog was up 9.5% year-over-year, "[t]he issue here is the backlog is down from 28% in 3Q."

## IX. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

176. At all relevant times, the Individual Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein. The Individual Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions. The Individual Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter, as discussed above and herein.

177. The Individual Defendants, by virtue of their knowledge of the true facts regarding Skechers, their control over, receipt, and/or modification of Skechers' allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Skechers, participated in the fraudulent scheme alleged herein. The scheme deceived the investing public regarding Skechers' business, operations, and management, as well as the intrinsic value of Skechers' securities, and caused Lead Plaintiff and members of the Class to purchase Skechers' stock at artificially inflated prices.

178. During the Class Period, the Individual Defendants knew of the alleged problems within the Company's Domestic Wholesale division, including the inability to pull 4Q15 orders into 3Q15, to sufficiently make up for the pull in the quarter before, the lack of backfill orders, the significant revenue vulnerability, and growth deceleration the Domestic Wholesale division was facing for 3Q15. In addition to the knowledge gleaned from the six month order-to-delivery timeframe discussed above, the Individual Defendants' knowledge is supported by their close relationships and close contacts with Domestic Wholesale customers and analysis of key financial metrics concerning Domestic Wholesale, which was the largest business division and a core operation of the Company, as discussed further below.

179. Defendant Greenberg's scienter is also supported by the fact that, during the Class Period, he engaged in a massive "pump and dump" scheme, selling over $101 million of his personal shares of Skechers stock at artificially inflated prices, as discussed further below.

### A. Domestic Wholesale Was the Company's Largest and Most Important Division

180. The Individual Defendants were at all times fully informed about the Company's Domestic Wholesale division, including the division's actual and projected revenue growth, current backlog levels, and how inventory was trending in relation to sales and backlog. The Individual Defendants closely followed the results and prospects of the Domestic Wholesale division because it was critically important to the Company's overall success. As detailed in ¶ 34 above, Domestic Wholesale was Skechers' largest operating division leading up to and during the Class Period, representing approximately 40% of the Company's total revenue and a primary source of growth and profit. Indeed, in its 2014 Form 10-K, Skechers described the "core Skechers business" as its Domestic Wholesale accounts.

181. As directors and the highest ranking executives of the Company, Greenberg (CEO and Chairman) and Weinberg (CFO, COO, EVP, and Board Director) were closely involved in all aspects of the Company's operations, including direct oversight of the Company's largest and most important business division, Domestic Wholesale. In addition to serving as CEO and Chairman during the Class Period, Greenberg possessed an exorbitant level of control over Skechers through the voting power of Class A and Class B common shares that he owned and/or effectively controlled directly and through a family trust.[19] According to the Company's April 30, 2015 Proxy Statement, Greenberg held approximately 33% of the aggregate number of votes eligible to be cast by all Skechers stockholders and thus was able to "exert significant influence over matters requiring approval by our stockholders":

> As our founder and one of our largest stockholders, with beneficial ownership of approximately 33.0% of the aggregate number of votes eligible to be cast by our stockholders and the ability to exert significant influence over matters requiring approval by our stockholders, we believe Mr. Greenberg is the appropriate person to lead both our Board of Directors and the management of our company.

182. Greenberg and Weinberg were also identified in Skechers' annual risk disclosures as two of three "key personnel" whose continued employment was deemed necessary for the Company to be successful going forward. Defendants were frequently quoted in statements that were disseminated to analysts and investors on behalf of Skechers, including reporting the

[19] During the Class Period, Skechers had a dual share class structure comprising Class A and Class B common shares. Owners of the Class A shares, which were traded on the New York Stock Exchange under the symbol "SKX," were entitled to one vote per share. Class B shares, which were not publicly traded, entitled owners to super-voting rights of 10 votes per share. Class B shares were convertible to an equal number of Class A shares, and had identical rights to Class A shares aside from voting. Greenberg beneficially owned 10.4% of all outstanding Class A shares and 46.5% of all outstanding Class B shares as of April 30, 2015.

Company's financial performance, responding to analyst inquiries, and providing television interviews. *See, e.g.*, Section IV, *supra*.

