## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STEAMFITTERS LOCAL 449 PENSION
PLAN, Individually and on Behalf of All
Others Similarly Situated,

                Plaintiff,

  v.

SKECHERS U.S.A., INC., ROBERT
GREENBERG, and DAVID WEINBERG,

                Defendants.

Civ. Action No. 1:17-CV-08107 (AT)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Dated: November 21, 2018
       New York, New York

**O'MELVENY & MYERS LLP**

Abby F. Rudzin
David K. Lukmire
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
arudzin@omm.com
dlukmire@omm.com

Seth Aronson (*pro hac vice*)
400 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
saronson@omm.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ....................................................................... 3

    A.    Skechers's Business ............................................................ 3

    B.    The Stock Drop .................................................................. 4

    C.    The SAC ............................................................................ 4

        1.    Alleged Misstatements ...................................... 5

        2.    Alleged Omissions ............................................ 8

        3.    Item 303 Allegations ......................................... 9

        4.    Scienter Allegations .......................................... 9

ARGUMENT ....................................................................................... 10

    I.    The Section 10(b) claim should be dismissed ................................... 10

    A.    The SAC pleads no actionable misstatements. ..................... 10

        1.    Defendants' forward-looking statements are not actionable. ...... 10

        2.    Defendants' opinions are not actionable. ..................................... 14

        3.    Defendants' vague statements and puffery are not actionable. ................................................................. 16

        4.    Defendants fail to plead that statements were false. ................... 18

    B.    The SAC pleads no actionable omissions. .............................. 19

        1.    Skechers specifically disclosed the risk of a Q3 revenue shortfall. ................................................................. 20

        2.    The alleged omissions are inadequately pleaded. ....................... 20

        3.    There was no duty to disclose the allegedly omitted information. ................................................................. 22

            a.    Defendants had no duty to disclose predictions. .............. 22

            b.    Defendants had no duty under Item 303 of Regulation S-K. ................................................................. 23

    C.    The SAC contains insufficient particularized facts giving rise to a strong inference of scienter. ................................. 24

        1.    The SAC does not allege a motive to commit fraud. ................... 25

        2.    The SAC does not allege conscious misbehavior or recklessness. ................................................................. 28

    II.    The ancillary Section 20(a) and Section 20A claims should be dismissed ......... 30

CONCLUSION ..................................................................................... 30

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ...................................................................................25

*Arazie v. Mullane*,
   2 F.3d 1456 (7th Cir. 1993) ................................................................................29

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)..................................................................................30

*Blackmoss, Invs. Inc. v. ACA Capital Holdings, Inc.*,
   2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .......................................................23

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) .................................................................18

*Carney v. Cambridge Tech. Partners, Inc.*,
   135 F. Supp. 2d 235 (D. Mass. 2001) .................................................................18

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)..................................................................................3

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)................................................................................16

*Debora v. WPP Grp. PLC*,
   1994 WL 177291 (S.D.N.Y. May 5, 1994) .........................................................20

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)................................................................................25

*Gissin v. Endres*,
   739 F. Supp. 2d 488 (S.D.N.Y. 2010).......................................................12, 13, 22

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................26, 30

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995)................................................................................20

*Hutchinson v. Perez*,
   2013 WL 1775374 (S.D.N.Y. Apr. 25, 2013)......................................................17

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013)..................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

*In re Biogen Inc. Sec. Litig.*,
   193 F. Supp. 3d 5 (D. Mass. 2016) ........................................................................17

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) ....................................................................24

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010) ....................................................................17

*In re Coty Inc. Sec. Litig.*,
   2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ........................................................24

*In re Express Scripts Holding Co. Sec. Litig.*,
   2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ............................................................3

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
   2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015) ........................................................17

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................................27

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009)................................................................26, 27

*In re Glenayre Techs., Inc. Sec. Litig.*,
   1998 WL 915907 (S.D.N.Y. Dec. 30, 1998) ..........................................................26

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
   1998 WL 283286 (S.D.N.Y. 1998) ........................................................................25

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ....................................................................27

*In re Lions Gate Entm't Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ........................................................................21

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ......................................................................27

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006) ....................................................................19

*In re PXRE Grp., Ltd., Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009)................................................................28, 29

*In re Salomon Analyst AT&T Litig.*,
   350 F. Supp. 2d 455 (S.D.N.Y. 2004) ....................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

*In re Sec. Capital Assur. Ltd. Sec. Litig.*,
   729 F. Supp. 2d 569 (S.D.N.Y. 2010)........................................................................28

*In re Sec. Litig. BMC Software, Inc.*,
   183 F. Supp. 2d 860 (S.D. Tex. 2001) .......................................................................18

*In re Skechers U.S.A., Inc. Sec. Litig.*,
   2004 WL 1080174 (C.D. Cal. May 7, 2004) .............................................................27

*In re Travelzoo Inc. Sec. Litig.*,
   2013 WL 1287342 (S.D.N.Y. March 29, 2013) ...............................................10, 22

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
   202 F. Supp. 2d 8 (S.D.N.Y. 2001)...........................................................................23

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)........................................................................................24

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)......................................................................................18

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
   32 F.3d 697 (2d Cir. 1994)........................................................................................30

*Kapps v. Torch Offshore, Inc.*,
   379 F.3d 207 (5th Cir. 2004) ....................................................................................24

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007)......................................................................................21

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)......................................................................................10

*Lopez v. Ctpartners Exec. Search Inc.*,
   173 F. Supp. 3d 12 (S.D.N.Y. 2016).........................................................................16

*Martin v. Quartermain*,
   732 F. App'x 37 (2d Cir. 2008) ..........................................................................14, 15

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
   951 F. Supp. 2d 479 (S.D.N.Y. 2013).......................................................................15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015)........................................................................................14, 16

*Pearlstein v. BlackBerry Ltd.*,
   93 F. Supp. 3d 233 (S.D.N.Y. 2015).........................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

*Pehlivanian v. China Gerui Adv. Materials Grp. Ltd.*,
  153 F. Supp. 3d 628 (S.D.N.Y. 2015)..................................................................18

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
  Commerce*,
  694 F. Supp. 2d. 287 (S.D.N.Y. 2010)................................................................26

*Podany v. Robertson Stephens, Inc.*,
  318 F. Supp. 2d, 146 (S.D.N.Y. 2004)................................................................14

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996)..................................................................................29

*Sawabeh Info. Servs. Co. v. Brody*,
  832 F. Supp. 2d 280 (S.D.N.Y. 2011).................................................................21

*Serabian v. Amoskeag Bank Shares, Inc.*,
  24 F.3d 357 (1st Cir. 1994).................................................................................29

*Shemian v. Research In Motion Ltd.*,
  2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) .....................................................17

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)................................................................................11

*Stratte–McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)..................................................................................28

*Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008).................................................................27

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................24

*Thesling v. Bioenvision, Inc.*,
  374 F. App'x 141 (2d Cir. 2010) .........................................................................22

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..........................................................................14, 15

**Statutes**

15 U.S.C. § 78u-5 ......................................................................................................11

Exchange Act § 10(b) ..................................................................................10, 18, 20, 30

## TABLE OF AUTHORITIES

**Page(s)**

Exchange Act § 20(a)...................................................................................................30

Exchange Act § 20A....................................................................................................30

**Other Authorities**

*Mgmt. Discussion and Analysis of Fin. Condition and Results of Operations*,
    Exchange Act Release No. 6835, 1989 WL 1092885 (May 18, 1989) ..................................24

## PRELIMINARY STATEMENT

This action purports to find securities fraud in a period of historic success for Skechers. Between 2012 and 2015, Skechers's sales increased by more than 50%.[1]  On October 22, 2015, Skechers reached a new milestone, reporting $856 million in third-quarter revenue—its best ever.  Despite this performance, Skechers's stock dropped 30% the next day.  The culprit: Wall Street analysts had predicted that Skechers would do even better, setting a target of $876 million. Plaintiff theorizes that because Skechers fell short of analysts' high expectations by a mere 2.33%, Skechers's positive statements during the preceding six months were fraudulent. Plaintiff cannot sustain a securities fraud claim by alleging that the company's strong quarter should have been even better.  Skechers never promised specific growth numbers within a specific timeframe and had no duty to hit the targets Wall Street imposed.  Nor do expressions of optimism constitute "fraud" simply because they do not pan out.  In any event, Skechers's optimism was warranted: Skechers bounced back in the fourth quarter of 2015, beating analysts' estimates and wrapping up a banner $3.147 billion year.

