USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/23/2019  

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
STEAMFITTERS LOCAL 449 PENSION PLAN, Individually and on Behalf of All Others Similarly Situated,

                           Plaintiff,

-against-

SKECHERS U.S.A., INC., ROBERT GREENBERG and DAVID WEINBERG,

                           Defendants.

17 Civ. 8107 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Steamfitters Local 449 Pension Plan, brings this action against Defendants, Skechers, U.S.A., Inc. ("Skechers" or "the company"), Robert Greenberg, and David Weinberg (Greenberg and Weinberg together, the "Individual Defendants"), alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. ¶ 78j(b), and Rule 10b–5, 17 C.F.R. ¶ 240.10b–5 against all Defendants; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants; and Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Greenberg. Compl. at 110–115, ECF No. 57. Plaintiff brings suit on behalf of all purchasers of Skechers stock from April 23, 2015 through October 22, 2015 (the "Class Period"). *Id.* ¶ 1. Defendants move to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 65. For the reasons stated below, Defendants' motion is GRANTED.

## BACKGROUND

Skechers is a footwear company that designs, develops, markets, and distributes its products. Compl. ¶ 34. It does not own or operate any manufacturing facilities, instead producing its products through independent contract manufacturers around the world. *Id.*

During the relevant period, Robert Greenberg was Skechers' chief executive officer, and David Weinberg was Skechers' chief financial officer and chief operating officer. *Id.* ¶¶ 22–23. Skechers' largest business segment is its "Domestic Wholesale" division, which accounts for approximately 42% of its revenue. *Id.* ¶ 36.

Skechers' strongest sales typically occur in June, July, and August, which encompass the "back-to-school" ("BTS") season. *Id.* ¶ 38. The company's order-to-delivery timeline for its Domestic Wholesale customers typically takes about six months, and entails meetings with its customers, followed by the order, production, and shipping of its products. *Id.* ¶¶ 39–41. For the 2015 BTS season, it began meeting with customers even earlier, in October and November 2014. *Id.* ¶ 55.

If a Skechers' domestic wholesale customer faced high demand for Skechers products, the customer could "pull in" an order for a later quarter to an earlier quarter, meaning it would receive an order earlier than it had originally requested. *Id.* ¶ 42. Plaintiff alleges that in accordance with "industry norm," a customer would have needed to inform Skechers by mid-April 2015 if it had wanted to pull in an order from the third quarter to the second quarter, or by mid-July if it wanted to pull in an order from the fourth quarter to the third quarter. *Id.*

Alternatively, a domestic wholesale customer could place a "backfill" or "fill-in" order if it faced high demand for a particular product—that is, if it needs additional inventory before the end of the then-current selling season. *Id.* ¶ 43. Typically, it takes about three to three-and-a-half weeks after placing a backfill order for the product to end up on the customer's sales floor. *Id.* ¶ 45. Domestic wholesale customers also have the option to cancel future orders. *Id.* ¶ 44. Because Skechers had a meticulous planning process and assessed its inventory levels using various metrics, *id.* ¶¶ 46–48, it had some amount of insight into its sales prospects at least six

months in advance, *id.* ¶ 49.

Skechers receives most of its footwear at ports on the United States' west coast from cargo ships that originate in Asia. *Id.* ¶ 57. In early 2015, a labor dispute arose concerning dockworkers at these ports, who allegedly purposefully slowed the entry of products into the ports and threatened to strike. *Id.* Skechers had good relationships with senior management at these docks, however, and avoided the disruptions and delays that its competitors were facing. *Id.* ¶ 58. Accordingly, in late 2014 and early 2015, Skechers' domestic wholesale customers increased their orders from Skechers (because the domestic wholesale customers were getting fewer products from Skechers' competitors)—increasing both their current and future orders for the 2015 BTS season. *Id.* ¶ 59. This boost in orders led to increased sales and revenue for Skechers prior to the Class Period. *Id.* The customers also "pulled in" some of their orders for the third quarter of 2015 into the second quarter, resulting in approximately $20 million in revenue being pulled in the second quarter of 2015. *Id.* ¶ 61.