### B. Defendants Tracked Key Metrics Informing Them of the Performance, Prospects, and Problems in Domestic Wholesale

183. Key metrics showing the performance of the Domestic Wholesale division were closely tracked by the Individual Defendants, including sales figures, sell-through rates, backlog, inventory, and competitor information. This was evidenced by the fact that the Individual Defendants spoke about Domestic Wholesale performance – using such metrics - routinely during the Class Period. *See, e.g.*, ¶¶ 43-45, *supra*. The Individual Defendants knew that the market considered the Domestic Wholesale division to be an important indicator of the Company's current and ongoing fiscal health, as shown by analysts' focus on that division during Skechers earnings calls. *See, e.g.*, ¶¶ 49-50, 72, 75, *supra*.

184. As the Company explained in its 2014 Form 10-K (which was signed by both Individual Defendants), Skechers used data collected from sales at its own retail locations to aid in inventory management, both for Skechers and its Domestic Wholesale customers. Skechers also closely monitored and analyzed sales activity after a product was initially introduced, including historical and current sales trends and other market data derived from its Domestic Wholesale customers' account base. Such data enabled the Company to forecast demand, develop internal product quantity forecasts, and manage future production and inventory levels.

185. One of the ways that Skechers monitored current sales trends was by tracking its Domestic Wholesale customers' "sell-through" of Skechers products. Sell-through refers to the percentage of a product that is sold by a retailer after being shipped by its supplier (here, Skechers), and is typically expressed as a ratio. Quarter after quarter, Defendants explained that

the Company could (and did) track slowdowns or momentum in sales by monitoring sell-through rates. For example:

(a) October 22, 2014: "[T]hird quarter sales increased . . . due to a combination of higher sales, **strong sell-throughs** and a well-designed mix of diversified product categories within all of our distribution partners." He also said he "was pleased with our double digit backlogs **and early reads on sales in the quarter to date**."

(b) February 11, 2015: In response to an analyst's question about revenue growth projections, Weinberg replied: "I will tell you, **there's nothing about the incoming order rate and the sell-throughs I hear** . . . . But I think yes, **I don't see any slowdown yet**."

(c) February 11, 2015: In the Company's press release, CEO Greenberg said that the Company "moved up our Fall 2015 buy meetings with our key domestic accounts to October and November, which allowed us to meet the increased order rate for our new product." Greenberg also said: "We are … continuing to see strong double-digit and, in some cases, triple-digit gains in Europe, the Americas, the Asia-Pacific region and the Middle East. We believe there are still tremendous growth opportunities for Skechers in 2015 and beyond."

(d) April 22, 2015: "**Based on our domestic wholesale backlog . . . and spring sell-throughs, we believe we will continue to achieve strong gains in 2015**."

(e) May 28, 2015: In response to a question about the health of Skechers' consumer, Weinberg replied: "**[F]rom what we see this year-to-date, we have no issues with the strength of our consumer**. Particularly, we continue to be at the top of where we think we should be. **And sell-throughs continue and acceptance continues and we haven't seen any slowdowns**."

(f) July 29, 2015: Weinberg said: "**Based on our domestic wholesale backlog . . . strong sell-throughs for spring and early feedback on our fall products, we believe we will continue our sales momentum through the back half of 2015**." He further explained that "[w]e think it's all positive going into [the] third quarter" because "we hear we're performing well for [BTS]" and "very positive and [] **great feedback from our customers**."

186. Defendants also tracked backlog, meaning orders that were placed but not yet shipped. Defendants' public statements demonstrated the importance of backlog to the Company's financial health and growth prospects. According to Weinberg, domestic backlog measured ***only*** Domestic Wholesale backlog and did not include Skechers' retail store backlog.

187. Leading into and during the Class Period, he repeatedly touted the Company's high Domestic Wholesale backlog as an indication of continued revenue growth. For example:

(a) February 11, 2015 earnings call: "With record domestic and international bookings in the fourth quarter, our year-over-year worldwide backlogs are up 60% … **which we believe is a clear indicator that our momentum will continue**."

(b) April 22, 2015 earnings call: "[O]ur year-over-year worldwide backlogs are up mid double digits at March 31, 2015, **which we believe is a clear indicator that our momentum will continue throughout the year**."

(c) April 22, 2015 press release: Greenberg said: "With the demand for our key product initiatives … remaining very high, we believe the growth that we experienced in the first quarter will continue in 2015."