The SAC alleges that defendants somehow knew that Skechers would have less robust revenue growth in the third quarter of 2015 because certain customers had canceled orders or shifted them into the second quarter.  But Skechers had in years past made up for such shifted orders and could certainly make up for cancellations, so neither fact told defendants that the company would miss analysts' revenue estimates.  Moreover, defendants disclosed that because customers had shifted orders, Skechers might earn $20 million less—the exact amount by which

---

[1] This brief refers to Skechers U.S.A., Inc. as "Skechers" and the complaint as the "SAC." All internal quotation marks and citations are omitted and all emphasis is added.  References to exhibits are to the accompanying November 21, 2018 declaration of Abby F. Rudzin.  Skechers Annual Reports are cited as "[year] 10-K," and Quarterly Reports are cited as "Q[] [year] 10-Q." Skechers Earnings Call Transcripts are cited as "Q[] [year] Earnings."  Statements of Changes in Beneficial Ownership are cited as "[date] Form 4."

it missed analysts' estimates.  Trying to shore up these weak allegations, plaintiff chants "pump and dump."  According to plaintiff, both Skechers's CEO and CFO made unduly optimistic statements to "pump" up the stock price so that the CEO alone could profit by "dumping" less than 20% of his Skechers holdings.  This allegation is implausible.  Why would the CFO make false statements to artificially drive up the share price and then hold onto his own stock so that he suffered large losses?  And why wouldn't the CEO sell more to avoid his large losses?

The SAC should be dismissed because it alleges no actionable misstatements or omissions.  Each of the alleged misstatements is protected by the safe harbor for forward-looking statements of the Private Securities Litigation Reform Act ("PSLRA") or is an inactionable statement of opinion or immaterial puffery, or all of the above.[2]  And some supposed misstatements are not alleged to be false.  None of the alleged omissions is actionable because defendants disclosed the essential fact plaintiff says should have been disclosed—that shifted orders might cause revenues to decrease—and had no duty to disclose further prognostications.

The SAC should also be dismissed because it fails to plead particularized facts supporting a "strong inference" that each defendant acted with scienter.  The allegations based on insider sales fail because the defendants' maintenance of significant holdings, and concomitant large losses, undercut an inference of scienter.  That the CEO and CFO avidly tracked customers, competitors, and sales metrics likewise does not suffice; all competent senior executives in the retail space do so.  And Skechers's banner year shows that their optimism was warranted.

For either of these reasons, the SAC should be dismissed.  And because plaintiff has already amended its complaint twice, the dismissal should be with prejudice.

---

[2] For the Court's convenience, rather than reprint all statements here, we provide Appendix A identifying the flaws in each allegedly false or misleading statement.

## STATEMENT OF FACTS

### A.    Skechers's Business

Skechers designs and markets footwear, selling its shoes in more than 160 countries. (SAC ¶¶ 2, 34.)[3]  It was founded in 1992 by defendant and CEO Robert Greenberg, who hired defendant David Weinberg as CFO in 1993.  (*Id.* ¶¶ 23–24.)  Skechers has four core business segments "integral" to its success.  (*Id.* ¶ 34; Ex. A (2014 10-K) at 9.)  This lawsuit focuses on one: "Domestic Wholesale."  (*See* SAC ¶ 36.)  Domestic Wholesale customers include retailers such as Zappos and Macy's.  (*Id.*)  Like all retail businesses, Skechers's sales fluctuate based on numerous factors, including global economic conditions and shifts in consumer demand.  (*See* Ex. A (2014 10-K) at 19.)  To ensure it can deliver orders despite a lengthy manufacturing and shipping process, Skechers works with customers to gain insight into future demand.  (SAC ¶¶ 37–38.)  For example, Skechers holds "buy meetings" with its key Domestic Wholesale accounts to plan for future selling seasons.  (*See id.* ¶¶ 39–40.)

Still, some risks and uncertainties are unavoidable, as Skechers has repeatedly warned. Customers have no obligation to purchase the inventory discussed in the buy meetings, and they may change or cancel orders "with minimal notice and without penalty."  (Ex. A (2014 10-K ) at 19.)  Customers can shift or "pull in" orders placed for a later quarter to receive products earlier. (SAC ¶ 42.)  The converse is also true: customers can order additional products on short notice. (*Id.* ¶ 43.)  Skechers therefore warns investors that it "may not be able to accurately predict [its] quarterly sales" and that "quarterly revenues and operating results have varied significantly in

---

[3] This section is drawn from (i) the SAC's allegations, which are accepted as true for purposes of this motion, and (ii) publicly available documents integral to the complaint, such as SEC filings.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  These documents are also judicially noticeable because they are public filings or otherwise widely available documents, the authenticity of which is not in question.  *See, e.g.*, *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *1 n.1 (S.D.N.Y. Aug. 1, 2017).

the past and can be expected to fluctuate in the future." (Ex. A (2014 10-K) at 19.) Skechers likewise has cautioned that sales are subject to "sustaining, managing and forecasting costs and proper inventory levels; losing any significant customers, [and] decreased demand by industry retailers." (Ex. B (July 29, 2015 Press Release) at 2.) Though Skechers's "strongest sales generally occur[] in [its] second and third quarters for the back-to-school selling season," the company has warned that the "timing of when products are shipped is determined by the delivery schedules set by our wholesale customers, which could cause sales to shift between our second and third quarters." (Ex. A (2014 10-K) at 19.)

### B.    The Stock Drop

Between 2012 and 2014, Skechers experienced explosive sales growth, which continued into 2015: 38% year-over-year growth in the first quarter and 36% in the second. (SAC ¶¶ 50–52.) On October 22, 2015, Skechers announced that its third-quarter sales had reached $856.18 million—27% year-over-year growth. (Ex. C (Q3 2015 Earnings) at 1, 3.) Although this represented the "highest quarterly sales in the company's 23-year history," it missed analysts' projections by 2.33%. (*See id.*) The next day Skechers's stock price dropped by almost a third. (SAC ¶ 15.) Skechers rebounded in Q4 2015, beating analysts' estimates for the quarter and ending with 32.4% growth for the year. (Ex. D (Q4 2015 Earnings) at 6.) Plaintiff filed this action on October 20, 2017, nearly two years after the October 22, 2015 earnings announcement and shortly before the two-year statute of limitations would run.

### C.    The SAC

Plaintiff seeks to assert claims on behalf all persons who acquired Skechers's stock between April 23 and October 22, 2015. Plaintiff asserts claims under Exchange Act Sections 10(b), 20a, and 20A. All the claims are based on the same alleged misstatements and omissions.

### 1.    Alleged Misstatements

Plaintiff claims that defendants committed securities fraud by making positive statements about Skechers's prospects in April, May, July, and August 2015.  (*See* SAC ¶¶ 98–172; Appendix A.)  These statements allegedly misled investors by concealing the risk that Skechers's revenue growth rate might slow and fail to meet analysts' expectations.  (*See* SAC ¶ 117.)