The labor dispute was resolved in late February 2015, although it took a few more months for things to get back to normal for Skechers' competitors. *Id.* ¶ 60. Beginning in late May and continuing through June and July, 2015, Skechers' domestic wholesale customers cancelled a "significant number" of orders for the BTS season. *Id.* ¶ 63. This resulted in a glut of inventory for Skechers, which could not cancel its own orders from the Asian manufacturers in time. *Id.* & n.15. Moreover, the renewed access to Skechers' competitors' products led to a reduction in "backfill" orders from Skechers. *Id.* ¶ 65.

Plaintiff alleges that by late July 2015, Skechers would have known that the company would not be receiving significant "fill-in" orders during the third quarter of 2015. *Id.* ¶¶ 66–67. Moreover, Plaintiff alleges that by this point, Skechers would have known that approximately

3

$20 million of the revenue that was "pulled in" from the third quarter to the second quarter would not be made up by "pulling in" revenue from the fourth quarter to the third quarter. *Id.* ¶ 68. Plaintiff alleges that, despite knowledge of these problems, Defendants made public misrepresentations that Skechers was doing well and would have a profitable third quarter. Compl. ¶ 71.

Plaintiff alleges that Defendants made misrepresentations about the company's financial performance in the following instances:

- an April 22, 2015 press release announcing Skechers' earnings for the first quarter of 2015, *id.* ¶¶ 99–100;
- an April 22, 2015 earnings call with investors, *id.* ¶¶ 101–109;
- an April 23, 2015 appearance by Weinberg on the CNBC television program "Mad Money," *id.* ¶¶ 114–117;
- a May 28, 2015 question-and-answer session with Weinberg at the "Citi Global Consumer Conference," *id.* ¶¶ 122–128;
- a July 29, 2015 press release announcing Skechers' results for the second quarter of 2015, *id.* ¶¶ 131–134;
- a July 29, 2015 earnings call with investors, *id.* ¶¶ 135–155;
- a July 30, 2015 appearance on "Mad Money" by Weinberg, *id.* ¶¶ 160–163; and
- an August 21, 2015 press release announcing a stock split, *id.* ¶¶ 169–171.

On October 22, 2015, Skechers announced its financial results for the third quarter of 2015. *Id.* ¶ 173. Skechers announced less growth in its Domestic Wholesale business segment than had been projected, *id.*, as well as an increase in inventory, *id.* ¶ 174. Skechers' stock price dropped by 31.5%. *Id.* ¶ 179. During the Class Period, Greenberg sold more than 16% of his

shares in Skechers for more than $101 million. *Id.* ¶¶ 212–213. Plaintiffs do not allege that Weinberg made any significant sales of his shares during the Class Period. *See generally id.*

## DISCUSSION

I. <u>Legal Standard</u>

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotation marks omitted)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[] and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the non-movant. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

II. <u>Analysis</u>

A. Count One: Section 10(b) and Rule 10b–5 Claims

Count One of the complaint is brought against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. "To state a claim for relief under § 10(b) and Rule 10b–5, plaintiffs must allege that [defendants] (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with

5

the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks and citation omitted).

Plaintiffs that bring claims pursuant to Section 10(b) and Rule 10b–5 of the Exchange act are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *See In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 262 (S.D.N.Y. 2010). "In order to satisfy Rule 9(b), a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (internal quotation marks and citation omitted). The PSLRA "insists that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed, and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (internal quotation marks, citation, and alterations omitted).

### 1. April 22, 2015 Press Release and Earnings Call

The Court shall address the alleged misrepresentations made in the April 22, 2015 press release and the accompanying earnings call with investors. Compl. ¶¶ 99–109.