(d) July 29, 2015 earnings call: "Based on our Domestic Wholesale backlog . . . strong sell-throughs for spring and early feedback on our fall products, **we believe we will continue our sales momentum through the back half of 2015**."

188. Skechers was also linked to some of its larger Domestic Wholesale customers through an electronic data interchange system ("EDI"). The EDI system allowed those customers to automatically place orders with Skechers, and included direct billing and shipping information, all of which served to eliminate the order processing time.

189. By monitoring sell-through and backlog rates, Defendants were able to closely oversee and control the Company's inventory with respect to both goods in the Company's distribution center and goods in-transit. For example, on October 22, 2014, Weinberg explained that the earlier that orders come in (backlog), the more efficient the Company becomes "with inventory and production." Weinberg made similar statements on February 11, April 22, and July 29, 2015. Based on these statements, analysts cited Skechers' visibility, oversight, and control over inventory as reasons to be excited about the Company going forward. For example, a Sterne Agee report dated April 22, 2015 observed that "[t]he company continues to control its expenses and inventory. . . . Inventories increased 25.6% versus sales growth of 40.5%."

190. Defendants also monitored their competition, giving them visibility into how Skechers and their competitors were both faring in the market and whether competition was affecting Skechers growth. For example during an analyst call on May 28, 2015, an analyst asked about competition, questioning: "Are you seeing new or old players start to try to take share in some of your categories?" In response, Weinberg said:

> I think it's a nature of competition. Everybody is always tried to take share. Right now, we've been pretty successful in moving along and continue to grow. **So but yes, everybody is always, I think, looking at what's successful and trying to take some market share back**. Right now, we

> seem to be in a pretty good spot. **If it is coming, it's just beginning, and we're constantly looking at it**. But right now, we don't see any slowdown to our growth projections over the next year or 2.

### C. Defendants Worked Closely With Domestic Wholesale Customers, Informing the Individual Defendants of the Performance, Prospects, and Problems With Their Domestic Wholesale Clients

191. Skechers worked closely with its Domestic Wholesale customers to fulfill product orders, analyze sales trends, forecast demand, and manage inventory. For example, in each of the quarters leading up to and during the Class Period, the Company held buy meetings with key domestic accounts at Skechers' principal executive office in Manhattan Beach, California, where both of the Individual Defendants were based. At these meetings, Domestic Wholesale customers placed orders for future selling seasons and provided feedback on the Company's products, giving the Individual Defendants visibility into the Company's current and future sales growth and financial prospects. Defendants routinely discussed these meetings during the Company's earnings calls. For instance:

(a) During Skechers' July 23, 2014 earnings call, Weinberg described a "**continued positive reception from our key accounts to our new product during their annual buy meetings at our corporate office this month**."

(b) During the Company's October 22, 2014 earnings call, Weinberg said "We are looking forward to the debut of our fall winter 2015 product. During our b[uy] meetings with our domestic key accounts over the next 2 months at our corporate offices."

(c) Weinberg stated on Skechers' February 11, 2015 earnings call that Defendants shifted their Fall 2015 buy meetings "with key domestic accounts" into 4Q14, two months earlier than usual, "**to allow us to meet the incoming order rate for our new product**."

(d) Also on February 11, 2015, Skechers issued a press release where Greenberg was quoted saying: "[We] moved up our Fall 2015 buy meetings with our key domestic accounts to October and November, which allowed us to meet the increased order rate for our new product."

(e) During Skechers' April 22, 2015 earnings call, Weinberg claimed that the "**reaction by key accounts during our interim meetings this month in our corporate offices**" led Defendants to believe that "**the strength of our brand and product has not slowed**."

(f) Weinberg again referenced "**buy meetings with our key accounts in our corporate offices this month**" during the Company's July 29, 2015 earnings call.

192. The Individual Defendants' regular review of key metrics and close communications with customers gave them direct knowledge of the results and prospects of the Domestic Wholesale division during the Class Period. Therefore, the Individual Defendants were fully aware of the Domestic Wholesale problems alleged herein, which they failed to disclose to the market.

**D. Defendant Greenberg Engaged in Massive, Suspiciously-Timed Sales of Skechers Stock During the Class Period**

193. During the Class Period, Defendant Greenberg sold massive quantities of his beneficially-owned Skechers common stock, while knowingly in possession of material, non-public adverse information, supporting his motive to defraud investors. Collectively, Greenberg sold **800,000 shares** in the open market at artificially inflated prices during the Class Period, liquidating **16.6%** of his beneficially owned Skechers' stock, and reaping net proceeds of approximately **$101 million**. Through this "pump and dump" scheme, Greenberg personally

benefited from the artificial inflation of Skechers' stock price caused by the materially false and misleading statements and omissions alleged herein.