#### *April 22, 2015 Press Release and Earnings Call*

Skechers announced its Q1 2015 earnings in an April 22, 2015 press release, and plaintiff challenges two of the company's statements: (1) "[h]aving just achieved a new annual sales record of $2.4 billion in 2014, we expected the momentum to continue into [Q1] 2015"; and (2) "we believe the growth that we experienced in the first quarter [of 2015] will continue in 2015."  (*Id.* ¶ 99; *see also* Ex. H (Apr. 22, 2015 Press Release) at 1–2.)  During an earnings call that same day, Weinberg was similarly optimistic, making statements that plaintiff claims were misleading: (1) "[w]ith significantly increased worldwide bookings, our year-over-year worldwide backlogs are up mid double digits at March 31, 2015, which we believe is a clear indicator that our momentum will continue throughout the year"; and (2) "[b]ased on our Domestic Wholesale backlog . . . we believe we will continue to achieve strong gains in 2015."  (*Id.* ¶ 102; *see also* Ex. E (Q1 2015 Earnings) at 4.)  Plaintiff also complains about Weinberg's optimism on future growth.  When asked about Domestic Wholesale's prospects, for example, Weinberg responded: "I don't know if [growth figures] stay quite at 38%, but I'd be surprised if they dipped significantly," noting that "[w]e're at the early stages now."  (*Id.* ¶ 106.)[4]

---

[4] *See also* SAC ¶ 102 ("[We] . . . believe there is upside opportunity in the third quarter."); ¶ 106 ("I really wouldn't anticipate any significant slowdown in the growth at domestic . . . ."); ¶ 108 ("[W]e have confidence that Q3 can be significantly to the upside.").

### *Spring 2015* Mad Money *and Citi Conference Appearances*

On April 23, 2015, Weinberg appeared on CNBC's *Mad Money*.  Plaintiff complains about his statement: "So it seems that we're very strong going into the back half of this year and things are still looking pretty good." (*Id.* ¶ 116.)  The following month, he attended a Citigroup investor conference and was asked about Skechers's growth prospects.  Weinberg responded: "I think it's just more of the same . . . .  We continue to grow in the U.S. by category expansion, shelf expansion, price point expansion. . . . I don't think that anything changes significantly other than we continue to grow at a significant pace." (*Id.* ¶ 123.)[5]  And when asked about inventory planning, he remarked that "[w]hen you grow at the pace we were growing and the demand keeps growing, you don't really have inventory issues." (*Id.* ¶ 125.)

### *July 29, 2015 Press Release and Earnings Call*

On July 29, 2015, Skechers announced its Q2 2015 results, which again included record sales and profits.  (Ex. F (Q2 2015 Earnings) at 3.)  Plaintiff claims that statements in that press release were misleading, such as "[the] present has never looked as colorful, comfortable, and successful thanks to our product and marketing" and "[t]he demand for Skechers footwear in markets worldwide continues." (SAC ¶ 131.)  Plaintiff also challenges statements about growth, such as "we believe we are well prepared for our planned growth" and "[w]e believe that our accelerated growth trend will remain through 2015 and into 2016." (*Id.* ¶¶ 131, 133.)  Plaintiff also complains about statements in the Q2 2015 earnings call.  For example, Weinberg reported that in "every major division we had . . . higher sales and higher gross margins"; "it was a very good and very broad-based increase for us in the second quarter"; and "we had not a lot of

---

[5] *See also* SAC ¶ 125 ("The good news is we're growing at a faster pace than even our consumers around the world anticipate order [*sic*] for.  I don't think it's changed very much."); ¶ 127 ("[W]e continue to be at the top end of where we think we should be.  And sell-throughs continue and acceptance continues, and we haven't seen any slowdown.").

markdowns, not a lot of returns, and not a lot of inefficiencies."  (*Id.* ¶ 150.)  He then opined that "we believe we will continue our sales momentum through the back half of 2015" (*id.* ¶ 140) and "[w]e think it's all positive going into third quarter" (*id.* ¶ 148).  Greenberg cautioned that Skechers might not grow at the same rate indefinitely, because while Skechers "had almost the perfect storm" in Q2, "I don't know that I would anticipate it continues forever."  (*Id.* ¶ 150.)

During that earnings call, Skechers disclosed the precise information that plaintiff claims was hidden from investors—that customers had shifted sales into the second quarter from the third.  (*Id.* ¶ 144.)  Greenberg explained that this "pull in" might take a bite out of third-quarter revenue: "It's very difficult to put a number on what was moved forward [from Q3 to Q2] and not.  If I had to guess, I would assume it was somewhere in the $15 million, $20 million range that normally would have gone into Q3."  (*Id.*)  He even cautioned that Skechers might not obtain enough orders "pulled in" from Q4 to Q3 to make up for the orders shifted from Q3 to Q2: "remember . . . the order of magnitude [pull-in] potential in Q3 to Q2 is certainly significantly larger than [pull-in potential from] Q4 to Q3."  (*Id.* ¶ 152.)

### July 30, 2015 Mad Money *Appearance*

On July 30, 2015, Weinberg appeared again on *Mad Money*.  Plaintiff claims that two statements he made during the interview were misleading: "It all works and it's all starting to work even better now" and "we continue to grow."  (*Id.* ¶ 162.)

### August 21, 2015 Press Release

On August 21, 2015, Skechers issued a press release containing two alleged misstatements: (1) "our confidence in our business model worldwide, which we believe will continue to generate profitable growth and strong cash flows"; and (2) "I have never been more confident and excited about the future of Skechers."  (*Id.* ¶ 170; *see also* Ex. G (Aug. 21, 2015 Press Release).)

### 2.   Alleged Omissions

Plaintiff alleges that Skechers concealed several facts that would have revealed that Skechers faced a "$20 million revenue vulnerability" for Q3.  (*See, e.g., id.* ¶ 100.)[6]  Specifically, plaintiff alleges that Skechers failed to disclose that by April 2015, Skechers's customers had begun shifting orders from Q3 to Q2 and Skechers knew that it would not have sufficient orders shifted from Q4 to Q3 to make up for the shifted revenue.  (*See, e.g., id.* ¶¶ 132, 137.)  Plaintiff alleges also that Skechers failed to disclose that Domestic Wholesale customers had canceled orders between May and July 2015.  (*See, e.g., id.* ¶¶ 62, 100, 149.)  Defendants allegedly knew that these circumstances would lead to a lackluster Q3 2015.  (*See, e.g., id.* ¶ 9.)

Plaintiff's omissions case also relies on the alleged consequences of a labor disruption at West Coast ports, where cargo shipments were slowed from June 30, 2014, until February 20, 2015.  (*Id.* ¶¶ 6 n.1, 57.)  Skechers supposedly had an undisclosed competitive advantage because an executive had personal relationships with dock managers, which "helped the company to avoid the disruptions and delays that their [*sic*] competitors were facing."  (*Id.* ¶ 58.)  Plaintiff alleges that this advantage "resulted in a sharp increase in sales and revenue for the Company prior to the Class Period."  (*Id.* ¶ 59.)  When Skechers lost this advantage in February 2015 (two months before the class period began), defendants supposedly had a duty to disclose that "Skechers's competitors would be able to get their own products through the ports, causing less demand for Skechers's products moving to the [back-to-school] season" in Q3 2015.  (*See, e.g., id.* ¶ 100.)  Plaintiff contends this alleged omission rendered statements through May 2015 misleading.  (*See, e.g., id.* ¶¶ 73, 100, 103, 109.)

---

[6] *See also, e.g.*, SAC ¶ 130 ("statements omitted both that the shift would occur and that this created a vulnerability for 3Q15 revenues"); ¶ 171 (statement "omitted the shift in Domestic Wholesale from 3Q15 to 2Q15 had created a $20 million revenue deficit and Skechers would not be able to sufficiently pull in orders from 4Q15 to 3Q15 to make up for this deficit").