Pursuant to the PSLRA's "safe harbor" provision, a defendant is not liable for a forward-looking statement that is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). A forward-looking statement includes, among other things, "a statement containing a projection of revenues . . . or other financial items." *Id.* § 78u-5(i)(1)(A). The "use of linguistic cues like 'we expect' or 'we believe,' when

combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement." *Slayton v. Am. Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010) (citation and quotation marks omitted).

The April 22, 2015 press release stated that it "contains forward-looking statements that are made pursuant to the safe harbor provisions of the [PSLRA]," and that they "can be identified by the use of forward looking language such as 'believe' [or] 'expect.'" Apr. 22, 2015 Press Release, ECF No. 67-8 at 1. It further explained the risks and uncertainties that Skechers faced, including:

> [S]ustaining, managing and forecasting costs and proper inventory levels; losing any significant customers; decreased demand by industry retailers and cancellation of order commitments due to the lack of popularity of particular designs and/or categories of products; maintaining brand image and intense competition among sellers of footwear for customers; . . . consumer demand for the products and the various market factors described above; sales levels during the spring, back-to-school and holiday selling seasons; and other factors referenced or incorporated by reference [in Skechers' annual report].

*Id.* at 2.

Plaintiff alleges two misstatements by Greenberg in the April 22, 2015 press release. *See* Compl. ¶ 99 ("Having just achieved a new annual sales record of $2.4 billion in 2014, we expect[] the momentum to continue into 2015.")[1]; *id.* ("With the demand for our key product initiatives in the United States . . . remaining very high, we believe the growth that we experienced in the first quarter will continue in 2015."). As discussed, Plaintiff claims that Skechers suffered a lackluster third quarter due to growth in inventory, cancellations of orders by

---
[1] Plaintiff alleges that Greenberg was misquoted in the press release—that is, he actually said "we expect the momentum to continue," not "we expected the momentum to continue," as was transcribed. *See* Compl. ¶ 100. Defendants state that "there is no reason to believe that Greenberg was misquoted." Def. Mem. App'x A at 1 n.1, ECF No. 68-1. Even if Plaintiff were correct, however, the statement is protected by the PSLRA's safe harbor provision and is, therefore, not actionable.

domestic wholesale customers, and competition from other sellers of footwear, *see, e.g.*, Compl. ¶¶ 7, 60, 63, 65, 67—some of the exact risks that Skechers disclosed. Therefore, Greenberg's statements in the April 22, 2015 press release are protected by the safe harbor provision.

As for the earnings call with investors that took place the same day, a Skechers executive read aloud a "safe harbor statement" at the beginning of the call, stating that "[t]here can be no assurance that the actual future results, performance or achievements expressed or implied by . . . forward-looking statements will occur," and that "[u]sers of forward-looking statements are encouraged to review the company's filings with the U.S. Securities and Exchange Commission, including . . . all other reports filed with the SEC as required by federal securities laws for a description of other significant risk factors that may affect the company's business, results of operations and financial conditions." Apr. 22, 2015 Tr. at 3, ECF No. 67-5. The April 22, 2015 press release was filed with the SEC as a Form 8–K. *See* April 22, 2015 8–K Statement, *available at* https://investors.skechers.com/financial-data/all-sec-filings/content/0001299933-15-000611/0001299933-15-000611.pdf (last visited September 23, 2019). Incorporation of cautionary language in SEC filings during earnings calls is sufficient to trigger the PSLRA's safe harbor provision. *See Shemian v. Research In Motion Ltd.*, No. 11 Civ. 4068, 2013 WL 1285779, at *6 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

Therefore, almost all of the alleged misstatements during the April 22, 2015 call are forward-looking and, based on Skechers' disclosures, accompanied by meaningful cautionary language. *See* Compl. ¶ 102 ("With significantly increased worldwide bookings, our year-over-year worldwide backlogs are up mid double digits at March 31, 2015, which we believe is a clear indicator that our momentum will continue throughout the year."); *id.* ("Based on our Domestic Wholesale backlog . . . we believe we will continue to achieve strong gains in 2015."); *id.* ("Our

8

record 2015 first quarter and a strong start to April in terms of revenues and backlogs, including double-digit domestic . . . retail comps, leads us to believe that our accelerated growth trend will continue through the second quarter and into the back half of 2015."); *see also id.* ¶¶ 106, 108.