194. Specifically, Greenberg made the following sales of Skechers stock during the Class Period:[20]

| Transaction Dates | Shares Sold | Price per Share (Pre-Split) | Total Value |
|---|---|---|---|
| April 29, 2015 | 110,800 | $91.07 | $10,090,556 |
| April 30, 2015 | 189,200 | $89.98 | $17,024,216 |
| August 18, 2015 | 100,000 | $153.73 | $15,373,000 |
| August 19, 2015 | 200,000 | $152.86 | $30,572,000 |
| September 23, 2015 | 40,500 | $143.32 | $5,804,460 |
| September 24, 2015 | 71,000 | $140.15 | $9,950,650 |
| September 25, 2015 | 88,500 | $141.60 | $12,531,600 |
| TOTAL | **800,000** | | **$101,346,482** |

195. Greenberg did not pay for these shares, so the value of these sales (minus taxes and trade fees) represented a pure profit.

196. None of Greenberg's stock sales during the Class Period were made subject to a 10b5-1 Plan. Critically, in contrast to these sales, Greenberg acquired no additional Skechers' shares during the Class Period. Moreover, as detailed below, the timing and amount of these sales support a strong inference of Defendant Greenberg's scienter.

---

[20] All of Greenberg's Class Period sales were made through the Greenberg Family Trust, which was beneficially owned and controlled by Defendant Greenberg. Through this trust, Greenberg owned and held Class B shares, which were directly convertible 1-for-1, at any time and at no cost, into publicly traded Class A common stock. All of Greenberg's Class Period sales were done in this manner. *I.e.*, Greenberg converted Class B shares to Class A shares and then immediately sold the latter in the open market. Greenberg's sale of 800,000 shares during the Class Period represented 16.6% of his total beneficial ownership in this trust.

### 1. The Timing of Greenberg's Sales Was Suspicious

197. Greenberg's Class Period stock sales were suspicious in timing because such sales were made while Greenberg was knowingly in possession of material, adverse, non-public information concerning the Company and at times designed to maximize his ability to profit from the artificial inflation in the Company's stock price. Specifically:

(a) When Greenberg sold 300,000 shares between April 29 – 30, 2015 for **proceeds of $27 million**, he did so with knowledge that Skechers was facing a significant revenue vulnerability in 3Q15. *See* Section VII.A. These trades were made one week after Greenberg and Weinberg touted future growth for Skechers – including growth in 3Q15 – during the Company's 1Q15 earnings call on April 22, 2015.

(b) Greenberg sold 300,000 shares on August 18-19, 2015 for proceeds of nearly **$46 million**, more than halfway through 3Q15, at an average price of $153.30 per share. These trades were made just over two weeks after Greenberg and Weinberg touted future growth for Skechers (and in particular 3Q15 growth) and affirmed guidance at the 2Q15 earnings call on July 29, 2015, and less than 10 days after Skechers' filed the 2Q15 Form 10-Q with the SEC, and just a few days before Greenberg touted the Company's growth in a press release dated August 21, 2015. Contrary to these statements, Greenberg knew that Skechers was experiencing a slowdown in growth in Domestic Wholesale and was unable to make up for the revenue deficit caused by shifting sales from 3Q15 to 2Q15. *See* Section VII.D.

(c) When Greenberg sold an additional 200,000 shares between September 23 – 25, 2015 for proceeds of **$28 million**, **just days before the end of the third quarter**, Greenberg knew that, in less than one month, it was inevitable that the Company was going to report disappointing 3Q15 results including a slowdown in Domestic Wholesale growth and a dramatic increase in inventory levels. As an insider knowingly in possession of material,

adverse, non-public information concerning the Company, Greenberg used this final opportunity to cash in on the inflated stock value before the market learned about slowdown in growth.