### 3.     Item 303 Allegations

Skechers's first- and second-quarter 2015 10-Qs allegedly violated Item 303 of Regulation S-K because they contained similar omissions, which plaintiff recasts as known "trends or uncertainties."  (*Id.* ¶¶ 93–97, 119–21, 165–68.)  Plaintiff alleges that in its Q1 2015 10-Q (May 8, 2015) and Q2 2015 10-Q (Aug. 10, 2015), Skechers failed to disclose that:

- Domestic Wholesale customers intended to shift Q3 sales to Q2 (*id.* ¶ 121);

- Skechers had months earlier lost a competitive advantage from the port issues (*id.*);

- There would not be a sufficient shift in revenues from Q4 to Q3 to make up for what plaintiff calls a "revenue deficit" in Q3 (*id.* ¶ 167);

- A "weakness" in replenishment orders would inevitably stifle Skechers's Q3 growth (*id.*); and

- Customers had canceled orders (*id.* ¶ 168).

Skechers also allegedly knew, but failed to disclose, that as of August 10, 2015, customers were sitting on excess inventory due to an "influx of footwear from Asia (both from Skechers and its competitors)" when the port strike was averted.  (*Id.*)

### 4.     Scienter Allegations

Plaintiff has two scienter theories.  First, plaintiff claims that there is a strong inference of scienter because Greenberg participated in a "massive pump-and-dump scheme, selling over $101 million of his personal shares at artificially inflated prices" due to defendants' misstatements.  (*Id.* ¶¶ 188, 190, 216–22.)  The SAC fails to explain, however, why Weinberg would participate in this scheme while selling no stock, instead suffering a large loss when the stock price dropped.  Second, plaintiff contends that the individual defendants had access to undisclosed facts bearing on Skechers's ability to hit analysts' sales targets.  (*See id.* ¶¶ 26, 187–211.)  According to a former "senior member of sales management" (*id.* ¶ 195), this included

knowledge of Skechers's sales and production timeline, relationships with customers, tracking of competitors, and analyses of sales and other financial reports (*id.* ¶ 189).  The SAC generally describes these reports, but does not provide their dates or details.  (*Id.* ¶ 195.)

## ARGUMENT

## I.      The Section 10(b) claim should be dismissed.

The Section 10(b) claim should be dismissed because the SAC has not adequately pleaded two essential elements: (1) that defendants made an actionable misstatement or omission, and (2) that defendants acted with scienter.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

### A.      The SAC pleads no actionable misstatements.

Despite Skechers's record revenues, Plaintiff asserts that defendants misled investors about Skechers's growth prospects for the third quarter of 2015.  In plaintiff's view, defendants' optimism was false and misleading because growth failed to meet analysts' expectations.  It is not fraud, however, simply because a "company failed to meet the expectations of analysts and investors, which therefore resulted in the decline of stock prices."  *In re Travelzoo Inc. Sec. Litig.*, 2013 WL 1287342, at *7 (S.D.N.Y. Mar. 29, 2013).  Although defendants were bullish on Skechers's prospects—and for good reason—they promised no specific growth numbers and repeatedly cautioned investors about the relevant risks.  Moreover, none of the allegedly misleading statements withstands scrutiny as an actionable misstatement.

#### 1.      Defendants' forward-looking statements are not actionable.

The SAC relies heavily on forward-looking statements about Skechers's growth prospects.  The PSLRA's safe harbor shields statements that are "accompanied by meaningful

cautionary statements identifying important factors that could cause actual results to differ materially." 15 U.S.C. § 78u-5(c)(1)(A)(i).[7]

A statement is "forward-looking" where it "projects results in the future." *Slayton v. Am. Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010). A forward-looking statement includes any "statement containing a projection of revenues . . . or other financial items" or any "statement of future economic performance." 15 U.S.C. § 78u-5(i)(1). "The use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement." *Slayton*, 604 F.3d at 769. As Skechers told investors: "Forward-looking statements can be identified by the use of forward looking language such as 'believe,' 'anticipate,' 'expect,' 'estimate,' 'intend,' 'plan,' 'project,' 'will be,' 'will continue,' 'will result,' 'could,' 'may,' 'might,' or any variations of such words with similar meanings." (Ex. H (Apr. 22, 2015 Press Release) at 1–2; Ex. B (July 29, 2015 Press Release) at 2.)

These linguistic cues show that the majority of the challenged statements here—about future growth and revenue prospects—are forward-looking:

- "*[W]e believe* the growth that we experienced in the first quarter *will continue* in 2015." (SAC ¶ 99.)

- "*[W]e believe* [the worldwide backlog] is a clear indicator that our momentum *will continue* throughout the year." (*Id.* ¶ 102.)

- "*[We] believe* that our accelerated growth trend *will continue* through the second quarter and into the back half of 2015." (*Id.*)

---

[7] Even if a forward-looking statement is not accompanied by cautionary language, a defendant cannot be liable unless the statement "was made with actual knowledge" that it was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(i). For the same reasons that the complaint fails to allege scienter for any defendant, *see infra* Section C.2, it also fails to allege that any of the forward-looking statements at issue were made with actual knowledge of their falsity.

- **"*[W]e believe* that we *will continue* to achieve new sales and profit records through 2015." (*Id.* ¶ 133.)[8]**

The PSLRA's safe harbor applies when statements are accompanied by "meaningful cautionary language," i.e., proclamations that "point to the principal contingencies that could cause actual results to depart from the projection" and "relate directly to that by which the plaintiffs claim to have been misled." *Gissin v. Endres*, 739 F. Supp. 2d 488, 509–10 (S.D.N.Y. 2010) (dismissing claim of alleged misstatements protected under PSLRA's safe harbor). Here, Skechers regularly identified specific risk factors, expressly warning of the very risks that plaintiff alleges were not disclosed: the difficulty in "sustaining, managing and forecasting costs and proper inventory levels"; "decreased demand by industry retailers; "cancellation of order commitments"; varying "sales levels during the spring, back-to-school and holiday selling seasons"; and the "ability to predict [Skechers's] revenues, which [] varied significantly in the past and can be expected to fluctuate in the future." (*See, e.g.*, Ex. H (Apr. 22, 2015 Press Release) at 2; Ex. I (Q1 2015 10-Q) at 16.)

To the extent plaintiff points to statements of present or historical fact embedded in a forward-looking statement, the safe harbor still applies because (i) statements that reference present or historical facts can still be protected as forward-looking, and (ii) plaintiff fails to allege that those present or historical facts are untrue. While it is true that "[w]here a statement contains references to both future and past or present conditions, safe harbor protection may only extend to the prognostic portion," the safe harbor applies if the statement *as a whole* is forward-looking in context. *See Gissin*, 739 F. Supp. 2d at 505. In *Gissin*, the plaintiffs argued that statements like the following were not protected because they were "oriented in the present":

---

[8] These are just examples. Other forward-looking statements and the cautionary language accompanying them are identified in Appendix B.

"Based on our *current* expectation of cash flows from operations and the cash and cash equivalent short-term investments, and also our revolving credit facility, we feel we will be in a position to fund those capital investments for the year." *Id.* Judge Scheindlin rejected the argument because the statement did "not justify the financial projections in terms of any particular aspect of the company's current situation." *Id.* In other words, the statement was still forward-looking because it presented "an assertion that is necessarily implicit in every future projection." *Id.* ("Defendants were not making guarantees about the present; they were stating their educated guess about what the preceding quarter's financial data would mean for the Company's future."). And the plaintiff challenged only the underlying "accuracy of the future prediction," not the statement's present or historical facts. *See id.* at 506.