Plaintiff argues that "Defendants' safe harbor is limited because it applies only to forward-looking statements, not omissions or statements of present or historical fact," and that the alleged misstatements in the complaint "encompassed representations of present or historical fact regarding problems within Domestic Wholesale that were occurring, or had already occurred, at the time the misstatements were made." Pl. Mem. at 17, ECF No. 69. "Where a statement contains references to both future and past or present conditions, safe harbor protection may only extend to the prognostic portion," but "context is everything." *Gissin v. Endres*, 739 F. Supp. 2d 488, 505–06 (S.D.N.Y. 2010). The safe harbor provision still applies where "[d]efendants [are] not making guarantees about the present," but are instead "stating their educated guess about what the preceding quarter's financial data would mean for the [c]ompany's future." *Id.* at 506. The alleged misstatements contain some present-tense language, but are all forward-looking as a whole, and, therefore, are protected by the safe harbor provision.

Plaintiff argues, however, that Defendants' cautionary language was not meaningful because it did not change when used in successive financial statements—and was, as Plaintiff characterizes it, "boilerplate." Pl. Mem. at 19–20. Plaintiff cites no authority for the proposition that cautionary language must change where the standard risks the company faces stay the same. The Court, therefore, finds this unpersuasive.

The remaining statements made during the call are not actionable because they constitute puffery. "[S]tatements that are too vague or general or are merely reflections of corporate

9

puffery are not actionable." *Lopez v. Ctpartners Executive Search Inc.*, 173 F. Supp. 3d 12, 27–28 (S.D.N.Y. 2016). This is because "[t]o be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). "Puffery is defined as a company's statements of hope, opinion, or belief about its future performance or general market conditions." *Shemian v. Research In Motion Ltd.*, No. 11 Civ. 4068, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013).

The remaining alleged misstatements during the April 22, 2015 conference call fit precisely within this definition. *See* Compl. ¶ 104 ("Based on the reaction by key accounts during our interim meetings this month in our corporate offices, we believe the strength of our brand and our product has not slowed."); *id.* ("We believe we are well positioned to maintain this growth."). These are statements of opinion, without sufficient specificity to offer any guarantee of some concrete fact or outcome.

2. April 23 and July 30, 2015 Mad Money Appearances

Next are Weinberg's appearances on April 23 and July 30, 2015 episodes of the CNBC television program "Mad Money." *Id.* ¶¶ 114–117, 160–163. The Court concludes that the alleged misstatements are all the kind of vague or general statements that constitute inactionable puffery, as discussed above. *See id.* ¶ 116 ("[[I]t seems we're very strong going into the back half of this year and things are still looking pretty good."); *id.* ¶ 163 ("It's about everything we do, all the categories, the geography[.] It all works and it's all starting to work even better

now."); *id.* (in response to Jim Cramer stating "you're the number two athletic footwear brand in this country," replying "[t]hat's right[, a]nd we continue to grow.").

### 3. May 28, 2015 Citi Global Consumer Conference

Next, the Court shall address the alleged misstatements made during a May 28, 2015 question-and-answer session with Weinberg at the "Citi Global Consumer Conference." *Id.* ¶¶ 122–128.

A "sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless of whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015). "Expressions of optimism and projections about the future are quintessential opinion statements." *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) (internal quotation marks, citation, and alternations omitted). A statement of opinion can be false or misleading only if "(1) the speaker does not hold the belief professed; (2) the facts supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor." *Id.* at 40 (internal quotation marks, alterations, ellipsis, and citation omitted).