198. The following chart shows that the timing of Greenberg's stock sales was suspicious:




### 2. The Amount of Greenberg's Class Period Sales Was Suspicious

199. The amount of Greenberg's Class Period stock sales was also highly suspicious. By any measure, a CEO's sale of **800,000 shares for more than $101 million** in proceeds **over a six month period** is considerable. Even when considered in isolation, these sales were massive. For example:

(a) Two day period from April 29 – 30, 2015: 300,000 for **$27 million**

(b) Two day period from August 18 – 19, 2015, 300,000 shares for nearly **$46 million**

(c) Three day period from September 23 – 25, 2015: 200,000 shares for **$28 million**

200. Moreover, the fact that these sales resulted in the liquidation of more than 16% of his beneficially owned Skechers' stock and were dramatically out of line with his sales before and after the Class Period demonstrate their highly suspicious nature. For example, a comparison of Defendant Greenberg's sales during the six-month Class Period (183 days) to six-month periods (183 days) before and after the Class Period, demonstrates that his Class Period sales were atypical:

(a) From October 20, 2014 through April 21, 2015 (183 days prior to the Class Period), Greenberg sold only 8,419 Skechers shares – or 1% of his Class Period sales.

(b) From October 23, 2015 through April 23, 2016 (183 days following the Class Period), Greenberg sold only 22,270 Skechers shares – or 3% of his Class Period sales.

(c) A comparison of Defendant Greenberg's Class Period sales to those made five years prior is even more astonishing.

(d) Additionally, Defendant Greenberg's sales during the Class Period - which spanned only 6 months - were **at least five times greater** than his sales in the **five full calendar years prior** to the Class Period (2010-2014), or in either of the **two full calendar years after** the Class Period (2016-2017). This stark disparity is depicted in the following chart:

| Calendar Year | Shares Sold | Sales Proceeds |
|---|---|---|
| 2010 | 0 | $0 |
| 2011 | 0 | $0 |
| 2012 | 0 | $0 |
| 2013 | 300,000 | $9,924,960 |
| 2014 | 250,000 | $10,266,485 |
| 2015 (pre-Class Period) | 15,000 | $1,020,164 |
| **2015 (Class Period)** | **800,000** | **$101,346,482** |
| 2015 (post-Class Period) | 0 | $0 |
| 2016 | 107,423[21] | $10,175,162 |
| 2017 | 166,667[22] | $18,830,000 |

201. Moreover, setting aside his sales in April 2015, Greenberg sold roughly the same number of shares during the 38-day window from August 18, 2015 to September 25, 2015 (when the Company's significant revenue vulnerability for 3Q15 was evident) as he had in the previous five years.

202. The value of Greenberg's stock sale proceeds during the Class Period also dwarfed his compensation in the three year period from 2013-2015. As detailed in the chart below, Greenberg's Class Period stock sales of $101 million were **14 times larger** than his total compensation during 2015 of $7.1 million. Greenberg's sales also **exceeded his total combined compensation for the three year period from 2013 – 2015** by more than $80 million, or 400%.

| Greenberg's Compensation (in $Ms) | | | | |
|---|---|---|---|---|
| Year | Base Salary | Stock Awards | Non-Equity Bonus | Total Comp. |
| 2013 | $2.0 | $0 | $1.5 | $3.5 |
| 2014 | $3.0 | $3.6 | $2.9 | $9.5 |
| 2015 | $3.0 | $0 | $4.1 | $7.1 |
| **TOTAL** | **$8.0** | **$3.6** | **$8.5** | **$20.1** |

[21] Adjusted to account for the Company's 3-for-1 stock-split on October 16, 2015.

[22] Adjusted to account for the Company's 3-for-1 stock-split on October 16, 2015.

203. In sum, Defendant Greenberg's Class Period sales, made while knowingly in possession of material, adverse and non-public information, were designed to take full advantage of the artificial inflation in the Company's stock price caused by Defendants' fraud and maximize the value of his proceeds. Knowing that sales growth in Company's Domestic Wholesale business was slowing, Defendant Greenberg unloaded his stock at an average sales price of $126.68, before the fraud began to be revealed and the stock price deflated 31.5% on October 23 to a price of $31.64.[23] Defendant Greenberg used his status as an insider and his access to non-public information to profit at the expense of shareholders, who suffered millions in losses when Defendants finally began to reveal the problems affecting the Company's Domestic Wholesale business during the Class Period. Defendant Greenberg's Class Period sales support a strong inference of his scienter.