Here, even where a forward-looking statement includes some present-tense portions, the statement as a whole is still forward-looking. For example, the statement that "Given the key performance indicators, we are comfortable with the second quarter analyst estimates and believe there is upside opportunity in the third quarter" is forward-looking because the present-tense portion of the statement—"[g]iven the key performance indicators"—"when read in context, cannot meaningfully be distinguished from the future projection of which [it is] a part." *Id.* at 505. Moreover, plaintiff does not allege how the present-tense portions of forward-looking statements were false. For example, the SAC challenges the following statement accompanying Skechers's Q1 2015 earnings announcement: "With the demand for our key product initiatives in the United States . . . remaining very high, we believe the growth that we experienced in the first quarter will continue in 2015." (SAC ¶ 99.) While plaintiff claims that Skechers's growth prediction was wrong, it does not allege that U.S. demand did not "remain[] high" when

13

Skechers announced record Q1 2015 earnings.  These and all other forward-looking statements referencing present or historical facts are protected by the safe harbor.

### 2. Defendants' opinions are not actionable.

"[A] sincere statement of pure opinion is not an untrue statement of material fact, regardless of whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015).  And "expressions of optimism [and] projections about the future are quintessential opinion statements." *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2008).  Many of the challenged statements indisputably fall into this category:

- ***"[W]e believe*** the growth that we experienced in the first quarter will continue in 2015."  (SAC ¶ 99.)

- ***"[W]e believe*** we will continue to achieve strong gains in 2015."  (*Id.* ¶ 102.)

- ***"We believe*** we are well positioned to maintain this growth . . . ."  (*Id.* ¶ 104.)

- ***"[W]e believe*** we are well prepared for our planned growth."  (*Id.* ¶ 133.)

These "beliefs" are just another way of stating opinions.

"[M]eeting the standard under *Omnicare* is no small task for an investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  "It is not sufficient . . . to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held." *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) (granting motion to dismiss).  Rather, the "*sine qua non* of a securities fraud claim based on false opinion is that defendants ***deliberately misrepresented a truly held opinion***." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d, 146, 153–54 (S.D.N.Y. 2004).  In the Second Circuit, opinions are not actionable unless (1) "the speaker

d[oes] not hold the belief . . . professed"; (2) the "fact[s] supplied" in support of the belief professed are "untrue"; or (3) the speaker "omits information" that "makes the statement misleading." *Martin*, 732 F. App'x at 40.  Plaintiff's allegations show none of these.

First, the SAC contains no allegations "to support the[] argument that defendants did not honestly believe their [statements] when made." *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013) (dismissing claim based on allegedly misleading opinions).  Indeed, defendants' statements that Skechers would continue to experience robust revenue growth were accurate—Skechers ***had record growth*** in both quarters in the second half of 2015.  (*See* Ex. C (Q3 2015 Earnings) at 3 (Q3 growth of 27%, "the highest quarterly sales in the company's 23-year history"); Ex. D (Q4 2015 Earnings) at 3 (Q4 growth of 26.8%, "a new fourth quarter record").)  And while defendants knew in the second quarter that orders had been shifted from Q3 to Q2, that does not suggest they believed that Skechers would not be able to make up the shortfall, when past experience dictated otherwise.  In 2014, for example, orders had been shifted from Q3 to Q2, yet Skechers still reported record revenue in the third quarter.  (*See* Ex. J (Q3 2014 Earnings) at 7.)  Similarly in 2013, orders were shifted from Q3 to Q2, but Skechers continued to grow in Q3, hitting near-record earnings and boasting 30.1% growth in the Domestic Wholesale sector.  (*See* Ex. K (Q3 2013 Earnings) at 3.)  Even in 2015, despite the Q3 to Q2 pull-in, Skechers still achieved record growth in the third quarter of 2015.  Indeed, the facts prove that defendants' optimism was entirely warranted: Skechers's overall growth for 2015 was a whopping 32.4%.  (*See* Ex. D (Q4 2015 Earnings) at 6.)

Second, the SAC identifies no facts supplied by defendants in support of their opinions that were untrue.  Instead, plaintiff merely alleges that defendants should have drawn different conclusions from the facts defendants relied on.  That is insufficient.  *See Tongue*, 816 F.3d at

15

214 ("Plaintiffs' allegations regarding Defendants' stated opinion . . . [do] little more than [raise] a dispute about the proper interpretation of data . . . .").

Third, plaintiff points to no omitted facts that make defendants' optimism misleading. "An opinion statement . . . is not [ ] misleading [simply because] an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 135 S. Ct. at 1329.  That is because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts" and input.  *Id*.  Courts consider the statements at issue in context, i.e., "in light of all [ ] surrounding text, including hedges [and] disclaimers." *Id.* at 1329–30.  Plaintiff alleges only that defendants knew, but failed to disclose, that Q3 2015 revenue and growth figures might fall short of what analysts expected.  But there was no duty to disclose the allegedly omitted facts, and defendants disclosed the risks at issue.

### 3. Defendants' vague statements and puffery are not actionable.

"[S]tatements that are too vague or general or are merely reflections of corporate puffery are not actionable." *Lopez v. Ctpartners Exec. Search Inc*., 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016).  To be material, "the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).  Here, Plaintiff challenges what are merely general statements of corporate optimism, with the following examples:

- "[W]e believe the **strength of our brand and product** has not slowed." (SAC ¶ 104.)

- "So it seems we're very strong going into the back half of this year [2015] and **things are still looking pretty good**."  (*Id*. ¶ 116.)

- "The present has never looked as **colorful, comfortable and successful** . . . ." (*Id*. ¶ 131.)

16

- "I have never been more **confident and excited** about the future of Skechers." (*Id.* ¶ 170.)

These statements are exactly the type of language that courts have found to be inactionable puffery.  In *Hutchinson v. Perez*, for example, Judge Baer held that the statement, "with the best data we have, we feel very comfortable with the level of cash we have and we feel very comfortable with the level we will have at the end of the year," was inactionable puffery, explaining that "words like 'comfortable' are expressions of corporate optimism and puffery too general to cause a reasonable investor to rely upon them."  2013 WL 1775374, at *2 (S.D.N.Y. Apr. 25, 2013).  General expressions of confidence are also puffery.  *See, e.g.*, *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *13 (S.D.N.Y. Aug. 19, 2015) (rejecting alleged misstatement that board members "continue to be very excited about Fairway's growth prospects" as inactionable puffery); *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) (statements such as "we are setting the stage for continuing success," "I feel very, very good about [the] U.S.," and "we're laying in the pieces here to sustain really exciting growth" were too vague to be actionable); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 248 (S.D.N.Y. 2010) (statement that company was "a pillar of strength in the markets" was puffery).

Defendants' statements about growth, such as "we believe . . . our momentum will continue throughout the year" (SAC ¶ 140) and "we have confidence that Q3 can be significantly to the upside" (*id.* ¶ 108), are also puffery.  *See, e.g.*, *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp.3d 233, 241 (S.D.N.Y. 2015) (statement that "[w]e continue to see compelling longterm opportunities for Blackberry 10" was "so lacking in tangible detail, that [it] would be immaterial from a reasonable investor's standpoint"); *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 42 (D. Mass. 2016) ("we'd be surprised if we don't see forward momentum from here" was a

17

"subjective, optimistic statement[] [that] would not be considered material"); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 258 (D. Mass. 2006) (statements conveying expectations of "growing momentum" and "substantial growth" were too vague to be actionable).

Where defendants express comfort with analysts' projections, those statements are likewise too vague to be actionable, because such statements are not guarantees but general expressions of optimism.  *See Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 253 (D. Mass. 2001) ("[C]ourts routinely have declined to impose liability where company officers simply express their 'comfort' with analysts' estimates."); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 891 (S.D. Tex. 2001) (executive's statement that he was "comfortable" with analysts' consensus that company would earn $.53 per share was inactionable optimism or puffery).  Thus, the following statements are inactionable:

- "*[W]e are comfortable* with the second quarter analyst estimates."  (SAC ¶ 102.)