Weinberg's statement at the May 28, 2015 "Citi Global Consumer Conference" is an inactionable statement of opinion. *See* Compl. ¶ 123 (responding, when about Skechers' growth over "the next several years": "I think it's just more of the same. . . . We continue to grow in the U.S. by category expansion, shelf expansion, price point expansion. So I don't think anything changes significantly other than we continue to grow at a significant pace. . . . I don't know that things are changing as we go to the back half [of 2015.] We continue to grow and we continue to, I don't know, I'm sure we continue to grow our market cap. We'll see what happens when

11

we're here this time next year. Maybe $10 billion."). Plaintiff has not plausibly alleged that Weinberg did not believe what he was saying to be untrue or that the facts supplied in support of the opinion were untrue, and as described below, he did not omit information that makes the statement misleading to a reasonable investor.

Weinberg's remaining statements at the conference are inactionable puffery, as discussed above. *See id.* ¶ 125 (responding, when asked about Skechers' inventory planning: "[W]hen you grow at the pace we were growing and the demand keeps growing, you don't really have inventory issues. . . . The good news is we're growing at a faster pace than even our consumers around the world anticipate order [*sic*] for. I don't think it's changed very much."); *id.* ¶ 127 ("[W]e continue to be at the top end of where, we think we should be. And sell-throughs continue and acceptance continues, and we haven't seen any slowdown."); *id.* ¶ 129 (stating, when asked about Skechers' relationships with its large customers: "I think it's fair to say that those names you mentioned, like DSW and Shoe Carnival, our business grows, and if it wasn't growing there, it'll be very difficult for us to maintain the growth we've shown domestically.").

### 4. July 29, 2015 Press Release and Earnings Call

Next, the Court shall address alleged misstatements made during the July 29, 2015 press release announcing Skechers' results for the second quarter of 2015 and an accompanying earnings call with investors. Compl. ¶¶ 131–155. Like the April 22, 2015 press release, this press release contained a safe harbor statement that disclosed the same risks. July 29, 2015 Press Release at 2, ECF No. 67-2. In addition, a Skechers executive read aloud a safe harbor statement at the beginning of the earnings call which referred listeners to the company's SEC filings. July 22, 2015 Tr. at 3, ECF No. 67-6. The July 29, 2015 press release was filed with the SEC as a Form 8–K. *See* July 29, 2015 8–K Statement, *available at* https://investors.skechers.com/

financial-data/all-sec-filings/content/0001299933-15-001164/0001299933-15-001164.pdf (last visited September 23, 2019).

One of the statements made in the press release is inactionable puffery. *See* Compl. ¶ 131 ("The present has never looked as . . . successful thanks to our product and marketing, and resulting record sales, shipments, and earnings."). The remaining statements are forward looking and protected by the PSLRA's safe harbor provision. *See id.* ("The demand for Skechers footwear in markets worldwide continues, and . . . [w]e believe that our accelerated growth trend will remain through 2015 and into 2016."); *id.* ¶ 133 ("With increased year-over-year backlogs at the end of June, strong incoming order rates and July sales, as well as the positive sell-through reports from wholesale . . . we believe that we will continue to achieve new sales and profit records through 2015. . . . [W]e believe we are well prepared for our planned growth. We remain comfortable with the analysts' current consensus estimates for the back half of 2015.").[2]

As for the earnings call, like the April 22, 2015 earnings call, the majority of the alleged misstatements are forward-looking and accompanied by meaningful cautionary language, and are, therefore, protected by the PSLRA's safe harbor provision. *See id.* ¶¶ 138, 140, 144, 146, 154. Some of the remaining statements are inactionable opinions. *See id.* ¶ 142 (Weinberg stating "[w]e believe the increased inventory when compared to the prior-year period is appropriate based on our strong backlog and our forecasted revenues for the second half of 2015."); *id.* ¶ 150 (Weinberg stating that Skechers' strength "came from everywhere. . . . [L]ike I said in the prepared comments, every major division we had, had significant—had higher sales

---

[2] Plaintiff argues that with respect to this last statement, Weinberg "specifically affirmed analysts' consensus guidance for the back half of 2015," which "misleadingly assured the market that Skechers' accelerated revenue growth trend would continue." Pl. Mem. at 9. Although a company may be liable for false and misleading information in analysts' reports when it "adopt[s] or [place[s its] 'imprimatur' on the reports," this does not apply to "statements containing simple economic projections" or "expressions of optimism" such as Weinberg's statement in the press release here. *Novak v. Kasaks*, 216 F.3d 300, 314–15 (2d Cir. 2000).