## X. CLASS ACTION ALLEGATIONS

204. Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that, during the period from April 23, 2015 through October 22, 2015, inclusive, purchased the publicly traded common stock of Skechers, and were damaged thereby, except as excluded below. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Skechers during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Skechers' employee retirement and benefit plan(s) and their participants or

[23] *See* n.1, *supra* (Explaining the three-for-one stock split on October 16, 2015). But for the split just a few days prior to the 3Q15 announcements, Skechers stock would have fallen $43.65 per share from $138.57 to $94.92.

beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

205. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Skechers had approximately 41.6 million shares (126 million post-stock split) of common stock outstanding and actively trading on the NYSE with the ticker symbol "SKX." As of March 20, 2018, Skechers has approximately 135.7 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by Skechers or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

206. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

207. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

208. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether and to what extent the market price of Skechers' common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(f) whether the Individual Defendants were controlling persons of Skechers;

(g) whether Individual Defendants violated Item 303 by failing to disclose known risks, and the potential impact of such risks;

(h) whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and

(i) whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

209. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may

be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. LOSS CAUSATION

210. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Skechers common stock and operated as a fraud or deceit on Class Period purchasers of Skechers common stock by failing to disclose and misrepresenting the adverse facts detailed herein. Later, when Defendants' prior misrepresentations and fraudulent course of conduct were disclosed to the market, the price of Skechers' common stock declined significantly as the prior artificial inflation was released from the Company's stock price.

211. As a result of their purchases of Skechers' common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Skechers' common stock to trade at artificially inflated levels throughout the Class Period, closing as high as $160.29 on August 5, 2015 – just one week after Defendants' 2Q15 earnings release on July 29, 2015, and two weeks prior to Greenberg's sale of 300,000 shares for a historic net value of $46 million on August 18 – 19, 2015.

212. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Skechers' business and prospects. As Defendants began to reveal these adverse to the market, the price of Skechers' common stock fell dramatically. This decline removed the artificial inflation from the price of Skechers' common stock, causing economic loss to investors who had purchased Skechers' common stock during the Class Period.

213. The decline in the price of Skechers' common stock following the corrective disclosures on October 22, 2015 was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Skechers' common stock, Defendants' post Class Period admissions, and analyst reactions to the news, individually and collectively, negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

214. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the price of Skechers' common stock and the subsequent material decline in the value of Skechers' common stock when Defendants' prior misrepresentations, misleading half-truths and other fraudulent conduct were revealed.

215. Specifically, on October 22, 2015, Defendants disclosed that the Company's inability to fill a 3Q15 revenue gap in the Domestic Wholesale that resulted from a sales shift from 3Q15 to 2Q15, coupled with an inventory overhang that prevented Skechers from making backfill sales during 3Q15, caused growth to decelerate, dramatically below what the Company promised and the market expected, in the Domestic Wholesale division. Defendants also revealed that inventory levels grew faster than sales for the first time in years during the quarter and cautioned that inventory levels would continue to rise for at least the remainder of 2015 – both signaling that the Company's growth was going to be stymied going forward.

216. As a result of these disclosures, Skechers' stock plummeted 31.5%, from a close of $46.19 per share on October 22, 2015 to $31.64 per share on October 23, 2015.

217. Several analysts issued reports explaining the Company's poor 3Q15 results and resulting stock price decline. Sterne Agee wrote: "The 3Q15 revenue/earnings miss was due to disappointing 12% growth in the domestic wholesale business…. Domestic wholesale had been running 20%-30% increases in the last few quarters . . ." CNBC's Jim Cramer observed Cramer observed that Skechers' "stock got beheaded" when "Skechers reported after [the] close yesterday and the numbers were viewed as disappointing." (¶ 173) (CNBC Mad Money, October 23, 2015). Another analyst, Buckingham Research, explained that while the Company fell short of both revenue and earnings expectations, the revenue miss was more critical to the market because "[i]n our view, investors typically trade SKX, first, on sales momentum and a distant second, on EPS." (¶ 85). (Buckingham Research, October 23, 2015). The same analyst explained that the market's negative reaction to Skechers' increased inventory versus sales was because, historically, "faster inventory growth than sales presaged a deterioration in both fundamentals and stock price." *Id.*; *see also,* (Citi Report, October 26, 2015) ("In the context of a still-challenging US retail environment this holiday, shaken investor confidence on SKX's first qtrly miss in 2yrs, & limited potential to beat in Q4 (on a smaller rev & EPS qtr), SKX remains a show-me story."); (¶¶ 169-172) (additional analyst and media coverage of Skechers' 3Q15 results and stock price decline).