- "*We remain comfortable* with the analysts' current consensus estimates for the back half of 2015."  (*Id.* ¶ 133.)[9]

### 4.    Defendants fail to plead that statements were false.

Grasping for straws, plaintiff attempts to cast numerous statements as somehow false or misleading without actually alleging how so.  But "[a] violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made."  *Pehlivanian v. China Gerui Adv. Materials Grp. Ltd.*, 153 F. Supp. 3d 628, 644–45 (S.D.N.Y. 2015).  This renders the following statements inactionable:

---

[9] These statements are also protected under the PLSRA's safe harbor.  *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009) (statements that company's first-quarter results "position us" to meet goals for the year and that company was "on track" to meet projections qualified for safe-harbor protection).

- "Having just achieved a new annual sales record of $2.4 billion in 2014, we expected the momentum to continue into 2015."  (SAC ¶ 99.)[10]

- "I think it's fair to say that those names you mentioned, like DSW and Shoe Carnival, our business grows, and if it wasn't growing there, it'll be very difficult for us to maintain the growth we've shown domestically."  (*Id.* ¶ 129.)

- "Like I said in the prepared comments, every major division we had, had significant—had higher sales and higher gross margins."  (*Id.* ¶ 150.)

Plaintiff does not even attempt to plead how any of these statements was false.  Nor does it dispute, for example, that Skechers hit a sales record of $2.4 billion in 2014, that large customers like DSW are critical to the company's success, or that every division had increased sales and margins in Q2 2015.

More broadly, the SAC purports to allege that swaths of defendants' statements were false or misleading by bolding text.  (*See id.* ¶ 98 n.22.)  But the SAC often fails to plead **why** they are false and misleading, instead cutting-and-pasting boilerplate language after each statement.  (*See* Appendix A.)  Plaintiff thus fails to meet its burden under Rule 9(b) and the PSLRA "to adequately explain the reason(s) why the alleged misstatements were false when made."  *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 391 (S.D.N.Y. 2006).

## B.     The SAC pleads no actionable omissions.

Plaintiff's claim that defendants should have disclosed that sales growth might slow and cause Q3 revenues to fall short of Wall Street expectations is doomed for at least three reasons.  First, Skechers explicitly disclosed that Q3 orders were being pulled into Q2 and therefore Q3 revenue might fall short.  Second, the omissions allegations are unsupported by factual allegations.  Third, Skechers had no duty to disclose the allegedly omitted information.

---

[10] The SAC places a "[sic]" after the word "expected" (SAC ¶ 100), apparently hoping to convert this word into the present-tense "expect" and changing the statement's meaning.  But there is no reason to believe that Greenberg was misquoted.

1.      **Skechers specifically disclosed the risk of a Q3 revenue shortfall.**

"A complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed." *Debora v. WPP Grp. PLC*, 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994). Here defendants specifically disclosed the risk that Q3 revenue might fall short of expectations. On Skechers's July 29, 2015 earnings call—months before Skechers announced Q3 revenue— Greenberg disclosed that orders shifting from Q3 to Q2 had created a deficit of Q3 orders: "If I had to guess, I would assume it was somewhere in the $15 million, $20 million range that normally would have gone into Q3." (SAC ¶ 144.) Greenberg also cautioned investors that new orders might not be able to fill the revenue gap created by this shift: "[T]he order of magnitude potential in Q3 to Q2 is certainly significantly larger than Q4 to Q3 because October is a small month, and September is the smallest month of the third quarter." (*Id.* ¶ 152.) Investors thus knew that Q3 demand might be less than anticipated—and it was by the ***exact amount*** Skechers warned—defeating plaintiff's claim that Skechers misled them about this possibility.

2.      **The alleged omissions are inadequately pleaded.**

Plaintiff's omissions allegations are illogical and inconsistent. The SAC relies heavily on Skechers's internal order-to-delivery timeline, which plaintiff claims "provided Skechers with good visibility into upcoming sales six months in advance" (*id.* ¶ 39), such that Skechers would have known of a Q3 2015 potential shortfall by the start of the class period in April 2015 (*see id.* ¶ 62). But even if Skechers had some visibility into future sales, that does not imply the laser-like precision necessary to forecast that months later Skechers would miss analysts' estimates by just a couple of percentage points. Plaintiff even admits that Skechers could have received orders for Q3 much later, in "late July or early August." (*Id.* ¶ 45.) That defeats plaintiff's contention that Skechers would have known months earlier. *See, e.g., Hirsch v. Arthur Andersen*

*& Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (sustaining dismissal where "attenuated allegations" supporting claim "are contradicted both by more specific allegations in the complaint").

Next, the SAC alleges that Skechers failed to disclose order cancellations that occurred in late May 2015.  (*See, e.g.*, SAC ¶¶ 124, 126, 128.)  But the SAC contains no information about the magnitude of the cancellations or how the cancellations affected Q3 revenues and thus fails to "state with particularity the specific facts" to support allegations that cancellations led Skechers to miss analysts' Q3 targets.  *See Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 295–96 (S.D.N.Y. 2011).

Plaintiff's claim that Skechers improperly failed to tell investors about its competitive advantage from a labor disruption also fails.  Plaintiff does not explain how a labor disruption ending in February 2015 affected Q3 revenues, stating only that when the slowdown ended it became "inevitable" that demand for Skechers's products would decrease as competitors caught up to Skechers's supposed "advantage" at the ports.  (*See, e.g.*, SAC ¶¶ 7–8.)  But any demand decrease would have occurred when the slowdown ended in February 2015 (during Q1), or at the latest "around late March or early April" 2015 (during Q2), when plaintiff alleges that ships were finally unloaded.  (*Id.* ¶ 60.)  And if ever a duty existed to disclose Skechers's advantage (or loss thereof), it arose no later than February 2015—two months before the proposed class period began—and therefore cannot form a basis for this securities claim.  *See In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 17 (S.D.N.Y. 2016) (noting "general rule that pre-Class Period statements are not actionable").  At most, the SAC alleges a "duty to correct," but "the duty to correct previous misstatements does not apply where the defendants made the original statements before the Class Period and became aware of the errors in those statements before the Class Period."  *Id.*; *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154 (2d Cir.

2007) (affirming dismissal where "it cannot be said that [defendant's] failure to correct [a pre-class period statement] constituted a statement made during the Class Period").

### 3. There was no duty to disclose the allegedly omitted information.

A disclosure duty may arise either "as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts," or "expressly pursuant to an independent statute or regulation." *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010). Here, Plaintiff tries to manufacture a disclosure duty by (i) suggesting that defendants' general statements about Skechers's business prospects required them to disclose every conceivable fact relevant to growth and (ii) contending that factors potentially affecting Domestic Wholesale were a "known trend or uncertainty" under Item 303. Neither duty applies.

#### a. *Defendants had no duty to disclose predictions.*

The alleged omission that Skechers's revenue growth might slow is no more than a mistaken prediction. "Mere allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Gissin*, 739 F. Supp. 2d at 501. Importantly, there is no duty to disclose "predictions that are not substantially certain to hold." *Travelzoo*, 2013 WL 1287342, at *6. What Skechers allegedly failed to disclose were predictions, not presently known facts. The SAC's key allegation is that there existed an undisclosed "revenue vulnerability" for Q3 2015 throughout the proposed class period that was "unlikely to be resolved." (SAC ¶ 73.) But a "vulnerability" is the mere potential for adversity and therefore not an actionable omission. *See Travelzoo,* 2013 WL 1287342, at *6 ("Travelzoo had no duty to disclose a ***potentially*** adverse effect that the launch of one of its products could have on the overall growth and revenue of its

22

other core business.") (emphasis in original).[11]   And as the SAC acknowledges, Skechers's Q3

2015 outcome was uncertain because a Domestic Wholesale revenue shortfall could have been

averted in several ways, including by pull-in and replenishment orders.  (*See* SAC ¶¶ 42–43.)