13

and higher gross margins. I think that comes from being more efficient as we come through, not a lot of markdowns, not a lot of returns, not a lot of inefficiencies. . . . So when you put it all together, we had almost the perfect storm. I don't know that I would anticipate it continues forever because we will settle into a broader mix of footwear and fill-ins, not only new product, but it was a very good and very broad-based increase for us in the second quarter."). And with respect to the sole remaining statement—Weinberg stating that the second quarter benefitted from "a shift in back-to-school shipments due to increased demand in both domestic and international markets," *id.* ¶ 136—Plaintiff does not explain how the statement is false.

### 5. August 21, 2015 Press Release

Finally, the Court shall address alleged misstatements in a press release issued on August 21, 2015, announcing a stock split. Plaintiff alleges that Greenberg made two misstatements in the press release. *See* Compl. ¶ 170 ("Our decision to adopt this stock split is another indication of our confidence in our business model worldwide, which we believe will continue to generate profitable growth and strong cash flows."); *id.* ("Personally, I have never been more confident and excited about the future of Skechers."). The Court concludes that these general statements of optimism of are inactionable puffery.

In sum, Plaintiff has not alleged any actionable misstatements during the Class Period.

### 6. Alleged Omissions

Throughout the complaint, Plaintiff alleges that most of the allegedly false or misleading statements are actionable because Defendants failed to disclose certain information. *See* 17 C.F.R. § 240.10b–5(b) ("It shall be unlawful for any person . . . to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]").

First, Plaintiff alleges that a number of statements were rendered misleading because Defendants failed to disclose that approximately $20 million of orders from 3Q15[3] were pulled into 2Q15. Compl. ¶ 61; *see, e.g.*, *id.* ¶ 100 (alleging statement was "materially false and misleading when made because, based on industry norms, by approximately mid-April, Skechers would have already been informed by its Domestic Wholesale customers of their need to shift orders from 3Q15 to 2Q15 causing a $20 million revenue vulnerability in 3Q15."). However, months before Skechers released its Q315 earnings, Greenberg disclosed this very risk. *See id.* ¶ 144 ("It's very difficult to put a number on what was moved forward and not. If I had to guess, I would assume it was somewhere in the $15 million, $20 million range that normally would have gone into Q3."). *See Debora v. WPP Grp. PLC*, No. 91 Civ. 1775, 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994) ("A complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed."). The Court agrees with Defendants that it is implausible to allege that Defendants should have had the "laser-like precision necessary to forecast" a $20 million revenue shortfall earlier than that (and should have disclosed it), Def. Mem. at 20, ECF No. 68, especially in light of Plaintiff's allegation that Skechers could have received unexpected fill-in orders as late as "late-July or early-August," Compl. ¶ 45; *see also Gissin v. Endres*, 739 F. Supp. 2d 488, 501–02 (S.D.N.Y. 2010) ("Mere allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." (internal quotation marks and citation omitted)).

Plaintiff also alleges that Skechers received a "significant" number of order cancellations from May through July 2015, Compl. ¶ 63, which rendered a number of statements misleading, *see, e.g.*, *id.* ¶ 124 (alleging statement misleading because "Domestic Wholesale customers

---

[3] "3Q15" denotes the third quarter of 2015.

cancelled a significant amount of BTS orders beginning in late May 2015—meaning that the Company's sales had already begun to slow down and revenue would be impacted"). However, Plaintiff does not explain the magnitude of cancellations or how they compared to cancellations in other quarters, or explain how they affected the revenue shortfall in the third quarter. *See City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 414 (S.D.N.Y. 2011) ("Although the plaintiffs may not have needed to allege precise dollar values and dates, they were required to plead something more than a broad statement that was consistent with the [c]ompany's actual disclosures."). Accordingly, Plaintiff fails to meet Federal Rule of Civil Procedure 9(b)'s requirement that a Plaintiff alleging an omission must "explain why the statements were fraudulent." *Holbrook v. Trivago N.V.*, No. 17 Civ. 8348, 2019 WL 948809, at *17 (S.D.N.Y. Feb. 26, 2019) (internal quotation marks and citation omitted), *appeal filed*, No. 19-766 (2d Cir. Mar. 28, 2019).