## XII. APPLICABILITY OF PRESUMPTIONS OF RELIANCE

218. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

219. In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a) Skechers' common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period;

(b) Skechers' common stock traded at high weekly volumes during the Class Period;

(c) as a regulated issuer, Skechers filed periodic public reports with the SEC;

(d) Skechers regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e) the market reacted promptly to public information disseminated by Skechers;

(f) Skechers' securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace. The firms who wrote analyst reports on Skechers during the Class Period include, but are not limited to, the following: BB&T Capital Markets, Buckingham Research Group, Citigroup, Morgan Stanley, Sterne Agee & Leach, Susquehanna Financial Group, and Wedbush Securities;

(g) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Skechers' common stock; and

(h) without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Skechers' common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts began to be disclosed.

## XIII. NO SAFE HARBOR

220. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint. *First*, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions, and omissions are not protected by the Safe Harbor. *Second*, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. *Third*, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. *Fourth*, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

### A. Defendants' False and Misleading Statements and Omissions Were Not Forward-Looking

221. Many of Defendants' false and misleading statements and omissions alleged herein, *e.g.*, (¶¶ 92, 95, 97, 99, 101, 109, 116, 118, 120, 122, 124, 127, 129, 131, 133, 135, 137, 139, 141, 143, 151, 159) are not forward-looking because such statements: (1) relate to

historical or current fact; (2) implicate existing conditions; and (3) do not contain projections of ***future*** performance or ***future*** objective.

222. To the extent that any of the alleged false and misleading statements and omissions might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

### B. The False and Misleading Statements Were Not Properly Identified as "Forward-Looking"

223. The PSLRA imposes an additional burden on "oral" forward-looking statements, requiring defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and failed to include the language required by the PSLRA. For example, the following oral statements made by Weinberg were neither identified as forward-looking pursuant to the PSLRA nor accompanied by *any* cautionary language, and thus to the extent that any such statement may be considered forward-looking, they are not afforded immunity by the PSLRA:

- Weinberg's statements on the CNBC program "Mad Money" on April 23, 2015 (¶¶ 108-09);
- Weinberg's statements at the Citi Global Consumer Conference on May 28, 2015 (¶¶118, 120, 122,); and
- Weinberg's statements on the CNBC program "Mad Money" on July 30, 2015 (¶¶ 150-51).

### C. Any Forward-Looking Statements Were Not Accompanied by Meaningful Cautionary Language

224. None of Defendants' alleged false statements or omissions was accompanied by meaningful cautionary language that identified important factors that could cause actual results to differ materially from any results projected.

225. Additionally, to the extent Defendants included any cautionary language, such language was not meaningful because any potential risks identified by Defendants had already manifested.

226. To the extent Defendants included any cautionary language, that language was not precise and did not relate directly to any forward-looking statements at issue.

227. Defendants' cautionary language was boilerplate and did not change during the Class Period, despite the fact that conditions had materially changed.

### D. Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made

228. Even if the alleged statements were forward-looking, sufficiently identified as such, and accompanied by adequate cautionary language at the time they were made, each speaker knew that the statement was false or misleading, as discussed above. In addition, all such statements were authorized or approved by Skechers' executive officers, including Individual Defendants, who actually knew that the statements were false or misleading when made. Accordingly, Defendants remain liable even for forward-looking statements.

## COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

229. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

230. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

231. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Skechers common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Skechers common stock at artificially inflated prices.

232. Defendants also violated Item 303 by failing to disclose known trends and uncertainties, and the potential impact of such trends and uncertainties, in their quarterly Form 10-Qs for the first and second quarters of 2015.

233. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

234. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally,

or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Skechers common stock during the Class Period.

235. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Skechers common stock, Lead Plaintiff and other members of the Class purchased Skechers common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Skechers common stock at such artificially inflated prices. As set forth herein, when Defendants began to reveal adverse, previously undisclosed facts concerning the Company, the price of Skechers common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Skechers common stock at artificially inflated prices and the subsequent decline in the price of that stock when Defendants began to reveal such facts.