That defendants offered their opinions on future growth does not trigger a duty to disclose every

prediction they might have had.  *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp.

2d 564, 581–82 (S.D.N.Y. 2013) ("A corporation is not required to reveal all facts on a subject

just because it reveals a single fact.").

> b.   *Defendants had no duty under Item 303 of Regulation S-K.*

Item 303 imposes a disclosure duty only "where a trend, demand, commitment, event or

uncertainty is both [1] presently known to management and [2] reasonably likely to have

material effects on the registrant's financial condition or results of operations."  *Id.* at 584.  The

alleged Item 303 violation fails for at least two reasons.

First, plaintiff alleges no "trend."  The SAC alleges that in its May 8, 2015 and August

10, 2015 10-Qs, Skechers failed to disclose that "there was a serious vulnerability" in Q3, that

Domestic Wholesale was trending downward for Q3, and that Skechers was "unlikely to get a

pull in from 4Q15 to 3Q15 to make up the difference."  (SAC ¶121.)  But a single-quarter change

is not long enough to constitute a "trend" under Item 303.  *See In re Turkcell Iletisim Hizmetler,*

*A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (single-quarter decline in operating

income need not be disclosed under Item 303); *Blackmoss, Invs. Inc. v. ACA Capital Holdings,*

*Inc.*, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two month period

of time does not establish a 'trend' for purposes of the disclosures required by Item 303.");

---

[11] Other alleged omissions similarly point to mere possibilities.  (*See* SAC ¶ 7 ("the Company was *unlikely* to overcome such a huge deficit."); ¶ 12 ("backfill (replenishment) orders were *unlikely* to bridge the massive revenue deficit"); ¶ 128 ("this kind of a shift this time of year creates a revenue deficit in 3Q15 that is *unlikely* to be filled").)

*Kapps v. Torch Offshore, Inc*., 379 F.3d 207, 218 (5th Cir. 2004) (a five-month "decline in

natural gas prices [did not yet constitute] a trend" requiring disclosure).

Second, "only those trends, events, or uncertainties that [the company] actually knows of

when it files the relevant report with the SEC" must be disclosed under Item 303, and "[i]t is not

enough" for a plaintiff to allege the company "should have known."  *Ind. Pub. Ret. Sys. v. SAIC,*

*Inc.,* 818 F.3d 85, 95 (2d Cir. 2016).  Plaintiff alleges only that defendants knew that there ***could***

***have*** been a growth slowdown in Q3.  (*See, e.g.*, SAC ¶¶ 70, 73.)  And where, as here, disclosure

would require "anticipating a future trend or event or anticipating a less predictable impact of a

known event, trend or uncertainty," Item 303 does not require disclosure.  *See Mgmt. Discussion*

*and Analysis of Fin. Condition and Results of Operations*, Exchange Act Release No. 6835, 1989

WL 1092885, at \*4 (May 18, 1989).  The facts actually known to defendants—a sustained high-

growth rate through the first two quarters of 2015 and high-performing Q3s in previous years

despite Q2 pull-ins—belied the downward "trend" that plaintiff describes.  *See In re Coty Inc.*

*Sec. Litig.*, 2016 WL 1271065, at \*7 (S.D.N.Y. Mar. 29, 2016) (no known trend of declining

sales when company's revenue was increasing until sharp downturn).

## C.     The SAC contains insufficient particularized facts giving rise to a strong inference of scienter.

A securities fraud claim cannot survive unless "a reasonable person would deem the

inference of scienter cogent and at least as compelling as any plausible opposing inference one

could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

324 (2007).  This requires a "comparative evaluation," under which courts consider "not only

inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the

facts alleged."  *Id.* at 314.  Plaintiff must establish the requisite "strong inference" of scienter as

to each defendant.  *In re BISYS Sec. Litig.,* 397 F. Supp. 2d 430, 438, 441 (S.D.N.Y. 2005).  To

show Skechers's scienter, plaintiff must show that its executives—i.e., at least one of the individual defendants—acted with scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (Corporate scienter demands "facts which create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."). Plaintiff must therefore plead facts showing (i) that Greenberg or Weinberg had the "motive and opportunity" to commit fraud or (ii) strong circumstantial evidence of their "conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The SAC's allegations are insufficient under either theory.

### 1.      The SAC does not allege a motive to commit fraud.

Plaintiff first relies on insider stock sales to show scienter. Insider trading may permit an inference of scienter, but not when a defendant sold no shares. *See In re Health Mgmt. Sys., Inc. Sec. Litig.,* 1998 WL 283286, at *6 (S.D.N.Y. 1998). There is thus no inference of scienter for Weinberg—who made most of the alleged misstatements—because he sold no Skechers stock and in fact ***increased*** his holdings during the proposed class period. (*Compare* Ex. L (Apr. 30, 2015 Proxy Statement) at 33 (holdings of 132,031 shares), *with* Ex. M (Apr. 29, 2016 Proxy Statement) at 36 (Weinberg's holdings of 497,449 shares).) Weinberg therefore suffered significant losses when Skechers's stock price dropped. Moreover, Weinberg sold shares before and after the proposed class period. (*See* Ex. N (Sep. 12, 2014 Form 4) (sold 25,000 shares); Ex. O (Mar. 2, 2016 Form 4) (sold 54,179 shares).) In other words, he sold stock ***before*** supposedly misleading the market to drive up the stock price and again ***after*** the market corrected for the alleged false inflation, but not ***while*** the price was allegedly inflated.

Although Greenberg did sell stock during the class period, Weinberg's lack of sales undercuts any inference of scienter from Greenberg's sales. *See Acito v. IMCERA Grp., Inc.*, 47

25

F.3d 47, 54 (2d Cir. 1995) ("[T]he fact that . . . other defendants did not sell their shares [ ] undermines [the] claim" of scienter.).   In *Acito*, the plaintiff sued a company and four executives for securities fraud.  The plaintiff pointed to one defendant's stock sale, but the court found the sale was not "unusual" or indicative of scienter, in part because the other defendants did not sell. *Id.*  Similarly, it is unreasonable to suggest that Greenberg and Weinberg perpetrated a fraudulent scheme to inflate Skechers's stock price when Weinberg lost rather than gained.  *See In re Glenayre Techs., Inc. Sec. Litig.*, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) ("[O]ne can assume that these high-ranking corporate officers . . . would be part of any fraudulent scheme . . . .  The absence of sales from these individuals, then, suggests that . . . trading by [other] defendants does not give rise to a strong inference of scienter.").

Greenberg's sales do not support scienter even considered alone.  It is "nonsensical" to ascribe dishonest motive to an executive who "suffered significant losses in [his] stock holdings."  *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010).  Although Greenberg sold stock during the class period, he still lost when the stock dropped over $175 million—significantly more than the $101 million in shares he sold.  (SAC ¶ 190; *see* Ex. P (Sept. 25, 2015 Form 4).)  Moreover, to plead scienter based on insider stock sales, plaintiff must show that such sales were "unusual" or "suspicious."  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009).  Factors courts consider include the percentage of holdings sold, the net profits realized, and whether they were out of line with other sales.  *See Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).