Plaintiff also alleges that Skechers' knowledge of an impending growth slowdown rendered a number of statements about Skechers' Q3 growth and revenues materially misleading. The Court disagrees. Plaintiff claims that Skechers' strong personal relationships with management at the West Coast docks afforded Skechers a several months-long competitive advantage over rival companies when a dockworkers' labor dispute arose in late 2014, *id.* ¶¶ 4, 60, but that after the strike was called off in February 2015, Skechers should have known that it would likely face a decline in business, *id.* ¶¶ 58, 63. Skechers' knowledge of that impending decline, Plaintiff contends, made a number of statements about Skechers' Q3 growth and revenues materially misleading. *See, e.g.*, *id.* ¶ 100 (alleging Greenberg's statement on April 22,

16

2015[4] was misleading because he "would have also known (or recklessly disregarded) that when the port strike ended in February 2015, it was inevitable that Skechers' competitors would be able to get their own products through the ports, causing less demand for Skechers' products moving in to the BTS season").

The Court concludes, however, that Plaintiff's allegation that Skechers knew or should have known during the Class Period that the resolution of the labor dispute would have a material effect on Skechers' Q3 revenues is vague and conclusory. For one, the Court finds that the complaint states only the thinnest causal connection between the strike call-off and the slowdown in Skechers' business. *E.g.*, *id.* ¶ 63 ("[W]hen the strike was called off in late February 2015 and Skechers' competitors began receiving and shipping their merchandise to the wholesalers in late March and early April, Skechers' business began to slow down . . . ."). Moreover, even accepting a plausible causal connection, the information allegedly omitted from Skechers' statements would have been based on a forecast of potential future revenue shortfall, not on shortfall that had already occurred or necessarily would occur. *See id.* ¶ 60 ("While the strike ended in late February 2015, . . . it took some time for Skechers' competitors to actually receive and process their goods . . . . Once this time-consuming process was underway, around late March or early April, many of their competitors were able to ship their products around the country for delivery . . . ."). Given the lag between the end of the labor dispute and signs of Skechers' diminished growth, and the uncertainty of such a slowdown coming to pass, Plaintiff's allegation that Skechers failed to disclose information it "knew" prior to its revenue decline, *id.* ¶ 6, is conclusory. The Court holds that Plaintiff's allegations here, that Skechers' failure to

---

[4] The Court notes, however, that the Class Period began on April 23, 2015. Compl. ¶ 1. *See In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 17 (S.D.N.Y. 2016) (noting the "general rule that pre-Class Period statements are not actionable").

discuss the effects of the labor dispute during the Class Period rendered certain statements misleading, fail to meet Rule 9(b)'s heightened pleading standards.

Plaintiff also alleges that Defendants violated SEC Regulation S–K 229.303 ("Item 303"). Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Plaintiff alleges that Skechers' 1Q15 and 2Q15 Form 10-Qs, filed with the SEC on May 8 and August 10, 2015, respectively, violated Item 303 because they did not specifically disclose, the shift in sales from 3Q15 to 2Q15, Skechers' advantage from the looming dockworker strike coming to a close, and order cancellations, all of which affected 3Q15 growth. Compl. ¶¶ 119–121, 165–168.[5] However, these alleged effects on a single quarter's revenues do not constitute "trends" under Item 303. *See In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001); *see also Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) (citing *In re Turkcell* for the proposition that "[a]s a matter of law, a two[-]month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303").