236. As alleged herein, Greenberg sold substantial numbers of shares of Skechers stock during the Class Period while knowingly in possession of material, adverse and non-public information concerning the Company.

237. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### Against Defendants Greenberg and Weinberg

238. Lead Plaintiff repeats, incorporates, and realleges each of the allegations set forth above as if fully set forth herein.

239. This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendants Greenberg and Weinberg.

240. As alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Skechers' common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period. Thus, Skechers is primarily liable under Section 10(b) of the Exchange Act.

241. As set forth above, Defendants Greenberg and Weinberg were controlling persons of Skechers during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including the Domestic Wholesale segment.

242. By virtue of the foregoing, Defendants Greenberg and Weinberg each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Skechers, including the content of its public statements with respect to the sales performance, sales growth, and inventory management of the Company's Domestic Wholesale segment.

243. Defendants Greenberg and Weinberg acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased Skechers common stock during the Class Period.

244. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Skechers common stock, Lead Plaintiff and other members of the Class purchased Skechers common stock at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Skechers common stock at artificially inflated prices. As set forth herein, when Defendants subsequently began to reveal adverse, previously undisclosed facts concerning the Company, the price of Skechers common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Skechers common stock at artificially inflated prices and the subsequent decline in the price of that stock when such facts began to be disclosed.

245. By reason of the foregoing, Defendants Greenberg and Weinberg are liable to Lead Plaintiff and the members of the Class as controlling persons of Skechers in violation of Section 20(a) of the Exchange Act.

## COUNT III

### Violation of § 20A of the Exchange Act
### (Against Defendant Greenberg)

246. Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

247. This Count is asserted pursuant to Section 20A of the Exchange Act against Defendant Greenberg, on behalf of Lead Plaintiff and all members of the Class who purchased Skechers stock contemporaneously with any of Greenberg's sales of Skechers stock during the Class Period.

248. As alleged herein, Greenberg sold substantial numbers of shares of Skechers stock during the Class Period while knowingly in possession of material, adverse and non-public information concerning the Company. By virtue of such sales and/or Greenberg's participation in the scheme to defraud investors alleged herein, Greenberg violated Section 10(b) of the Exchange Act and applicable rules and regulations thereunder.

249. As set forth in the PSLRA certification (*see* Exhibit A), Lead Plaintiff purchased 6,900 shares of Skechers stock on August 26, 2015, just five business days after Greenberg sold 200,000 shares of Skechers stock, and six business days after he sold a total of 300,000 shares of Skechers' stock,[24] while he was knowingly in possession of material, adverse and non-public information concerning the Company. Greenberg's sales and Lead Plaintiff's purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

250. Numerous members of the putative Class also purchased Skechers stock at or near the times when Greenberg sold his shares during the Class Period. These purchases were also contemporaneous within the meaning of Section 20A of the Exchange Act.

251. Accordingly, under Section 20A of the Exchange Act, Greenberg's sales of Skechers' stock while knowingly in possession of material, adverse, and non-public information during the Class Period makes him liable to Lead Plaintiff and the Class for all profits gained and losses avoided by him as a result of such stock sales.

252. Greenberg is required to account for all such stock sales and disgorge his profits or ill-gotten gains.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

---

[24] ¶ 194 - Between August 18-19, 2015, Greenberg sold a total of 300,000 shares.

A. Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B. Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Ordering an accounting of Defendant Greenberg's insider trading proceeds;

D. Disgorgement of Defendant Greenberg's insider trading proceeds;

E. Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

F. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

G. Granting such other and further relief as the Court deems just and proper.

## XV. JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: April 4, 2018

**LABATON SUCHAROW LLP**

By: *_/s/ Carol C. Villegas_*

Carol C. Villegas
David J. Schwartz
Christopher L. Mooney
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
dschwartz@labaton.com
cmooney@labaton.com

*Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN**
**& DOWD LLP**

DAVID A. ROSENFELD
ROBERT M. ROTHMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
Fax: 631/367-1173
drosenfeld@rgrdlaw.com
rrothman@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP

JACK REISE
ELIZABETH A. SHONSON
ANDREW T. REES
120 East Palmetto Park Road
Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
Fax: 561/750-3364
jreise@rgrdlaw.com
eshonson@rgrdlaw.com
arees@rgrdlaw.com

*Additional Counsel for the Class*