These factors undermine any inference of improper motive by Greenberg, whose stock sales in the class period constituted only 16.6% of his holdings (SAC ¶ 212)—too small a portion

to be considered "unusual." *See, e.g.*, *Take-Two Interactive Sec. Litig.,* 551 F. Supp. 2d 247, 276 (S.D.N.Y. 2008) (sales of less than 20% not "unusual"); *In re Skechers U.S.A., Inc. Sec. Litig*., 2004 WL 1080174, at *10 (C.D. Cal. May 7, 2004) (dismissing complaint because Greenberg's sales of 7–17% of holdings and Weinberg's sales of 42% of his "much smaller stake in the company" were insufficiently large).  Also, the allegations are insufficient because they do not say what Greenberg's profits were.  *See In re Gentiva Sec. Litig*., 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013) (rejecting scienter allegations in part because a "plaintiff alleging motive and opportunity in connection with stock sales must allege . . . the defendants' net profits rather than their gross proceeds").  Nor can plaintiff suggest Greenberg's class-period sales of 300,000 shares in Q2 and 500,000 shares in Q3 were inconsistent with sales in other timeframes; Greenberg often sold large chunks of his holdings, e.g., 300,000 shares in Q4 2013 and 250,000 shares in Q2 2014.  (Ex. Q (Dec. 19, 2013 Form 4)); Ex. R (May 1, 2014 Form 4).)  He similarly sold 282,000 shares in 2016, after the class period.  (*See* Exs. S–Y (Jan. 29, 2016; Mar. 2, 2016; Apr. 1, 2016; May 17, 2016; June 22, 2016; June 30, 2016; Nov. 30, 2016 Form 4s).)

Courts also consider whether the sales were "at times calculated to maximize personal benefit from undisclosed inside information," *Gildan Activewear*, 636 F. Supp. 2d at 270, which entails examining both how quickly after the alleged misstatement the sales were made and their proximity to the alleged corrective disclosure.  Even small time gaps can negate an inference of scienter.  *See, e.g.*, *In re Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 586 & n.24 (S.D.N.Y. 2014) (rejecting scienter where stock sales were 17 days after alleged misstatements); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003) (two-month gap between sales and alleged corrective disclosure insufficient).  Here, Greenberg's stock sales occurred weeks after his alleged misstatements or far before the end of the class period:

| Date | Shares Sold / Statements Made[12] |
|------|-----------------------------------|
| 4/22/2015 | Q1 press release and earnings call with first alleged misstatements (SAC ¶ 99) |
| 4/29/2015 | 110,800 shares sold, *almost six months before alleged corrective disclosure* |
| 4/30/2015 | 189,200 shares sold, *almost six months before alleged corrective disclosure* |
| 7/29/2015 | Q2 press release and earnings call with alleged misstatements (SAC ¶ 131) |
| 8/18/2015 | 100,000 shares sold, *almost three weeks after alleged misstatement* |
| 8/19/2015 | 200,000 shares sold, *three weeks after alleged misstatement* |
| 8/21/2015 | Press release with last alleged misstatements (SAC ¶ 170) |
| 9/23/2015 | 40,500 shares sold, *over a month after last alleged misstatement* |
| 9/24/2015 | 71,000 shares sold, *over a month after last alleged misstatement* |
| 9/25/2015 | 88,500 shares sold, *over a month after last alleged misstatement* |
| 10/22/2015 | End of proposed class period and date of alleged corrective disclosure. |

Simply put, the most compelling inference from Greenberg's stock sales is not fraudulent intent, but that Greenberg sold stock because (i) it was his usual practice and (ii) he wanted to sell some of his holdings while the stock was strong during a period of robust growth.

### 2.    The SAC does not allege conscious misbehavior or recklessness.

Because plaintiff has failed to allege motive, it must allege scienter by demonstrating "strong circumstantial evidence" of "conscious misbehavior or recklessness"—i.e., "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).  The "strength of the circumstantial allegations" under this theory must be "correspondingly greater" than those required under a motive theory.  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y. 2009).  Specific allegations that defendants knew "facts or had access to information suggesting that their public statements were not accurate" can show scienter.  *In re Sec. Capital Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 594–95 (S.D.N.Y. 2010).  But allegations that "Defendants received and were aware of information contradicting their public statements because they held management roles is not enough to allege scienter." *Id.*

---

[12]  This chart is derived from Skechers's Form 4s reporting transactions by Greenberg in 2015.  (*See* Exs. Z–BB.)

The SAC alleges scienter based on Greenberg's and Weinberg's hands-on management practices.  Plaintiff asserts, for example, that they "were closely involved in all aspects of the Company's operations" (SAC ¶ 192) and "closely followed the results and prospects of the Domestic Wholesale division because it was critically important to the Company's overall success" (*id.* ¶ 191).  This included tracking of "sales figures and trends, inventory levels, customer cancellations, sell-through rates, backlog, and competitor information."  (*Id.* ¶ 194.)[13] But merely having information on a topic does not show scienter; plaintiff must allege that "specific contradictory information was available to the defendants."  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d at 536 (finding scienter allegations insufficient).

Plaintiff attempts to make this showing by pointing to reports revealing problems in Domestic Wholesale that belied defendants' optimistic statements.  But alleging the existence of such reports does not amount to "particularized facts."  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."); *see also Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 365 (1st Cir. 1994) (requiring plaintiffs to "specifically identify the internal reports and the public statements underlying their claims, providing names and dates"); *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) ("[R]eferences to unreleased or internal information [should] indicate [such matters as] who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them.").  The SAC identifies no specific report that Greenberg or

---

[13] *See also* SAC ¶¶ 202–06 (Skechers tracked customers and sales); ¶ 207 (Skechers monitored competitors); ¶¶ 208–10 (Skechers worked closely with customers).

Weinberg received that suggested their optimism about Skechers's prospects to be unwarranted. And there is no dispute that Skechers had an excellent year, ending up with 32.4% sales growth for the year (*see* Ex. D (Q4 2015 Earnings) at 6), rendering their optimism fully justified.

Citing a former employee, the SAC describes seven types of reports that Greenberg and Weinberg received (SAC ¶ 195), but says nothing about what any particular report actually contained.  The only detail is that unspecified Cancellation Reports "reflected the significant cancellations in late May, June, and July 2015."  (*Id.*)  The SAC does not, however, allege when the defendants received this information, the dates of the reports, or the volume of canceled orders.  The SAC does not even allege that the Cancellation Reports concerned the Domestic Wholesale division (as opposed to another division or across all divisions).  Plaintiff's "confidential witness" does not satisfy its burden to plead facts showing a strong inference of scienter.  *See Glaser*, 772 F. Supp. 2d at 588 (dismissing claim where plaintiffs failed to allege "specific instances in which Defendants received information that was contrary to their public declarations").

## II.     The ancillary Section 20(a) and Section 20A claims should be dismissed.

Because plaintiff fails to state a claim under Section 10(b), the Section 20(a) and 20A claims should be dismissed.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir. 2007) (affirming dismissal of Section 20(a) claim for failure to plead Section 10(b) claim); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2d Cir. 1994) ("[T]o state a claim under § 20A, a plaintiff must plead a predicate violation . . . .").

## CONCLUSION

For the reasons stated above, the SAC should be dismissed with prejudice.

Dated:  November 21, 2018                              Respectfully submitted,
       New York, NY

                                        /s/ *Abby F. Rudzin*
                                        Abby F. Rudzin
                                        David K. Lukmire
                                        Times Square Tower
                                        7 Times Square
                                        New York, NY 10036
                                        Telephone: (212) 326-2000
                                        Facsimile: (212) 326-2061
                                        arudzin@omm.com
                                        dlukmire@omm.com

                                        Seth Aronson (*pro hac vice*)
                                        400 South Hope Street
                                        Los Angeles, CA 90071
                                        Telephone: (213) 430-6000
                                        Facsimile: (213) 430-6407
                                        saronson@omm.com

                                        *Attorneys for Defendants*