Because Plaintiff has not alleged any actionable misstatements, the Section 10(b) claim fails at the first element, *Lentell*, 396 F.3d at 172. In any event, the Court is unpersuaded that Greenberg's sales are sufficient to meet the scienter requirement, the sole remaining disputed

---

[5] Defendants did disclose the following risk factors: "(1) our ability to sustain, manage and forecast our costs and proper inventory levels; (2) decreased demand by industry retailers; (3) our ability to predict our revenues, which have varied significantly in the past and can be expected to fluctuate in the future due to a number of reasons, many of which are beyond our control; and (4) sales levels during the spring, back-to-school and holiday selling seasons." Compl. ¶¶ 120, 166.

18

element.[6]  Either way, Plaintiff does not state a Section 10(b) claim.

B. Counts Two and Three: Sections 20(a) and 20A of the Exchange Act

Count Two is against the Individual Defendants for violations of Sections 20(a) of the Exchange Act. Compl. at 112. Count Three is against Greenberg for violation of Section 20A of the Exchange Act. *Id.* at 114. Under Section 20(a), "[e]very person who, directly or indirectly, controls any person liable [under the Exchange Act] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). Under Section 20A, "[a]ny person who violates [the Exchange Act] by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold." *Id.* § 78t-1(a).

These claims are dismissed because, as discussed, Plaintiff has failed to allege a primary violation of the Exchange Act. *See ATSI Commc'ns, Inc.*, 493 F.3d at 108 (Section 20(a)); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 704 (2d Cir. 1994) (Section 20A).[7]

---

[6] *Compare, e.g.*, *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558–59 (S.D.N.Y. 2010) (noting that defendant sold 97% of his shares and was motivated by potential $225 million payout in stock-price-dependent merger); *with* Compl. ¶¶ 212–213 (alleging that Greenberg sold approximately 16% of his shares in Skechers during the proposed Class Period). Moreover, Weinberg did not sell shares during the same period. The "failure of other defendants to sell their stock" undercuts Platiniff's scienter allegations. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001).

[7] Plaintiff argues that with respect to the Section 20A claim against Greenberg, "Defendants fail to address that Greenberg committed a predicate 'insider trading' violation of Section 10(b) by selling Skechers stock during the Class Period while knowingly in possession of material, non-public information concerning the Company." Pl. Mem. at 30. However, the caselaw is clear that the "conclusion that [a plaintiff] has not stated a claim under section 10(b) precludes relief under [Section 20A], as well." *Feiner Family Tr. v. VBI Corp.*, 352 F. App'x 461, 464 (2d Cir. 2009). The sole case Plaintiff cites is inapposite. Pl. Mem. at 30 (citing *Gruber v. Gilbertson*, No. 16 Civ. 9727, 2018 WL 1418188, at *15, *17 (S.D.N.Y. Mar. 20, 2018) (finding that a plaintiff had pleaded a predicate insider trading violation of the Exchange Act as required by Section 20A, but only after finding a Section 10(b) violation to have been sufficiently pleaded).

In their brief, Defendants seek dismissal of the complaint with prejudice. Def. Mem. at 2, 30. Plaintiff does not respond to this in his opposition. The Court notes that Plaintiff has already amended his complaint twice. *See* ECF Nos. 1, 51, 57. Plaintiff has indicated that the second amendment occurred after the exchange of pre-motion letters and included "new, particularized information that bears on both the falsity of Defendants' statements and their scienter." ECF No. 55 at 1. Accordingly, the complaint is dismissed with prejudice. *See Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 218 (2d Cir. 2010) (summary order) (affirming dismissal with prejudice when "[n]owhere in their opposition to the motion to dismiss did plaintiffs request leave to amend").

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the complaint with prejudice is GRANTED. The Clerk of Court is directed to terminate the motion at ECF No. 65, enter judgment for Defendants, and close the case.

SO ORDERED.

Dated: September 23, 2019
      New York, New York

_____
ANALISA TORRES
United States District Judge